

## The Office of Secretary of State

*Brad Raffensperger*
SECRETARY OF STATE

*Blake Evans*
DIRECTOR OF ELECTIONS

March 24, 2022

**VIA CERTIFIED MAIL**
**RETURN-RECEIPT REQUESTED**

**VIA EMAIL TO: Marjorie@Greene2020.com**

Marjorie Taylor-Greene
204 Woodglen Road SW
Rome GA 30165

Re:   Received Written Complaint to Challenge Candidate Qualifications,
Marjorie Taylor Greene for Georgia Congressional District 14.

Dear Congresswoman Greene:

On March 10, 2022, you submitted a Declaration of Candidacy and Affidavit for the office of Georgia's Congressional District 14. This letter serves to inform you that multiple electors have challenged your qualifications pursuant to Section Three of the Fourteenth Amendment to the United States Constitution. A copy of the written complaint is enclosed for your reference.

This matter has been referred to the Office of State Administrative Hearings ("OSAH") for review by an administrative law judge and an expedited hearing has been requested. Please direct any inquiries to OSAH with respect to a hearing:

225 Peachtree Street NE, Suite 400
4th Floor, South Tower
Atlanta, Georgia 30303
Telephone: 404-657-2800

Sincerely,

Steven A Ellis
Deputy General Counsel

Enclosures

Ex. A to Verified Complaint

STATE OF GEORGIA

BEFORE THE SECRETARY OF
STATE OF GEORGIA

|  |  |  |
|---|---|---|
| *In re* Challenge to | ) | |
| the constitutional qualifications of | ) | Notice of |
| Rep. Marjorie Taylor Greene | ) | Candidacy Challenge |
| | ) | |

## INTRODUCTION

1.     The Challengers in this action ("Challengers"), registered voters in the 14th Congressional District, submit this written complaint to Brad Raffensperger, Secretary of State of Georgia, alleging that Representative Marjorie Taylor Greene, a candidate for Georgia's 14th Congressional District, does not meet the federal constitutional requirements for a Member of the U.S. House of Representatives and is therefore ineligible to be a candidate for such office. As set forth below, after taking the oath to defend and protect the Constitution, before, on, and after January 6, 2021, Greene voluntarily aided and engaged in an insurrection to obstruct the peaceful transfer of presidential power, disqualifying her from serving as a Member of Congress under Section 3 of the 14th Amendment and rendering her ineligible under state and federal law to be a candidate for such office.

2.     Georgia requires that "[e]very candidate for federal and state office . . . shall meet the constitutional and statutory qualifications for the office being sought." O.C.G.A. § 21-2-5(a). When a challenger provides a "written complaint with the Secretary of State giving the reasons why the elector believes the candidate is not qualified to seek and hold the public office," the Secretary of State must request

Ex. A to Verified Complaint

a hearing before an Administrative Law Judge ("ALJ") of the Office of State Administrative Hearings ("OSAH") to determine whether the candidate is qualified for office. *Id.* § 21-2-5(b). In that hearing, the "entire burden is placed upon [the candidate] to affirmatively establish [their] eligibility for office." *Haynes v. Wells*, 273 Ga. 106, 108–09 (2000).

3.     Under Section Three of the Fourteenth Amendment to the U.S. Constitution, known as the Disqualification Clause, "No Person shall be a . . . Representative in Congress . . . who, having previously taken an oath, as a member of Congress . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same."

4.     Persons who trigger this provision are disqualified from congressional office, just as those who fail to meet the age or citizenship requirements of Article I, section 2 of the Constitution are disqualified from congressional office. "The oath to support the Constitution is the test. The idea being that one who had taken an oath to support the Constitution and violated it, ought to be excluded from taking it again, until relieved by Congress." *Worthy v. Barrett*, 63 N.C. 199, 204 (1869). Consequently, such persons do not "meet the constitutional . . . qualifications for holding the office being sought." O.C.G.A. § 21-2-5(a).

Ex. A to Verified Complaint

5.     After the Civil War, Georgia was readmitted to the Union on the condition that no one disqualified by Section Three would hold office.[1] In 1868, after thirty-three Black representatives were elected to the Georgia General Assembly, the Assembly refused to seat them and replaced them with white candidates, some of whom had served in the Confederacy. After President Grant asked Congress to take action to enforce "the third clause of the fourteenth amendment," Congress intervened, ultimately (with the eventual assistance of the U.S. Army) removing the ineligible lawmakers.[2]

6.     An "insurrection" or "rebellion" under the Disqualification Clause includes actions against the United States with the intent to overthrow the government of the United States or obstruct an essential constitutional function. The events of January 6, 2021, amounted to an insurrection or a rebellion under Section Three: a violent, coordinated effort to storm the Capitol to prevent the Vice President of the United States and the United States Congress from fulfilling their constitutional roles by certifying President Biden's victory, and to illegally extend

---

[1] 40 Cong. Ch. 70, 15 Stat. 73 (1868) ("no person prohibited from holding office under the United States . . . by section three of the proposed amendment to the Constitution of the United States, known as article fourteen, shall be deemed eligible to any office in [any] of said States, unless relieved from disability as provided by said amendment").

[2] Gerard Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87, 98–99 (2021).

Ex. A to Verified Complaint

then-President Trump's tenure in office, including by illegally introducing illegitimate electors as "alternate slates" for Congress to vote on.[3]

7.      Under Section Three, to "engage" merely requires "a voluntary effort to assist the Insurrection . . . and to bring it to a successful [from insurrectionists' perspective] termination"). *United States v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871); *Worthy v. Barrett*, 63 N.C. 199, 203 (1869) (in leading national precedent, defining "engage" under Section Three to mean "[v]oluntarily aiding the rebellion, by personal service, or by contributions, other than charitable, of any thing that was useful or necessary").

8.      Planning or helping plan an insurrection or rebellion satisfies that definition. So does planning a demonstration or march upon a government building that the planner knows is substantially likely to (and does) result in insurrection or rebellion, as it constitutes taking voluntary steps to contribute, "by personal service," a "thing that was useful or necessary" to the insurrection or rebellion. And knowing that insurrection or rebellion was likely makes that aid voluntary.

---

[3] The available evidence suggests that then-President Trump and those who facilitated his efforts were simultaneously engaged in multiple attempts to overturn the election results. *See* Rosalind S. Helderman, *All the ways Trump tried to overturn the election – and how it could happen again*, Wash. Post (Feb. 9, 2022) https://www.washingtonpost.com/politics/interactive/2022/election-overturn-plans/. By January 5, their plans included introducing the existing illegal slates of electors, having Pence declare the election in dispute, giving more time for state legislatures to elect new slates of electors, and/or having Pence simply declare Trump the winner. Crucially, they all hinged on Pence's cooperation. Once he signaled he would not voluntarily cooperate, some other mechanism of delay—such as a violent attack on the Capitol—became necessary.

Ex. A to Verified Complaint

9.      As described below, the pre-attack demonstration at the Ellipse and related march on the U.S. Capitol, and their endorsement by prominent House Members (including Representative Greene), Senators, and the incumbent President, led directly, intentionally, and foreseeably to the insurrectionists' violent assault on the Capitol.[4]

10.      The evidence shows that Representative Greene encouraged and was otherwise involved in efforts to intimidate Congress and the Vice President into rejecting valid electoral votes and subvert the essential constitutional function of an orderly and peaceful transition of power. She was involved in either planning the attack on January 6, or alternatively the planning of the pre-attack demonstration and/or march on the Capitol with knowledge that it was substantially likely to lead to the attack, and otherwise voluntarily aided the insurrection.

11.      As set forth in more detail below, Representative Greene promoted the demonstration ahead of time, declaring that it was "our 1776 moment" on an interview the day before. Furthermore, the planners of the January 6 demonstration report that she met with them beforehand. The stated goal of the organizers was to pressure Vice President Pence into disregarding the electoral votes from several states and declaring Trump the winner of the 2020 election. The likelihood of violence during the implementation of this plan was plain to bystanders and probably more so to those intimately involved. Before the

---

[4] This candidacy challenge uses the term "insurrectionists" without prejudice as to whether the events of January 6 may also constitute a "rebellion" within the meaning of the Disqualification Clause.

Ex. A to Verified Complaint

demonstration, violent groups announced they were going to attend it. Plans for

violence—and specifically occupying the Capitol to prevent the certification vote or

violently influence its outcome—were so prevalent that one reporter has remarked

that "[a]nyone with a Twitter account and an hour of time to kill could have

warned about the potential for violence on Jan. 6—and many did."[5] Furthermore,

the insurrection was in part motivated by a desire to prevent the certification in

order to send false electoral slates to Congress—an effort Greene endorsed and

promoted.

12.    Representative Greene has a history, leading up to and continuing

after her swearing-in as a Member of the U.S. House of Representatives, of

advocating for political violence. She has also made supportive statements about

the insurrectionists who stormed the Capitol, describing them as "patriots," while

falsely claiming that the violence at the Capitol was perpetrated by "antifa"

infiltrators or the FBI.

---

[5] Quinta Jurecic, *Why Didn't the FBI Review Social Media Posts Announcing Plans for the Capitol Riot?*, Lawfare (June 29, 2021), https://www.lawfareblog.com/why-didnt-fbi-review-social-media-posts-announcing-plans-capitol-riot; *see also* Brandy Zadrozny & Ben Collins, *Violent threats ripple through far-right internet forums ahead of protest*, NBC News (Jan. 5, 2021), https://www.nbcnews.com/tech/internet/vio.lent-threats-ripple-through-far-right-internet-forums-ahead-protest-n1252923; Craig Timberg & Drew Harwell, *Pro-Trump forums erupt with violent threats ahead of Wednesday's rally against the 2020 election*, Wash. Post. (Jan. 5, 2021), https://www.washingtonpost.com/technology/2021/01/05/parler-telegram-violence-dc-protests/; Martha Mendoza & Juliet Linderman, *Officers maced, trampled: Docs expose depth of Jan. 6 chaos*, AP News (Mar. 10, 2021), https://bit.ly/3F2Hi26.

Ex. A to Verified Complaint

13.    Collectively, Greene's actions and the events of January 6 provide, at a minimum, a prima facie case that under the Disqualification Clause, she is constitutionally disqualified from congressional office and, as such, ineligible to run as a candidate under state and federal law.

## STATUTORY BACKGROUND

14.    Under Georgia law, "any elector who is eligible to vote for a candidate may challenge the qualifications of the candidate by filing a written complaint with the Secretary of State giving the reasons why the elector believes the candidate is not qualified to seek and hold the public office for which he or she is offering." O.C.G.A. § 21-2-5(b). This includes the "constitutional . . . qualifications for holding the office being sought." *Id.* § 21-2-5(a); *see also id.* § 21-2-153(e)(7) (requiring candidates to file and affidavit that they are "eligible to hold such office."). Furthermore, Georgia has heard federal constitutional challenges to federal candidates in the past. *See, e.g.*, *Farrar v. Obama*, No.1215136-60-Malihi (Ga. Off. State Admin. Hearings Feb. 3, 2012). Once this written complaint is issued, the Secretary of State must notify the candidate and call a hearing before an ALJ. O.C.G.A. § 21-2-5(b). The Secretary has no discretion in calling such a hearing. *See, e.g.*, *Farrar*, No.1215136-60-Malihi, at *2.

15.    The Secretary has thirty days from the receipt of the challenge to call a hearing. O.C.G.A. § 50-13-41(a)(1).

16.    The hearing before the ALJ mirrors a trial court hearing: notice is required and both parties have a right to "be represented by legal counsel and to respond and present evidence on all issues involved," to request subpoenas, and to

Ex. A to Verified Complaint

take testimony by deposition. O.C.G.A. §§ 50-13-13(a)(1)-(7). The ALJ has similar powers to a trial court judge, including the power to find parties in contempt for not adhering to court orders. *Id.* §§ 50-13-41(a)(2)–(4), (b).

17.     At the ALJ hearing, the "entire burden is placed upon [the candidate] to affirmatively establish [their] eligibility for office." *Haynes*, 273 Ga. at 109. One of the qualifications for membership in the House is that candidates have not, after taking an oath to support the constitution, "engaged in insurrection or rebellion." U.S. Const. amend. XIV, § 3. The burden of proof in a candidate challenge is by preponderance of the evidence. *See, e.g.*, *Harvey v. Austin*, No. 1638942-11-Miller, at *7-8 (Ga. Off. State Admin. Hearings Apr. 16, 2020).[6]

18.     The ALJ will have thirty days after the close of the record to issue a decision on both findings of fact and conclusions of law. O.C.G.A. § 50-13-41(c). The Secretary then has thirty days to make a final decision "determin[ing] if the candidate is qualified to seek and hold the public office for which such candidate is offering." *Id.* § 21-2-5(c). The Secretary must give "due regard" to the ALJ's decision. *Id.* § 50-13-41(d)(2). If he fails to take an action, the ALJ's decision will be implemented by default. *Id.* § 50-13-41(d)(3).

19.     If the Secretary determines that the candidate is not qualified, he "shall withhold the name of the candidate from the ballot or strike such candidate's name from the ballot if the ballots have been printed. If there is insufficient time to

---

[6] http://administrativelawreport.com/wp-content/uploads/gravity_forms/7-4290b068ac7052f5d7bce1ca986eb4ee/2016/05/Austin-1638942-ELE.pdf.

Ex. A to Verified Complaint

strike the candidate's name or reprint the ballots, a prominent notice shall be placed at each affected polling place advising voters of the disqualification of the candidate and all votes cast for such candidate shall be void and shall not be counted." *Id.* § 21-2-5(c).

20. The Secretary's decision can be appealed to the Superior Court of Fulton County "within ten days" of the issuance of the decision. O.C.G.A. § 21-2-5(e). The decision of the Superior Court is appealable directly to the Georgia Supreme Court, which has exclusive appellate jurisdiction over candidate challenges. *Burgess v. Liberty Cty. Bd. of Elections*, 291 Ga. 802, 803 (2012) (citing *Cook v. Bd. of Registrars of Randolph Cty.*, 291 Ga. 67, 70–71 (2012)) (candidate challenges are "election contests"); Ga. Const. art. VI, § 6, ¶ II (the Georgia Supreme Court has exclusive jurisdiction over "election contest[s]").

## FACTUAL BACKGROUND

21. Public reports and publicly available evidence support the following.

22. Representative Greene has a long history of advocating for violence against her political opponents and endorsing wildly false claims against them.[7] Many remarks mirror and anticipate the particular violence that would occur on January 6. For instance, in response to a call in 2018 to hang former President Obama and Secretary of State Clinton, Greene responded "Stage is being set. Players are being put in place. We must be patient. This must be done perfectly or

---

[7] Brian Slodysko, *A look at Rep. Marjorie Taylor Greene's past incendiary statements and social media posts*, Chicago Tribune (Feb. 4, 2021), https://www.chicagotribune.com/nation-world/ct-aud-nw-marjorie-taylor-greene-social-media-statements-20210204-cihvw64f5vdodm7ni72svunnui-story.html.

Ex. A to Verified Complaint

liberal judges would let them off."[8] On January 7, 2019, she advocated for exactly what would happen two years later: "If we have a sea of people shut down the streets . . . flood the Capitol building, flood all of the government buildings, go inside these are public buildings we own them."[9] In January 2019 she argued that Speaker Pelosi

> took an oath to protect American citizens and uphold our laws. And she gives aid and comfort to our enemies who illegally invade our land. That's what treason is. And by our law representatives and senators can be kicked out and no longer serve in our government. And it's, uh, it's a crime punishable by death is what treason is. Nancy Pelosi is guilty of treason.[10]

And in February 2019, from inside Pelosi's office, Greene posted a live broadcast arguing that Pelosi will "suffer death or she'll be in prison" and suggested Representative Waters was "just as guilty of treason as Nancy Pelosi."[11]

23.    On October 27, 2020, while running for Congress, Greene posted a video arguing that "[i]f this generation doesn't stand up and defend freedom, it's

---

[8] Em Steck & Andrew Kaczynksi, *Marjorie Taylor Greene indicated support for executing prominent Democrats in 2018 and 2019 before running for Congress*, CNN (Jan. 26, 2021), https://www.cnn.com/2021/01/26/politics/marjorie-taylor-greene-democrats-violence/index.html.

[9] Roger Sollenberger, *In 2019, Marjorie Taylor Greene told protesters to "flood the Capitol," feel free to use violence*, Salon (Feb. 2, 2021), https://www.salon.com/2021/02/02/in-2019-marjorie-taylor-greene-told-protesters-to-flood-the-capitol-feel-free-to-use-violence/.

[10] Em Steck & Andrew Kaczynksi, *Marjorie Taylor Greene indicated support for executing prominent Democrats in 2018 and 2019 before running for Congress*, CNN (Jan. 26, 2021) https://www.cnn.com/2021/01/26/politics/marjorie-taylor-greene-democrats-violence/index.html.

[11] Em Steck & Andrew Kaczynksi, *Marjorie Taylor Greene indicated support for executing prominent Democrats in 2018 and 2019 before running for Congress*, CNN (Jan. 26, 2021) https://www.cnn.com/2021/01/26/politics/marjorie-taylor-greene-democrats-violence/index.html.

Ex. A to Verified Complaint

gone. And once it's gone, freedom doesn't come back by itself. The only way you get your freedoms back is it's earned with the price of blood."[12]

24.    After the 2020 election, Greene posted on social media almost every day between November 4, 2020, and January 6, 2021, falsely insisting that Trump had won the election, warning of dire consequences if he was not installed, and/or urging people to "fight" for Trump.[13]

25.    These statements were made in support of a larger movement, often using the slogan "Stop the Steal," that advances and promotes the false claim that Donald Trump won the 2020 election. Beginning in November 2020, various persons associated with the movement attempted to block the certification of President-elect Biden's victory with dozens of lawsuits. None succeeded, and all were found to be baseless.[14]

26.    After litigation failed, some within this larger movement accepted that they had exhausted their legal options for challenging the results of the presidential election.[15]

---

[12] Representative Zoe Lofgren, *Georgia Social Media Review* 22 (2021), https://lofgren.house.gov/sites/lofgren.house.gov/files/Georgia2.pdf.
[13] Rep. Lofgren, *Georgia Social Media Review*, at 22–71.
[14] Jacob Shamisian & Sonam Sheth, *Trump and his allies filed more than 40 lawsuits challenging the 2020 election results. All of them failed*, Business Insider (Feb. 22, 2021), https://bit.ly/3mZYfEf.
[15] Colin Dwyer, *After Supreme Court Defeat, Trump's Backers In Congress Are Quiet On What Comes Next*, NPR (Dec. 12, 2020), https://n.pr/32ybK7f; Rep. Bruce Westerman (@RepWesterman), Twitter (Dec. 11, 2020, 8:49 PM), https://bit.ly/3eFkZ7S.

Ex. A to Verified Complaint

**The Unconstitutional Scheme to Overturn the 2020 Election Results**

27.    Others, however, followed Greene's lead and turned to extralegal plans. They formulated an unconstitutional scheme to subvert the constitutional process of counting the electoral votes in Congress, preventing President-elect Biden from being sworn in as President. Leaders of this scheme—including then-President Trump, certain Members of Congress, and others outside government—focused on January 6, the day that Congress counts the presidential electors' votes, as an opportunity to prevent Congress from certifying Biden's victory.[16]

28.    Under the provisions of the Twelfth Amendment to the U.S. Constitution and the Electoral Count Act, 3 U.S.C. §§ 15 et seq., the votes of presidential electors are officially counted as follows. At 1:00 p.m. on January 6 of the year following a presidential election, the U.S. Senate and the U.S. House of Representatives meet jointly in the House Chamber, with the Vice President of the United States (in his capacity as President of the Senate) presiding. Beginning with Alabama, and proceeding alphabetically, the Vice President opens each state's certificate of the votes of its electors, and calls for objections, if any. Any objection must be filed by at least one Senator and at least one Member of the House. These objections are then voted upon separately by the House and Senate.[17]

29.    The Electoral Count Act provides that, if a state has submitted only one return of electoral votes, and if the electoral votes were "regularly given by

---

[16] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[17] 3 U.S.C. § 15; U.S. Const. amend. XII.

Ex. A to Verified Complaint

electors whose appointment has been lawfully certified," then Congress *cannot* reject those electoral votes.[18]

30.     The Electoral Count Act provides two scenarios in which, theoretically, Congress can reject electoral votes. First, "the two Houses concurrently" may reject one or more electoral votes from a state when both Houses "agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified." Second, if a state submits *multiple* conflicting returns of its electoral votes, the Act contains procedures for determining which return prevails.[19]

31.     After the 2020 election, no lawful procedure under the Electoral Count Act could prevent the counting of electoral votes from the states where President-elect Biden had won the election. None of those states had submitted multiple competing electoral tallies to Congress, notwithstanding attempts to create "alternate slates," described below. And it was generally understood that there were insufficient votes in the U.S. House of Representatives to reject as not "regularly given" the electoral votes from any state, let alone to reject enough electoral votes to change the outcome to anything other than a Biden victory.[20]

32.     Since no *lawful* procedure under the Electoral Count Act could prevent the counting of electoral votes from the states where President-elect Biden had won the election, leaders of the scheme to subvert the counting of the votes developed

---

[18] 3 U.S.C. § 15.

[19] *Id.*

[20] Joseph Choi, *Pelosi sets up call on election challenge: 'No situation matches Trump presidency,'* The Hill (Jan. 3, 2021), https://bit.ly/32F5CtP.

Ex. A to Verified Complaint

*unlawful* stratagems by which Vice President Pence would refuse to recognize the votes of electors from certain states that Trump had lost, thus leading to a Trump "victory" in Congress.[21] However, these plans relied on cooperation from sympathetic members of Congress and, crucially, Vice President Pence. The plans centered on Pence abusing the Vice President's ceremonial duty to "open all the certificates" of state electoral votes as a pretext to unilaterally *reject* votes.[22]

33.    Key leaders and participants in the larger scheme developed plans to pressure or intimidate Congress and Pence into cooperating—and, if that failed, to obstruct the electoral count certification.[23] Obstructing electoral count certification would have also "bought time" for another strategy: to introduce fake electoral votes. In December 2020 Trump, along with key allies, devised a plan to create

---

[21] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y; *READ: Trump lawyer's full memo on plan for Pence to overturn the election*, CNN (Sept. 21, 2021), https://cnn.it/3qldg4p. As discussed further below, a contingency plan was for Pence to simply recognize the "alternate slates" of fake electors on January 6 and declare Trump the winner. Rosalind S. Helderman, *All the ways Trump tried to overturn the election – and how it could happen again*, Wash. Post (Feb. 9, 2022) https://www.washingtonpost.com/politics/interactive/2022/election-overturn-plans/.

[22] U.S. Const. amend. XII.

[23] *See, e.g., Trump pressures Pence to throw out election results — even though he can't*, Politico (Jan. 5, 2021), https://politi.co/3961iTx; *READ: Trump lawyer's full memo on plan for Pence to overturn the election,* CNN (Sept. 21, 2001), https://cnn.it/3qldg4p; *Ahead of Jan. 6, Willard hotel in downtown D.C. was a Trump team 'command center' for effort to deny Biden the presidency*, Wash. Post (Oct. 23, 2021), https://wapo.st/3pOUPpL; *'A roadmap for a coup': inside Trump's plot to steal the presidency*, The Guardian (Oct. 30, 2021), https://bit.ly/31q0MjJ; United States v. Greene, No. 21-CR-52, Statement of Offense, ¶¶ 29-31 (D.D.C. Dec. 22, 2021), https://www.justice.gov/usao-dc/press-release/file/1458266/download; *see also infra* note 36.

Ex. A to Verified Complaint

"alternate slates" of electors.[24] These electors met on the same day as the real electors and the conspirators prepared, as needed, to introduce them on or after January 6.[25] Representative Greene commended this meeting when it occurred in December, announcing in a written a statement that "[t]he Republican slate of electors in our great state of Georgia showed unprecedented courage in casting their votes for the rightful winner of Georgia, President Donald Trump."[26] This effort to produce "alternate" electors has been described in a recent brief by the U.S. Congress's Select Committee to Investigate the January 6th Attack on the United States Capitol as a criminal conspiracy to defraud the United States.[27]

34.    To further their scheme to overturn the presidential election results, in December 2020 and January 2021, organizers associated with a group called "Women for America First" planned a "Save America" demonstration in Washington, D.C. on January 6 to coincide with, and seek to block, the certification of electoral votes. At this demonstration, they planned to push false claims of massive voter fraud and to pressure then-Vice President Pence to refuse to count slates of electors from states with close contests.[28]

---

[24] Luke Broadwater, *Jan. 6 Inquiry Subpoenas 6 Tied to False Pro-Trump Elector Effort*, N.Y. Times (Feb. 15, 2022), https://www.nytimes.com/2022/02/15/us/politics/jan-6-subpoenas-trump.html.
[25] *Id.*
[26] Rep. Lofgren, *Georgia Social Media Review*, at 50.
[27] *See generally* Def.'s Br. in Opp. to Pl.'s Privilege Assertions, Eastman v. Thompson, ECF No. 160, No. 22-cv-00099-DOC-DFM (C.D. Cal.. March 8, 2022).
[28] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y; *see also supra* note 23.

Ex. A to Verified Complaint

35.     The organizers of the demonstration were in close contact with several Members of Congress or their staff during this time regarding the details of the demonstration, including Representative Greene or her staff.[29] Those same organizers were also in touch with White House staff about the demonstration.[30] In addition, those organizers had planned and promoted events that devolved into violence in November and December. Specifically, the group promoted the November 14 "Million MAGA March" in D.C. that left one person stabbed and several arrested; a demonstration on December 6, 2020 in Des Moines where a pro-Trump attendee shot into a car of teenage girls; and a December 12 demonstration in D.C. where several were stabbed and one person was arrested.[31]

36.     Organizers' plans for January 6 also included a march on the U.S. Capitol while Congress was counting electoral votes.[32]

---

[29] Hunter Walker, *Jan. 6 Protest Organizers Say They Participated in 'Dozens' of Planning Meetings With Members of Congress and White House Staff*, Rolling Stone (Oct. 24, 2021), https://bit.ly/3HB2Nc4.
[30] *Id.*
[31] *See* DFRLab, *#StopTheSteal: Timeline of Social Media and Extremist Activities Leading to 1/6 Insurrection*, Just Security (Feb. 10, 2021), https://www.justsecurity.org/74622/stopthesteal-timeline-of-social-media-and-extremist-activities-leading-to-1-6-insurrection/; *see also* Marissa J. Lang et al, *After thousands of Trump supporters rally in D.C., violence erupts when night falls*, Wash. Post (Nov. 15, 2020), https://www.washingtonpost.com/dc-md-va/2020/11/14/million-maga-march-dc-protests/; Des Moines Register, *Man charged with 5 new felonies in Iowa Trump rally shooting*, (Jan. 19, 2021), https://bit.ly/3isXp0f; Mark Osborne, *4 stabbed in skirmishes at DC protests, while 1 person shot at clashes in Washington state*, ABC News (Dec. 13, 2020), https://abcnews.go.com/US/shot-competing-protesters-clash-washington-state/story?id=74697209.
[32] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.

Ex. A to Verified Complaint

37.    On December 19, 2020, then-President Trump endorsed the demonstration, claiming it would be "wild."[33] That same day, Greene tweeted a news story about Trump's promotion of the demonstration and added that she was "planning a little something on January 6th as well."[34] Given that Greene had already announced her plans to object to Biden's certification,[35] this sly reference to a "little something" had to be something else—and given her well documented history of advocating violence against her political opponents, the "little something" would be easily understood as unlawful action to ensure the continuation of Trump's presidency. Similarly, Trump's nearly simultaneous call for a "wild" protest was widely understood to be a coded call for violence by Trump supporters. On social media, his supporters openly called for weapons to be carried into the District of Columbia, for law enforcement to be murdered if they interfered, and for supporters to storm the Capitol to prevent the certification of President-elect Biden's victory.[36]

---

[33] *Id.*
[34] Rep. Lofgren, *Georgia Social Media Review*, at 53.
[35] Rep. Lofgren, *Georgia Social Media Review*, at 49.
[36] Brandy Zadrozny & Ben Collins, *Violent threats ripple through far-right internet forums ahead of protest*, NBC News (Jan. 5, 2021), https://www.nbcnews.com/tech/internet/vio.lent-threats-ripple-through-far-right-internet-forums-ahead-protest-n1252923; *see also* Dan Barry & Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date*, N.Y. Times (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html; Ryan Goodman & Justin Hendrix, *The Absence of "The Donald,"* Just Security (Dec. 6, 2021), https://bit.ly/3sRenLY.

Ex. A to Verified Complaint

38.    Greene promoted the demonstration with a Twitter post on December 19, 2020,[37] tweeted for her supporters to "HOLD THE LINE on Jan. 6"[38] on December 20, and met with President Trump on December 21 to discuss the plan to object to the 2020 election results.[39] In a now-deleted video preserved and re-posted by others, Greene insisted (after urging her supporters to come to D.C. on January 6) that "[w]e aren't a people that are going to go quietly into the night. We are not a people that are going to be thrust into socialism, without stopping it."[40]

39.    In another video preserved and re-posted by others, Representative Greene explicitly rejected the peaceful transfer of power:

> You can't allow it to just transfer power "peacefully" like Joe Biden wants and allow him to become our president because he did not win this election. He's guilty of treason. It's a crime punishable by death is what treason is. Nancy Pelosi is guilty of treason.[41]

40.    On January 3, 2021, pursuant to Article VI of the U.S. Constitution, Greene swore an oath of office to uphold and protect the Constitution.

41.    On that same day, it was reported that Trump and his associates in the movement to overturn the 2020 election had begun to use extralegal and

---

[37] Rep. Lofgren, *Georgia Social Media Review*, at 54.
[38] Rep. Lofgren, *Georgia Social Media Review*, at 55.
[39] Rep. Lofgren, *Georgia Social Media Review*, at 56.
[40] Scott Dworkin (@funder), Twitter (Oct. 25, 2021 11:51 p.m.) https://twitter.com/funder/status/1452845224410112005.
[41] CNN, Transcripts (Jan. 31, 2021), http://edition.cnn.com/TRANSCRIPTS/2101/31/cnr.06.html; Scott Dworkin (@funder), Twitter, https://twitter.com/funder/status/1357394672436600833 (Feb. 4, 2021, 1:24 p.m.), Facebook, https://www.facebook.com/watch/?v=497120431452741 (Mar. 24, 2021). Greene used her fingers to imitate quotation marks when she said "peacefully."

Ex. A to Verified Complaint

unlawful tactics, as Trump and Meadows attempted to intimidate Georgia Secretary of State Raffensperger into fabricating votes and declaring Trump the winner of Georgia's presidential election.[42]

42.    On January 5, 2021, Pence informed Trump that he did not have the authority to unilaterally reject electoral votes and consequently would not do so. This was widely and publicly reported that same day.[43] Nonetheless, Greene insisted that the following day would be "our 1776 moment!"[44] and that "the people will remember the Patriots who stood for election integrity."[45]

43.    "1776" was used as a codeword for violence in the run-up to January 6. For instance, Ali Alexander, a violent extremist who listed Representative Greene as a speaker at his January 6 event,[46] and referred to Greene as a "friend,"[47] replied to a Tweet by Greene on December 30, 2020, promising that "1776 is

---

[42] Michael D. Shear & Stephanie Saul, *Trump, in Taped Call, Pressured Georgia Official to 'Find' Votes to Overturn Election*, N.Y. Times (Jan. 3, 2021), https://nyti.ms/3mUVQef.

[43] Kaitlan Collins & Jim Acosta, *Pence informed Trump that he can't block Biden's win*, CNN (Jan. 5, 2021), https://cnn.it/3FH4gx9.

[44] Rep. Lofgren, *Georgia Social Media Review*, at 69.

[45] Rep. Lofgren, *Georgia Social Media Review*, at 71.

[46] Wild Protest, *Speakers*, archived at Internet Archive Wayback Machine, https://bit.ly/3L8GnRd (last accessed Mar. 22, 2021).

[47] Andrew Kaczynksi & Em Steck, *Videos show 'Stop the Steal' rally organizer saying he would work with extremist groups*, CNN (Jan. 22, 2022), https://cnn.it/3ufNG2Q.

Ex. A to Verified Complaint

*always* an option" if objections to certification were blocked.[48] The responses

indicate it was understood as a call to storm the Capitol.[49]

44.    Alexander increasingly used references to "1776" between December 30

and January 6 as a call for violence if Trump was not installed as president for

another four years.[50] By this time, it was well known that events Alexander

planned and promoted developed into violence.[51] Similarly, Enrique Tarrio, until

recently the leader of the "Proud Boys," had on hand a detailed plan for the far-

right extremist group to distract police, swarm federal buildings, and obstruct their

functioning. The title of the document describing the plan was "1776 Returns."[52]

45.    Greene's references to "1776," made two days after she took the oath to

uphold and protect the Constitution, had a specific meaning to her intended

audience, when taken in the context of her well-known history of advocating

political violence, the widespread use of "1776" by violent extremists as a codeword

for violence and for storming government buildings, and the widespread reports of

---

[48] Because Alexander's Twitter account has been suspended, only image captures
remain. *E.g.,* Onesecondname (@onesecondname), Twitter (Dec. 31, 2020, 10:56
a.m.), https://twitter.com/Onesecondname/status/1344673792010768385.
[49] *Id.*
[50] Will Sommer, *'Stop the Steal' Organizer in Hiding After Denying Blame for Riot*,
Daily Beast (Jan. 10, 2021), https://www.thedailybeast.com/stop-the-steal-organizer-
in-hiding-after-denying-blame-for-riot.
[51] DFRLab, *#StopTheSteal: Timeline of Social Media and Extremist Activities
Leading to 1/6 Insurrection*, Just Security (Feb. 10, 2021) (finding that the rallies
Alexander promoted or helped plan devolved into violence, including the November
14 "Million MAGA March" and the December 12 demonstration, both in D.C.),
https://www.justsecurity.org/74622/stopthesteal-timeline-of-social-media-and-
extremist-activities-leading-to-1-6-insurrection/.
[52] Alan Feuer, *Document in Jan. 6 Case Shows Plan to Storm Government
Buildings*, N.Y. Times (Mar. 14, 2022), https://nyti.ms/3L3yVqC.

Ex. A to Verified Complaint

planned violence on the Capitol. Specifically, her remarks had the intent and effect of signaling to her supporters that she was calling not for peaceful protest, but for violent resistance, to a peaceful transfer of power to the president-elect, in defiance of the Constitution.

### The Events of January 6, 2021

46.    The morning of January 6, Greene announced that "Congress is the last line of defense from a stolen election."[53]

47.    At the rally Greene had helped organize and promote, speakers included Trump's lawyer, Rudy Giuliani, who called for "trial by combat,"[54] and Rep. Mo Brooks of Alabama, who urged the crowd to "start taking down names and kicking ass" and be prepared to sacrifice their "blood" and "lives" and "do what it takes to fight for America" by "carry[ing] the message to Capitol Hill," since "the fight begins today."[55]

48.    Around 12:00 pm, then-President Trump began speaking about how "we will stop the steal."[56] Seven minutes into his speech, the crowd was chanting "Fight for Trump!" About 16 minutes into his speech, he said, "[a]fter this, we're going to walk down and I'll be there with you. We're going to walk down. We're going to walk down any one you want, but I think right here. We're going walk

---

[53] Rep. Lofgren, *Georgia Social Media Review*, at 72.

[54] Wash. Post, *Trump, Republicans incite crowd before mob storms Capitol*, YouTube (Jan. 6, 2021), https://youtu.be/mh3cbd7niTQ.

[55] The Hill, *Mo Brooks gives FIERY speech against anti-Trump Republicans, socialists*, YouTube (Jan. 6, 2021), https://youtu.be/ZKHwV6sdrMk.

[56] *Donald Trump Speech "Save America" Rally Transcript January 6*, Rev (Jan. 6, 2021), https://bit.ly/3GheZid; Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://n.pr/3G1K2ON.

Ex. A to Verified Complaint

down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women. We're probably not going to be cheering so much for some of them because you'll never take back our country with weakness. You have to show strength, and you have to be strong."[57] At about this point, 10,000-15,000 demonstrators began the roughly 30-minute march to the Capitol, where they joined a crowd of 300 members of the violent extremist group "Proud Boys."[58]

49.     Around 1:00 p.m.—just as Congress had begun the process of jointly counting the electoral votes—then-President Trump ordered the remaining crowd to "walk down Pennsylvania Avenue . . . we are going to the Capitol."[59] At around that time, Trump supporters attacked police protecting the barricades surrounding the Capitol.[60] As Trump ended his speech, a large portion of the crowd began their 30-minute march to the Capitol.[61] By 1:30 p.m., law enforcement retreated as insurrectionists scaled the walls of the Capitol. Many were armed with weapons, pepper spray, and tasers. Some wore full body armor; others carried homemade shields. Many used flagpoles, signposts, or other weapons to attack police officers defending the Capitol.[62]

---

[57] *Id.*

[58] Martha Mendoza & Juliet Linderman, *Officers maced, trampled: Docs expose depth of Jan. 6 chaos*, AP News (Mar. 10, 2021), https://bit.ly/3F2Hi26.

[59] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.

[60] *Id.*

[61] Kat Lonsdorft et al., *A timeline of how the Jan. 6 attack unfolded — including who said what and when*, NPR (Jan. 5, 2022), https://n.pr/3ztHpmo.

[62] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.

Ex. A to Verified Complaint

50.     Because certain Members of Congress—including Greene—had filed objections to Arizona's slate of electors, by this time the joint counting session had been suspended and the House and Senate were debating the objections separately.[63]

51.     By 2:00 p.m., the Capitol had been breached by insurrectionists, smashing through first-floor windows. Over the next two hours, hundreds of insurrectionists stormed the Capitol, attacking police with weapons and pyrotechnics. One police officer was crushed against a door, screaming in agony as the crowd chanted "Heave, ho!"[64] An attacker ripped off the officer's gas mask, beat his head against the door, took his baton, and hit his head with it.[65] Another officer was pulled into a crowd, beaten and repeatedly Tased by insurrectionists.[66] One of the insurrectionists in the Capitol was longtime Greene associate and ally Anthony Aguero.[67]

---

[63] *Id.*

[64] Kelsie Smith & Travis Caldwell, *Disturbing video shows officer crushed against door by mob storming the Capitol*, CNN (Jan. 9, 2021), https://cnn.it/3eAmdSc.

[65] Clare Hymes & Cassidy McDonald, *Capitol riot suspect accused of assaulting cop and burying officer's badge in his backyard*, CBS News (Mar. 13, 2021), https://cbsn.ws/3eFAaxS.

[66] Michael Kaplan & Cassidy McDonald, *At least 17 police officers remain out of work with injuries from the Capitol attack,* CBS News (June 4, 2021), https://cbsn.ws/3eyXZr8.

[67] Andrew Kaczynski & Em Steck, *Videos show ally of Marjorie Taylor Greene among mob inside Capitol during January 6 riot*, CNN (March 25, 2021) https://www.cnn.com/2021/03/24/politics/kfile-marjorie-taylor-greene-ally-us-capitol/index.html.

Ex. A to Verified Complaint

52.    The insurrectionists demanded the arrest or murder of various other elected officials who refused to participate in their attempted coup.[68] They chanted "hang Mike Pence" and, as Greene had long urged, threatened to kill Speaker Pelosi.[69] They taunted a Black police officer with racial slurs for pointing out that overturning the election would deprive him of *his* vote.[70] Confederate flags and symbols of white supremacist movements were widespread.[71]

53.    At 2:13 p.m., Vice President Pence was removed by the Secret Service; the House adjourned at 2:20 p.m.[72] The insurrectionists had successfully obstructed Congress from certifying the votes, temporarily blocking the peaceful transition of power from one presidential administration to the next.

54.    At 2:44 p.m., insurrectionists attempted to force their way into the Speaker's Lobby (adjacent to the House Chamber) as lightly armed security guards tried to hold the door long enough to evacuate Members of Congress and others.[73] Senate staffers took the electoral college certificates with them when they were evacuated, ensuring they did not fall into the hands of the insurrectionists.[74]

---

[68] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[69] H.R. Rep. No. 117-2, at 16, 12–13 (2021), https://www.govinfo.gov/app/details/CRPT-117hrpt2/CRPT-117hrpt2.
[70] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[71] *Id.*; Staff of S. Comm. on Rules & Admin., 117th Cong., A Review of the Security, Planning, and Response Failures on January 6, at 28 (June 1, 2021), https://www.rules.senate.gov/download/hsgac-rules-jan-6-report.
[72] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[73] *Id.*
[74] *Id.*

Ex. A to Verified Complaint

55.     Shortly after, the House Chamber and Senate Chamber fell. Insurrectionists, some carrying zip ties and tactical equipment, overtook the defenses of the United States government and achieved, through force, effective control over the seat of the United States Congress.[75]

56.     At this point, leaders of the effort to overturn the election began to shift tactics. At 2:38 p.m., Trump tweeted that supporters should "stay peaceful."[76] Sixteen minutes later, at 2:54 p.m., Greene followed suit and tweeted, "Be safe, Be smart. Stay peaceful. Obey the laws. This is not a time for violence."[77]

57.     After 3:00 p.m., DHS, ATF, and FBI agents, and police from Virginia and Maryland, joined Capitol Police to help regain control of the Capitol.[78] Around 4:30 p.m., insurrectionists attacked officers guarding the Capitol, beating them with improvised weapons, spraying them with mace, and beating one so badly he required staples.[79] Around 5:20 p.m., the D.C. National Guard began arriving.[80] By 6:00 p.m., the insurrectionists had been removed from the Capitol, though some committed sporadic acts of violence through the night.[81] At 9:04 p.m., Greene tweeted a false claim that "Antifa infiltrated protesters who stormed Capitol."[82]

---

[75] *Id.*
[76] *Id.*
[77] Rep. Lofgren, *Georgia Social Media Review*, at 76.
[78] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[79] *Id.*
[80] Staff of S. Comm. on Rules & Admin., 117th Cong., A Review of the Security, Planning, and Response Failures on January 6, at 26 (June 1, 2021), https://www.rules.senate.gov/download/hsgac-rules-jan-6-report.
[81] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[82] Rep. Lofgren, *Georgia Social Media Review*, at 77.

Ex. A to Verified Complaint

58.    Vice President Pence was not able to reconvene Congress until 8:06 p.m., nearly six hours after the process had been obstructed.[83] Around 9 p.m., Trump's counsel John Eastman argued to Pence's counsel via email that Pence should refuse to certify Biden's victory by not counting certain states.[84] Pence's counsel ignored it. Congress was required under the Electoral Count Act to debate the objections filed by Senators and Members of Congress to electoral results from Arizona and Pennsylvania. Despite six Senators and 121 Representatives, including Greene, voting to reject Arizona's electoral results,[85] and seven Senators and 138 Representatives, including Greene, voting to reject Pennsylvania's results,[86] Biden's victory was ultimately certified at 3:14 a.m., January 7.[87]

59.    In total, five people died[88] and over 150 police officers suffered injuries, including broken bones, lacerations, and chemical burns.[89] Four Capitol Police officers on-duty during January 6 have since died by suicide.[90]

---

[83] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y.
[84] *Id.*
[85] 167 Cong. Rec. H77 (daily ed. Jan. 6, 2021), http://bit.ly/Jan6CongRec.
[86] *Id.* at H98.
[87] *What Happened on Jan. 6*, Wash. Post (Oct. 31, 2021), https://wapo.st/3eSdf2y; 167 Cong. Rec. H114–15 (daily ed. Jan. 6, 2021), http://bit.ly/Jan6CongRec.
[88] Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, N.Y. Times (Jan. 11, 2021), https://nyti.ms/3pTyN5q.
[89] Michael Kaplan & Cassidy McDonald, *At least 17 police officers remain out of work with injuries from the Capitol attack*, CBS News (June 4, 2021), https://cbsn.ws/3eyXZr8; Michael S. Schmidt & Luke Broadwater, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (Feb. 11, 2021), https://nyti.ms/3eN31k2..
[90] Luke Broadwater & Shaila Dewan, *Congress Honors Officers Who Responded to Jan. 6 Riot*, N.Y. Times (Aug. 3, 2021), https://nyti.ms/3EURwlp.

Ex. A to Verified Complaint

### Greene's Statements Defending the Insurrectionists

60.     On January 7, Greene insisted, falsely, that any violence was committed by "Antifa" and that Trump supporters were not involved.[91] On October 26, 2021, Greene insisted that "January 6 was a riot . . . and if you think about what our Declaration of Independence says, it says to overthrow tyrants."[92] Seeking to overthrow the government is not a "riot," it is an insurrection.  She has also referred to the insurrectionists as "patriots" and publicly condemned the actions of the Department of Justice to hold the insurrectionists accountable.[93] Recently, she suggested the attack was perpetrated by the FBI,[94] and attended a white nationalist conference where the insurrection was praised as "awesome."[95]

61.     Representative Greene's false denials do not detract from her repeated support for the insurrection; rather, they suggest an attempt to confuse the public about the events of the day, even as she continues to endorse and advocate for the insurrection's goals and defend and praise the insurrectionists as "patriots."  And, in any case, no amount of post-insurrection obfuscation can undo the fact that

---

[91] Rep. Lofgren, *Georgia Social Media Review*, 78–79, 96.
[92] https://www.washingtonpost.com/politics/2021/10/26/marjorie-taylor-greene-says-jan-6-riot-was-line-with-declaration-independence/.
[93] *See, e.g.*, Alia Shoaib, *Marjorie Taylor Greene visited accused Jan. 6 rioters in jail and told Steve Bannon the prisoners cry while singing the national anthem every night*, Business Insider (Nov. 6, 2021) https://www.businessinsider.com/marjorie-taylor-greene-visited-jan-6-rioters-jailed-patriot-wing-2021-11.
[94] Rep. Marjorie Taylor Greene (@RepMTG), Twitter (12:20 a.m. Mar. 10, 2022) https://twitter.com/RepMTG/status/1501790101189312513.
[95] Aaron Navarro & Robert Costa, *Marjorie Taylor Greene downplays speaking at a conference founded by white nationalist*, CBS News (Feb. 28, 2022) https://www.cbsnews.com/news/marjorie-taylor-greene-cpac-nick-fuentes-afpac-white-nationalist/.

Ex. A to Verified Complaint

Greene aided and engaged in the insurrection, by encouraging the insurrectionists prior to and on the day of the insurrection.

## INELIGIBILITY ANALYSIS

**The ALJ and the Secretary of State must hear candidate challenges based on Section Three, such hearings are consistent with precedent, and Georgia has a duty to prevent unqualified congressional candidates from appearing on the ballot.**

62.    In general, states can apply ballot eligibility procedures to candidates for federal office who do not meet the criteria established by the U.S. Constitution. As then-Judge (now U.S. Supreme Court Justice) Gorsuch held, a state's "legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office." *Hassan v. Colorado*, 495 F. App'x 947, 948 (10th Cir. 2012); *accord Peace & Freedom Party v. Bowen*, 750 F.3d 1061 (9th Cir. 2014); *see also Burdick v. Takushi*, 504 U.S. 428, 441 (1992) ("the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system").

63.    The candidate challenge process in Georgia is fully competent to adjudicate questions of ineligibility under the Disqualification Clause of the Fourteenth Amendment. First, a process for disqualifying candidates ineligible under Section Three was an express condition of the federal statute that

Ex. A to Verified Complaint

readmitted Georgia to the Union after the Civil War.[96] Second, as discussed above, the challenge process provides ample process to the challenged candidate, and allows the candidate to present evidence, call witnesses, testify, and appeal any adverse decisions to the Fulton County Superior Court and beyond.[97]

64.    Georgia law specifically authorizes challenges to candidates on the grounds that the candidate is "not qualified to seek and hold the public office" in question and requires "[e]very candidate for federal . . . office" to "meet the constitutional and statutory qualifications for the office being sought." O.C.G.A. §§ 21-2-5(a)-(b). Within the last decade, this challenge process has been used against a presidential candidate who was alleged not to meet the constitutional requirements for office. *See generally Farrar*, No. 1215136-60-Malihi.

65.    There is a history of states using state law processes to exclude candidates who are ineligible to hold office under the Disqualification Clause. *See Worthy*, 63 N.C. at 204–05; *In re Tate*, 63 N.C. 308 (1869); *State ex rel. Sandlin v. Watkins*, 21 La. Ann. 631, 633–34 (La. 1869). Furthermore, these processes have long included initial determinations of qualifications by non-judicial state officials. *See Worthy*, 63 N.C. at 200. And although the U.S. Supreme Court held it lacked

---

[96] 40 Cong. Ch. 70, 15 Stat. 73 (1868) ("no person prohibited from holding office under the United States . . . by section three of the proposed amendment to the Constitution of the United States, known as article fourteen, shall be deemed eligible to any office in [any] of said States, unless relieved from disability as provided by said amendment").

[97] The Georgia procedures also satisfy Chief Justice Chase's dictum that Section Three requires "proceedings, evidence, decisions, and enforcements of decisions, more or less formal" to determine who is and is not covered. *In re Griffin*, 11 F. Cas. 7, 26–27 (C.C.D. Va. 1869).

Ex. A to Verified Complaint

jurisdiction to review the *merits* of the case in *Worthy* under a more restrictive jurisdiction-granting statute than it is currently governed by, *Worthy v. Commissioners*, 76 U.S. 611, 613 (1869), it seemingly never occurred to anyone that states lacked the power to enforce this provision entirely—an issue the Court would arguably have jurisdiction over.

66.    The fact that the U.S. House of Representatives itself has authority to exclude Greene, if re-elected, does not deprive the sovereign state of Georgia of the power and obligation to protect the integrity of its own ballots.[98] The power of the House attaches *after* an election. *Cf. Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 614 (1929) (suggesting the power attaches when a member-elect presents their credentials to the relevant body). But states are given broad powers to regulate pre-election conduct of congressional races under the "Elections Clause." U.S. Const. art. I, § 4, cl. 1. For nearly one hundred years, the Supreme Court has affirmed that the power granted by that clause "embrace[s an] authority to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *accord Arizona v. Inter Tribal Council of Ariz., Inc.,* 570 U.S. 1, 8–9 (2013); *Roudebush v. Hartke*, 405 U.S. 15, 24–25 (1972). That includes verifying the eligibility of congressional candidates.

67.    Once a state has determined a candidate is disqualified under Section Three, it has a duty to ensure that the unqualified candidate is not listed on the

---

[98] Resolving this issue now, at the primary stage, would ensure that Republican primary voters may choose a constitutionally eligible candidate in the normal election schedule, and would prevent the possible need for a special election.

Ex. A to Verified Complaint

ballot. Just as Georgia should exclude an eighteen-year-old candidate from the primary for a congressional race, it should also exclude one who engaged in an insurrection against the United States.

### January 6 was an insurrection or rebellion within the meaning of Section Three of the Fourteenth Amendment.

68.   The January 6 attack constituted an "insurrection" or "rebellion" under Section Three of the Fourteenth Amendment.

69.   First, the insurrectionists defied the authority of the United States. *See In re Charge to Grand Jury*, 62 F. 828, 830 (N.D. Ill. 1894) (defining insurrection as an uprising "so formidable as for the time being to defy the authority of the United States"); *Insurrection*, Worcester's Dictionary (1835) (leading pre-1868 dictionary defining "insurrection" to mean "[a] seditious rising against government");[99] *see also Allegheny Cty. v. Gibson*, 90 Pa. 397, 417 (1879) (applying a similar definition); 4 Wm. Blackstone, Commentaries on the Laws of England, *81–82 (distinguishing riots from violence against the state). During the attack, insurrectionists were armed, called for the death of elected officials (including the Vice President, the Speaker of the House of Representatives, and other prominent Members of Congress), attacked law enforcement, and forced their way into the building. Five people died and 150 law enforcement officers were

---

[99] Most legal authority defining "insurrection" pertains to insurrections against *any* government. Under Section Three, the violent uprising must be against the United States, rather than state or local government. *See* U.S. Const. amend. XIV, § 3 (applying to a person who previously swore "to support the Constitution of the United States" but engaged in insurrection "against the same").

Ex. A to Verified Complaint

injured. It took the combined efforts of the Capitol Police, federal agents, state police, and the National Guard to clear the insurrectionists from the Capitol.[100]

70.    Second, the insurrectionists' goal was to overthrow the government or obstruct its core functions. *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1005 (2d Cir. 1974) (insurrection requires "an intent to overthrow a lawfully constituted regime"); *Home Ins. Co. of N.Y. v. Davila*, 212 F.2d 731, 736 (1st Cir. 1954) (insurrectionary action must be "specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof"). Even before the attack, the entire point of the demonstration was to intimidate Congress and Vice President Pence—in particular, to intimidate Pence into violating the Twelfth Amendment and the Electoral Count Act by ignoring the legal electoral votes for Biden. And the insurrectionists mounted their violent assault on the U.S. Capitol and the government officials within for the purpose of preventing the Vice President of the United States and the United States Congress from fulfilling their constitutional roles in ensuring the peaceful

---

[100] The original public understanding of "insurrection" may not have required actual violence. *See In re Charge to Grand Jury*, 62 F. 828, 830 (N.D. Ill. 1894) (insurrection does not require "bloodshed," only that the uprising be "so formidable as for the time being to defy the authority of the United States"). Twentieth-century cases typically define "insurrection" as requiring violence. *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1017 (2d Cir. 1974) (defining insurrection to require "a violent uprising"); *Home Ins. Co. of N.Y. v. Davila*, 212 F.2d 731, 736 (1st Cir. 1954) (similar). As set forth above, the facts of January 6 easily satisfy any such requirement.

Ex. A to Verified Complaint

transition of power. As they attacked, the insurrectionists insisted that elected officials anoint their preferred candidate the winner—or be murdered.

71.     This was an attack on the *United States*. The importance of counting the electoral votes in our constitutional system cannot be overstated. It formalizes a deeper, bedrock norm in our democracy: the peaceful transition of power. The Electoral Count Act, as well as the Article II and the Twelfth Amendment, lay out the procedures for counting votes; together with the Twentieth Amendment, they ensure that transition is orderly and non-violent. They are essential constitutional functions of the United States government. An attempt to disrupt those procedures, particularly through violence, is an attack on our country itself.

72.     This was no mere riot; it was an attempt to disrupt an essential constitutional function and illegally prolong Trump's tenure in office. And while an attack on public authority need not be likely to succeed in order to constitute an insurrection, *see Davila*, 212 F.2d at 736 ("An insurrection aimed to accomplish the overthrow of the constituted government is no less an insurrection because the chances of success are forlorn."), the January 6 insurrectionists' violent seizure of the House and Senate Chambers and key congressional offices did, in fact, obstruct and delay this essential constitutional procedure. They very nearly succeeded in achieving their aim of overturning the results of the 2020 presidential election. U.S. Representative Peter Meijer of Michigan, a member of Greene's party who joined the House on the same day as her, has described the attack as "a violent attempt to interfere with the proceedings of Congress, and specifically the

Ex. A to Verified Complaint

certification of the Electoral College results."[101] General Mark Milley, Chairman of the Joint Chiefs of Staff, "believed January 6 was a planned, coordinated, synchronized attack on the very heart of American democracy, designed to overthrow the government"; he referred to January 6 as a "coup attempt."[102] If this violent attack on the political system of the United States in the heart of the nation's capital is not an insurrection, then nothing is.

73.    This analysis of January 6 is consistent with the understanding of Congress, the U.S. Department of Justice, and federal courts.

74.    On the evening of January 6, after Congress was finally able to reconvene, Senator Mitch McConnell of Kentucky, the Senate Majority Leader, described the assault as a "failed insurrection."[103] He has since confirmed his understanding in response to the attempted characterization of the insurrection as "legitimate political discourse": "We saw it happen. It was a violent insurrection for the purpose of trying to prevent the peaceful transfer of power after a legitimately certified elections, from one administration to the next. That's what it was."[104]

75.    In court filings, the U.S. Department of Justice has characterized the attack on the Capitol as "an insurrection attempting to violently overthrow the

---

[101] *Death threats, primary challenge followed Rep. Meijer's vote to impeach Trump after Jan. 6*, PBS (Jan. 4, 2022), https://to.pbs.org/3FXcKAj.
[102] Bob Woodward & Robert Costa, Peril, xviii (2021).
[103] Nicholas Fandos et al., *Resuming electoral counting, McConnell condemns the mob assault on the Capitol as a 'failed insurrection'*, N.Y. Times (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/insurrection.html.
[104] Jonathan Weisman & Annie Karni, *McConnell Denounces R.N.C. Censure of Jan. 6 Panel Members*, N.Y. Times (Feb. 8, 2022), https://nyti.ms/36C78yC.

Ex. A to Verified Complaint

United States Government."[105] Judge Carl Nichols of the U.S. District Court for the District of Columbia has described the attack as an "uprising" that "target[ed] a proceeding prescribed by the Constitution and established to ensure a peaceful transition of power."[106] Members of the "Oath Keepers" that stormed the Capitol or organized the storming have been indicted on seditious conspiracy charges.[107]

76.    Bipartisan majorities of the House and Senate voted for articles of impeachment describing the attack as an "insurrection."[108] And in the impeachment trial, President Trump's own defense lawyer stated that "the question before us is not whether there was a violent insurrection of [sic] the Capitol. On that point, everyone agrees."[109] The Senate voted by unanimous consent to award a Congressional Gold Medal for Capitol Police officer Eugene Goodman via a bill that categorized the January 6 attackers as

---

[105] United States v. Chansley, No. 21-cr-00003 (D. Ariz. filed Jan. 14, 2021), ECF No. 5, https://bit.ly/3FJ1LdM.

[106] United States v. Miller, No. 21-cr-00119 (D.D.C. Dec. 21, 2021), ECF No. 67, https://bit.ly/318NBmX.

[107] United States v. Rhodes, No. 22-cr-00015, ECF No. 1, Indictment, at 8–32 (D.D.C. Jan 12, 2022), https://s3.documentcloud.org/documents/21178549/rhodes-complaint.pdf. The elements of seditious conspiracy track the definition of insurrection almost exactly. 18 U.S.C. § 2384 (defining crime as "conspir[ing] to overthrow, put down, or to destroy by force the Government of the United States . . . or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States"). Of course, as discussed below, disqualification under Section Three does not require criminal charges.

[108] 167 Cong. Rec. H191 (daily ed. Jan. 13, 2021); 167 Cong. Rec. S733 (daily ed. Feb. 13, 2021).

[109] 167 Cong. Rec. S729 (daily ed. Feb. 13, 2021), http://bit.ly/EveryoneAgrees.

Ex. A to Verified Complaint

"insurrectionists."[110] Congress separately voted to award Congressional Gold Medals to other Capitol Police, using the same "insurrectionists" language.[111]

77.     Recognizing January 6 as an insurrection or rebellion for purposes of Section Three is also consistent with the intent of the Fourteenth Amendment's drafters, who worried that the reelection of the pre-war political class in the South would re-empower those willing to use violence or otherwise reject the results when their preferred policies were not enacted, or their preferred candidates were not elected. *See, e.g.*, 69 Cong. Globe, 39th Cong., 1st Sess. 2532 (1866) (statement of Rep. Banks) ("They do not rely on ideas for success. They govern by force. Their philosophy is force. Their tradition is force."). The idea behind Section Three was that politicians who took an oath to protect the Constitution and then disregarded the norms of peaceful and lawful political discourse could not be trusted to hold office—that was true then, and it remains true today.

**Because Greene encouraged the insurrection and helped plan the January 6 events with the intent to incite or aid an insurrection or rebellion, or with the knowledge that an insurrection or rebellion was substantially likely, she has engaged in insurrection or rebellion under the Fourteenth Amendment.**

78.     To "engage" in insurrection or rebellion, one must voluntarily and knowingly aid the insurrection by providing it with something useful or necessary.

---

[110] 167 Cong. Rec. S694–95 (daily ed. Feb. 12, 2021).
[111] Pub. L. No. 117-32, 135 Stat. 322 (2021).

Ex. A to Verified Complaint

79.   The Disqualification Clause does not require that one personally commit acts of violence or open defiance to have "engaged" in an insurrection.[112] Nor does it require that they be charged with criminal offenses. In the leading national case on the standard for "engaging" in insurrection under Section Three— a case where the disqualified candidate had not been charged with any crimes whatsoever—the North Carolina Supreme Court interpreted the word "engage" to mean "[v]oluntarily aiding the rebellion, by personal service, or by contributions, other than charitable, of any thing that was useful or necessary" to it. *Worthy*, 63 N.C. at 203; *see also United States v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871) (holding that "engage" merely required "a voluntary effort to assist the Insurrection . . . and to bring it to a successful [from insurrectionists' perspective] termination"). For example, voluntary efforts to help transport combatants to the site of conflict can qualify as "engaging" in insurrection. *See Martin v. Wallace*, 40 Ga. 52, 54–55 (1869) (in tort case, finding no recovery for injury incurred while transporting Confederate soldiers to front, because plaintiff was "engaged" in insurrection); *Wallace v. Cannon*, 38 Ga. 199, 204 (1868) (same).

80.   This is similar to the doctrine of civil aiding and abetting liability: someone who knowingly aids an unlawful act is also liable. This doctrine is familiar to Georgia courts. *See, e.g., Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 826 S.E.2d 116, 125 (2019) (describing the doctrine); *Anthony v. Am. Gen. Fin.*

---

[112] For example, Confederate President Jefferson Davis did not personally engage in violence during the Civil War.

Ex. A to Verified Complaint

*Servs., Inc.*, 287 Ga. 448, 697 S.E.2d 166, 170 (2010) (holding that a Georgia law making those who "procure" unlawful acts civilly liable is functionally identical to criminal aiding and abetting liability); *Chattahoochee Brick Co. v. Goings*, 135 Ga. 529, 867–68 (1910) (citing treatises and holding that anyone who knowingly aids an unlawful act is a joint tortfeasor). It was also familiar to the drafters of the Fourteenth Amendment. *See, e.g.*, *Bird v. Lynn*, 49 Ky. 422, 423–24 (10 B. Mon. 422) (1850); *Brown v. Perkins*, 83 Mass. 89, 97–98 (1 Allen 89) (1861) (clarifying that aiding and abetting is distinct from agency law and does not require a showing of control).

81.     While private citizens discussing the overthrow of the government over a few beers does not amount to engaging in insurrection, when a Member of Congress publicly encourages her supporters to engage in insurrection, as the evidence shows Greene did, she has provided "useful" support to the insurrection and therefore engaged in insurrection within the meaning of Section 3 of the Fourteenth Amendment.

82.     Greene further engaged in insurrection by planning a demonstration with the intent, knowledge, or reason to know that it would result in, or serve as an inciting event to, an insurrection, or with knowledge that an insurrection was substantially likely to result. She thereby provided a "personal service," "useful" and "necessary" to the insurrection.

83.     Indeed, there is reliable reporting that Representative Greene, who was intimately involved in the plans *inside* the Capitol to reject the electoral votes

Ex. A to Verified Complaint

of several states, was also involved with, at minimum, the planning and promotion of events that led to the insurrection. She did not promote the event as a private citizen, but rather as a sitting Member of Congress. Furthermore, as a Member of Congress, she knew that there was no lawful mechanism to overturn the election, but encouraged her supporters to believe that Trump could be installed as president for another four years if Vice President Pence and Congress could be intimidated, encouraging intimidation and violence and, at a minimum, knowing that violence was substantially likely to result. She did so against a backdrop of calls from groups, to forcibly prevent the certification of Biden and install Trump as president for another four years. When those legal plans broke down—as she must have known they would—her supporters did what she had told them for years they had to do, and what they had said they would do: fight – not metaphorically, but violently.

84.     The day before the insurrection, Greene argued that this is "our 1776 moment." Again, having promised a fictitious legal solution that had been publicly disavowed by the person essential to carrying it out—Vice President Pence— Greene told her supporters they should mimic our founding fathers. Our founding fathers did not peacefully object in 1776. They violently *rebelled*. They rebelled against *real* tyranny, not against the will of the majority of American voters, but they engaged in armed and violent rebellion. *That* is what Representative Greene called for: another armed and violent rebellion. Of course, as the court noted in *Davila*, a successful insurrection is "retroactively . . . dignified by the

Ex. A to Verified Complaint

characterization of a 'revolution.'" 212 F.2d at 736. Thankfully for American democracy, the insurrection on January 6 failed to overturn the election and will never be "dignified" as a revolution. But to ensure the continuing safety of our Republic, those who reject democracy in favor of violence against our constitutional democracy cannot be allowed to hold office in the very government they seek to destroy.

85.    Greene has advocated for political violence both before and after the insurrection. She has called for her political opponents to be hanged for treason and threatened fellow lawmakers. And in the wake of the violent insurrection, she has defended the insurrectionists as patriots and attempted to justify their unlawful actions with more incendiary rhetoric: "if you think about what our Declaration of Independence says, it says to overthrow tyrants."

86.    Although she couches her language in American values, her support for false election fraud claims and references to bloodshed and violent confrontation demonstrate her public position that violence and intimidation is justified in response to a peaceful, orderly election if her candidate of choice loses. Her occasional professions of false denial that the foot soldiers who stormed the Capitol engaged in violence cannot conceal the fact that she encouraged and helped aid the insurrection. She poses precisely the type of ongoing threat to the Republic that the Disqualification Clause was written to guard against.

## CONCLUSION

87.    Evidence shows that Representative Greene was involved in encouraging and planning efforts to intimidate Congress and the Vice President

Ex. A to Verified Complaint

into rejecting valid electoral votes and subvert the essential constitutional function of an orderly and peaceful transition of power. Greene repeatedly advocated for political violence, up to and including, her encouragement of insurrectionists on January 6. Greene was involved in either planning the attack on January 6, or alternatively the planning of the pre-attack demonstration and/or march on the Capitol with the advance knowledge that it was substantially likely to lead to the attack, and otherwise voluntarily aided the insurrection after taking an oath, as a member of Congress to support the Constitution. Each and all of these actions disqualify her from federal office under the Disqualification Clause of Section Three of the Fourteenth Amendment; and, therefore, that she "is not qualified to seek and hold the public office" of U.S. Representative. O.C.G.A. § 21-2-5(b).

## REQUESTED RELIEF

WHEREFORE, the Challengers respectfully request that:

1. Secretary Raffensperger call a hearing forthwith before an ALJ to determine whether Representative Greene is eligible for office under the Disqualification Clause.

2. Secretary Raffensperger act immediately on the decision of the ALJ and promptly decide that Representative Greene is not qualified to seek and hold the public office that she seeks.

3. In accordance with O.C.G.A. § 21-2-5(c), Secretary Raffensperger withhold Representative Greene's name from the ballot or strike her name from the ballot if the ballots have been printed, or, if there is insufficient time to strike her name or reprint the ballots, place a prominent notice at each affected

Ex. A to Verified Complaint

polling place advising voters of her disqualification and that all votes cast for

her shall be void and shall not be counted.

Respectfully submitted,

/s/ Ronald A. Fein                                    March 24, 2022
Ronald Fein*
John C. Bonifaz*
Ben Clements*
Courtney Hostetler*
Benjamin Horton*
FREE SPEECH FOR PEOPLE
1320 Centre St. #405
Newton, MA 02459
(617) 244-0234
rfein@freespeechforpeople.org

Jonathan S. Abady*
Andrew G. Celli, Jr.*
Sam Shapiro*
Andrew K. Jondahl*
EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
jabady@ecbawm.com
acelli@ecbawm.com

Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

*Attorneys for Challengers*

* Motions for pro hac vice admission forthcoming.

Ex. A to Verified Complaint