IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Marjorie Taylor Greene**, | Case No. 1:22-cv-1294-AT |
| Plaintiff, | |
| vs. | **Intervenor Defendants' Response in Opposition to the Plaintiff's Motions for a Temporary Restraining Order and a Preliminary Injunction** |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, *et al.,* | |
| Defendants, | |
| and | |
| **David Rowan,** *et al.,* | |
| Intervenor Defendants. | |

Intervenor defendants David Rowan, Donald Guyatt, Robert Rasbury, Ruth Demeter, and Daniel Cooper (collectively, the "Rowan Intervenors"), respectfully submit this brief in opposition to plaintiff Marjorie Taylor Greene's motion for a temporary restraining order (ECF 4) and motion for a preliminary injunction (ECF 5). The Court should either abstain from exercising jurisdiction over this case because of an ongoing state proceeding or deny the motions on their merits.

## Background

This is a constitutional challenge to an on-going state proceeding. Greene, who is the incumbent member of the United States House of Representatives from Georgia's Fourteenth Congressional District, seeks injunctive relief halting a challenge under state law to her qualifications to seek re-election to that office.

The state law at issue is O.C.G.A. § 21-2-5, which requires "[e]very candidate for federal and state office … [to] meet the constitutional and statutory qualifications for holding the office being sought.," *id.* § 21-2-5(a), and provides for challenges to a candidate's qualifications by the Secretary of State or eligible voters. The statute requires the Secretary to refer any challenge to an administrative law judge for a hearing under Georgia's ordinary rules of administrative procedure. *Id.* § 21-2-5(b). The administrative law judge reports her or his findings to the Secretary of State, who then makes an initial determination of the candidate's qualifications. *Id.* §§ 21-2-5(b) & (c). A candidate or challenging voter can then appeal the Secretary's decision to state courts, which have the power to overturn the Secretary's decision for, among other things, any "error of law." *Id.* § 21-2-5(e).

Here, the Rowan Intervenors filed a timely challenge to Greene's qualifications with the Secretary of State based on the Disqualification Clause of the Fourteenth Amendment.[1] The Secretary referred the challenge to an administrative law judge, and a hearing on the challenge is now set for April 13.

Greene then filed this action to stop the state proceedings. She argues that Georgia's challenge statute is unconstitutional as applied to her, and she seeks a temporary restraining order and preliminary injunction against the Secretary and the administrative law judge assigned to hear the matter that would effectively end the challenge.

## Argument

### I.   The Court should abstain from exercising jurisdiction here.

Under the *Younger* abstention doctrine—named for *Younger v. Harris*, 401 U.S. 37 (1971)—a federal court must abstain from exercising jurisdiction in certain cases seeking to enjoin on-going state proceedings. This judicially created doctrine arises from important considerations of

---

[1] The relevant part of the Disqualification Clause provides: "No Person shall be a … Representative in Congress … who, having previously taken an oath, as a member of Congress … to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same." U.S. Const. amend. XIV, § 3.

comity between state and federal governments. *Id.* at 44; *see also 31 Foster Children v. Bush*, 329 F.3d 1255, 1274-81 (11th Cir. 2003) (holding that a district court did not abuse its discretion in abstaining under *Younger*).

Although *Younger* itself dealt with state criminal proceedings, the Supreme Court has extended the doctrine to state administrative proceedings, *see Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 627 n.2 (1986), and its principles are "fully applicable to noncriminal judicial proceedings when important state interests are involved." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432 (1982)).

To determine whether *Younger* abstention applies, a court must consider three questions known as the *Middlesex* factors: "first, do [the proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *31 Foster Children*, 329 F.3d at 1274 (quoting *Middlesex*, 457 U.S. at 432). Here, the answer to all three questions is "yes."

Greene does not dispute the first two *Middlesex* factors. There is clearly an ongoing state proceeding, and the relief that Greene seeks here—an injunction halting the proceeding—would interfere with it. The State also has a "compelling" interest in the orderly administration of elections and the regulation of ballot access. *Cowen v. Ga. Sec'y of State*, 22 F. 4th 1227, 1234 (11th Cir. 2022).

Greene does, however, dispute the third *Middlesex* factor: whether she has an adequate opportunity to raise her constitutional challenges in the state proceeding. She has the burden of establishing that the state proceeding will not provide an adequate remedy for her claims, and this Court must "assume that that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *31 Foster Children*, 329 F.3d at 1279 (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987)).

Greene argues that "Georgia state law clearly bars the interposition of the constitutional claims." (ECF 4-1 at 15.) She reasons that, because Georgia's constitution vests the state's judicial power in its judicial branch, neither the Secretary nor the administrative law judge

has the power to determine the constitutional claims that she raises here. (*Id.*) Not so.

Georgia's administrative procedures expressly require administrative law judges to make "conclusions of law," O.C.G.A. § 50-13-41(c), and nothing bars them from considering legal issues based on the United States Constitution. Georgia has heard federal constitutional challenges to federal candidates under these procedures in the past. *See, e.g.*, *Farrar v. Obama*, No.1215136-60-Malihi (Ga. Off. State Admin. Hearings Feb. 3, 2012).[2] And the Georgia Supreme Court has made clear that federal constitutional claims can also be a defense in challenges to a candidate's qualifications under these procedures. *See, e.g.*, *Cox v. Barber*, 568 S.E. 2d 478, 481-82 (Ga. 2002) (considering a First Amendment challenge to Georgia's durational residency requirement for certain candidates). Indeed, Greene has already filed a motion to dismiss the state proceeding on constitutional grounds, and the administrative law judge has ordered the challengers to file a response by Monday.[3] Under these circumstances, Greene cannot meet her burden on the third

---

[2] A copy of the *Farrar* decision is attached to this response as Exhibit A.
[3] A copy of Greene's motion is attached to this response as Exhibit B

6

*Middlesex* factor, and this Court should therefore abstain from exercising its jurisdiction.

Greene can pursue—and is pursuing—her constitutional defenses to the Rowan Intervenors' challenge in the ongoing state proceeding.

## II. Greene is not entitled to a temporary restraining order or a preliminary injunction.

To obtain a temporary restraining order or a preliminary injunction, a plaintiff must show: (1) a substantial likelihood of success on the merits of her claim; (2) a substantial threat of irreparable harm in the absence of injunctive relief; (3) that the threatened injury outweighs the harm that an injunction might cause the defendants; and (4) that granting the injunction would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Greene cannot make that showing here.

## A. Greene is not likely to succeed on the merits of her claims.

Greene's complaint raises four claims. (ECF 3 at 16-23.) First, she contends that Georgia's challenge statute puts an unjustified burden on her First Amendment and Fourteenth Amendment right to run for office. Second, she claims that Georgia's challenge procedures violate due process. Third, she claims that Georgia's challenge statute violates

Article I, Section 5, Clause 1 of the United States Constitution, which

empowers the House to judge the qualifications of its own members.

And, finally, she contends that the Amnesty Act of 1872 granted her

prospective amnesty under the Disqualification Clause for the

insurrection of January 6, 2021. She is not likely to succeed on any of

these claims.

### 1. First and Fourteenth Amendments

To determine whether Georgia's challenge statute violates the

First and Fourteenth Amendments, this Court must apply the balancing

test set forth in *Anderson v. Celebrezze*:

> First, a court must evaluate the character and magnitude
> of the asserted injury to rights protected by the First and
> Fourteenth Amendments. Second, it must identify the
> interests advanced by the State as justifications for the
> burdens imposed by the rules. Third, it must evaluate the
> legitimacy and strength of each asserted state interest and
> determine the extent to which those interests necessitate
> the burdening of the plaintiffs' rights.

*Bergland v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985)

(paraphrasing *Anderson*, 460 U.S. 780, 789 (1983); *accord Cowen*, 22 F.

4th at 1231.

Under the *Anderson* test, the level of scrutiny varies on a sliding

scale with the extent of the asserted injury. When, at the low end of the

scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places "severe" burdens on the rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1982)).

Greene argues that Georgia's challenge statute imposes a severe burden on her right to run for office "because it requires the Secretary of State to refer a complaint for an administrative hearing … without any consideration or requirement of any standard of proof whatsoever." (ECF 4-1 at 17.) In other words, the challenge statute imposes a severe burden because it requires her to defend her eligibility even though there has been no showing that she is likely ineligible.

Greene offers no evidence to support her contention that the challenge process is burdensome, nor does she cite any cases that have assessed the burden of similar statutes. On its face, the challenge

process is not unduly burdensome; it consists of a streamlined administrative hearing under Georgia's ordinary rules of administrative procedure. *See* O.C.G.A. § 21-2-5(b). The challenge process also is much less burdensome than other candidate eligibility requirements that courts have determined do not impose severe burdens. In *Cowan v. Georgia Secretary of State*, for example, the Eleventh Circuit recently held as a matter of law that Georgia's ballot-access requirements for independent and third-party candidates—which require such candidates for United States Representative to gather tens of thousands of signatures—do not impose severe burdens. *Cowen*, 22 F. 4th at 1233.

Greene is therefore unlikely to establish that the burden imposed by Georgia's challenge statute is severe, and the state's "important regulatory interests" will be sufficient to justify it. *Anderson*, 460 U.S. at 788. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). A State also has compelling interests in "maintaining the orderly administration of elections" and "avoiding confusion, deception, and even frustration of the democratic process." *Cowan*, 22 F. 4th. at 1234; *see also Lindsay v. Bowen*, 750 F.3d

1061, 1063-64 (9th Cir. 2014) (holding that various state interests justify the exclusion of an ineligible candidate from a presidential ballot); *Hassan v. Colorado*, 495 F. App'x 947, 947-48 (10th Cir. 2012) (Gorsuch, J.) ("a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office"). Because Georgia's challenge statute is a "rational way" to satisfy those interests, *Cowen*, 22 F. 4th at 1234, Greene is not likely to succeed on her First and Fourteenth Amendment claim.

### 2. Due Process

Greene's due process claim fares no better. Under the law of the Eleventh Circuit, a procedural due process claim requires proof of three elements: (1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). The dispute here centers on the third.

Greene claims that the challenge statute provides constitutionally inadequate process because it requires her "to affirmatively establish [her] eligibility for office." (ECF 4-1 at 19 (quoting *Haynes v. Wells*, 538

S.E. 2d 430, 432-33 (Ga. 2000)). It is unconstitutional, in other words, for a state to put the burden on the candidate rather than the challenger. But no court has ever so held.

To determine what process is due, courts turn to the test from *Mathews v. Eldridge*, which requires the balancing of several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*J.R. v. Hansen*, 736 F.3d 959, 966 (11th Cir. 2013) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the private interest at issue is the "right to run for public office." (ECF 4-1 at 12 (citing *Cook v. Randolph Cnty. Ga.*, 573 F.3d 1143, 1152 (11th Cir. 2009)). That interest is important, and it is entitled to substantial, though not dispositive, weight.

But the risk of an erroneous deprivation of that right through the challenge procedures is small. All the information needed to establish her eligibility for office is within Greene's control. Even Greene concedes that proof of some qualifications, such as age or residency, "could easily

be provided by the Candidate." (ECF 4-1 at 19.) Greene contends, however, that she cannot easily provide the proof required under the Disqualification Clause because it requires her to establish that she did not engage in an insurrection against the United States. She fails to explain why she could not meet her burden through her own testimony or documents within her control. *See, e.g.*, O.C.G.A. § 21-2-153(e) (candidates for party nomination are required to establish their eligibility for office in the first instance by filing an affidavit). Nor does she explain why placing the burden on a challenger to prove her ineligibility for office is less likely to lead to error.

Finally, the government interests here are compelling. As discussed in the preceding section, the State has compelling interests in preserving the integrity of the electoral process; in maintaining the orderly administration of elections; and in avoiding confusion, deception, and even frustration of the democratic process. Allowing ineligible candidates onto the ballot would undermine those interests, and relieving candidates of their burden to establish eligibility would radically disrupt the candidate qualification process. As a practical matter, it would force already-overworked election officials to confirm

the qualifications of hundreds of candidates per election cycle without easy access to the information necessary to do that.

Under these circumstances, Greene is unlikely to establish that Georgia's challenge process is constitutionally inadequate. She relies on the Supreme Court's decision in *Speiser v. Randall*, 357 U.S. 513 (1953), for the proposition that burden-shifting is unconstitutional whenever state processes "implicate free speech" (ECF 4-1 at 19), but Greene reads that case too broadly. In *Speiser*, the Court held that California had improperly shifted the burden of proof onto taxpayers to prove that they were not engaged in advocating the overthrow of the federal government by unlawful means before being entitled to a tax exemption. In that decision, however, the Supreme Court recognized that

> [i]t is of course within the power of the State to regulate procedures under which its laws are carried out, *including the burden of producing evidence and the burden of persuasion*, unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

357 U.S. at 523 (cleaned up) (emphasis added). California's law, the Court concluded, did offend such fundamental principles of justice because it involved not only speech but also proof of criminal liability, where due process protection is strongest. *See id.* at 523-29. Later cases

14

have observed that outside the context of the criminal law, "where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) (quoting *Lavine v. Milne*, 424 U.S. 577, 585 (1976)).

Here, requiring a candidate to establish her eligibility for office does not raise the same concerns as the California law at issue in *Speiser*. It offends no deeply rooted principle of justice. It is a sensible regulation designed to support the orderly administration of elections. The Disqualification Clause imposes no criminal or civil penalty but only an additional qualification for public office for individuals who have previously sworn to uphold the Constitution.

Greene is therefore unlikely to succeed on her due process claim.

### 3. Article I, Section 5, Clause 1

Greene's third claim involves Article I, Section 5, Clause 1 of the United States Constitution, which provides that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." U.S. Const. art. I, § 5, cl. 1. Greene argues that this clause gives Congress "an exclusive role" in judging the qualifications of its own

members and that states may not scrutinize the qualifications of house

or senate candidates. (ECF 4-1 at 20-22.) But that is not the law.

The Constitution's Elections Clause gives the states broad

authority to regulate congressional elections:

> The Times, Places and Manner of holding Elections for
> Senators and Representatives, shall be prescribed in each
> State by the Legislature thereof; but the Congress may at
> any time by Law make or alter such Regulations, except as
> to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1; *see also Roudebush v. Hartke*, 405 U.S. 15, 25

(1972) (holding that Indiana's recount procedure was a valid exercise of

state authority and did not usurp the Senate's power to judge elections).

With this authority, states may enact "numerous requirements as to

procedure and safeguards which experience shows are necessary in order

to enforce the fundamental right involved." *U.S. Term Limits v.

Thornton*, 514 U.S. 779, 834 (1995) (quoting *Smiley v. Holm*, 285 U.S.

355, 366 (1932)). *See also Storer v. Brown*, 415 U.S. 724, 730 (1974)

("[A]s a practical matter, there must be a substantial regulation of

elections if they are to be fair and honest and if some sort of order,

rather than chaos is to accompany the democratic processes."); *United

States v. Classic*, 313 U.S. 299, 311 (1941) ("[T]he states are given, and

16

in fact exercise, a wide discretion in the formulation of a system for the choice by the people of representatives in Congress.").

In *Roudebush*, the Supreme Court upheld an Indiana recount procedure in a close Senate election as a valid exercise of the State's broad powers under the Elections Clause and rejected a claim that the process usurped a power that only the Senate could exercise. 405 U.S. at 24-26. The Court reasoned that "a recount can be said to 'usurp' the Senate's function only if it frustrates the Senate's ability to make an independent final judgment." *Id.* at 25. Indiana's procedure did not frustrate the Senate's function, the Court explained, because the Senate remained "free to accept or reject the apparent winner in either count, and, if it so chooses, to conduct its own recount." *Id.* at 25-26 (footnotes omitted). As a result, the recount process did not violate Article 1, Section 5, Clause 1. *See id.* at 26.

So too here. The House remains free to accept or reject Georgia's determination of Greene's qualifications and can, if it so chooses, void the election and require a new one if it disagrees with a determination that Greene is disqualified. Georgia's challenge process therefore does

not usurp the House's power any more than Indiana's recount process usurped the Senate's.

Greene nonetheless argues that Georgia violates the Constitution simply by making an "independent evaluation" of Greene's qualifications. (ECF 4-1 at 21.) She cites no case for that proposition, however, and such a rule would be absurd. Georgia would not, for example, violate the Constitution if it made an independent evaluation of a non-citizen or underage candidate's qualifications. Congress also has the final say over presidential election results, *see* 3 U.S.C. § 15, and yet courts have held that States retain the ability to disqualify constitutionally ineligible presidential candidates under these circumstances. *See, e.g.*, *Hassan,* 495 F. App'x at 948-49 (candidate not a natural-born citizen); *Lindsay*, 750 F.3d at 1065 (underage candidate).

Greene is therefore unlikely to succeed on her claim that States may not scrutinize the qualifications of House or Senate candidates.

### 4.  The Amnesty Act of 1872

Greene's fourth claim asserts that, because the Amnesty Act of 1872 granted prospective amnesty to all future insurrectionists, the Disqualifications Clause simply does not apply to her. (ECF 4-1 at 22-

18

25.) Greene is not likely to succeed on this claim, however, because her reading of both provisions is at odds with their text and history.

The Disqualifications Clause provides in full as follows:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. *But Congress may by a vote of two-thirds of each House, remove such disability.*

U.S. Const. amend. XIV, § 3 (emphasis added). Congress does not have the power to repeal the Disqualification Clause by statute, but it does have the power to "remove" a disqualification under this Clause.

Congress did just that by private legislation in the years immediately following the 1868 ratification of the Fourteenth Amendment. *See, e.g.*, Private Act of December 14, 1869, Ch. 1, 16 Stat. 607, 607-13. Then, in 1872, Congress adopted the Amnesty Act, which provides in part that

> all political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever, except Senators and Representatives of the

19

> thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States.

Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872) (the "Amnesty Act of 1872"). The issues here are whether Congress could, and did, remove disqualifications prospectively.

The word "remove" means to "take away or off"; "to get rid of"; or to "eliminate." *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1219 (11th Cir. 2009); *Vurv Techn. LLC v. Kenexa Corp.*, 2009 WL 2171042, at * 5 (N.D. Ga. Jul. 20, 2009). It means to take away something already present. The plain meaning of the text of the Disqualifications Clause therefore suggests that it does not empower Congress to grant *prospective* amnesty.

Congress confirmed this understanding of its power under the Disqualifications Clause in 1919 when it rejected a similar argument, based on the Amnesty Act of 1898, from a Representative-elect who had been convicted of espionage. After acknowledging that the Clause authorizes Congress to remove disqualifications, the House concluded that "manifestly it could only remove disabilities incurred previously to the passage of the [1898 Amnesty] act, and Congress in the very nature

of things would not have the power to remove any future disabilities." 6
Clarence Cannon, *Cannon's Precedents of the House of Representatives of
the United States*, ch. 157, § 56-59 (1936).[4] The history of the Clause thus
also suggests that it does not give Congress the power to grant
prospective amnesty. Greene's interpretation, moreover, would mean
that Congress effectively repealed the Disqualification Clause without
the constitutionally required ratification by three fourths of the states.

But even if Congress had the power to do so, the text and history
of the Amnesty Act of 1872 suggest that Congress did not intend to grant
prospective amnesty. The Act uses the past tense "imposed" rather than
"which may be imposed," suggesting that it only applies to
disqualifications that have already been imposed. *See Gundy v. United
States,* 139 S. Ct. 2116, 2127 (2019) (noting that the use of past tense
indicates that a statute applies to pre-enactment conduct); *Carr v.
United States,* 560 U.S. 438, 448 (2010) (observing that the Supreme
Court has "frequently looked to Congress' choice of verb tense to
ascertain a statute's temporal reach").

---

[4] Available at https://www.govinfo.gov/content/pkg/GPO-HPREC-CANNONS-V6/pdf/GPO-HPREC-CANNONS-V6.pdf#page=75.

And the history of the statute confirms the plain meaning of the text. *See generally*, Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87, 111-20 (2021). Before the Act, Congress had been passing private bills to remove disqualifications from former Confederates. *See id.* at 112. That soon became cumbersome, with thousands of names in each bill. *Id.* Rather than pass another statute with a long list of names, Congress chose to use a general phrase to identify those former Confederates it was relieving of disqualification, with a few exceptions for some of the most prominent Confederate leaders. *Id.* at 116-20. It was not a statute designed to grant amnesty to potential future insurrectionists.

Greene's argument to the contrary is exceedingly simple: "By the plain language of this Act, the political disability was removed from any Representative other than those of the two enumerated Congresses." (ECF 4-1 at 23.) But this merely assumes that one can "remove" something which does not already exist. And it ignores the plain meaning and history of the provisions at issue. As authority, Greene cites only a district court case from North Carolina which recently

adopted this textual argument (ECF 4-2 at 20-23), but that case is neither binding nor persuasive, and it remains pending on appeal.

Under these circumstances, Greene is unlikely to succeed on her claim that the Amnesty Act of 1872 granted her prospective amnesty for engaging in the insurrection of January 6, 2021.

**B.    Greene will not suffer irreparable harm.**

The second *Winter* factor requires the Court to determine whether there is a substantial threat of irreparable harm in the absence of the requested injunction. 555 U.S. at 20. Here, there is not.

In the absence of the requested injunction, Greene will have a hearing next Wednesday before the Office of State Administrative Hearings at which she can raise all the arguments that she raises here. Greene has not shown that she would suffer injury in that tribunal if this Court stays its hand, nor has she shown that the state proceeding necessarily cannot provide an adequate remedy. This *Winter* factor therefore weighs against injunctive relief.

**C.    The balance of equities weighs against Greene.**

The third *Winter* factor asks whether the threatened injury to the movant in the absence of the requested injunction outweighs the harm

that the requested injunction might cause the defendants. 555 U.S. at 20. Here, Greene will not suffer any harm, and the harm to the State would be substantial. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *accord Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018).

## D.    The public interest also weighs against Greene.

When the government is the party opposing an injunction, the third and fourth *Winter* factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). That is, there is a public interest in the enforcement of statutes enacted by the peoples' democratically elected representatives.

And so there is here. The Georgia General Assembly has seen fit to require all candidates for state and federal office to meet the constitutional and statutory qualifications of the office they seek. O.C.G.A. § 21-2-5(a). It has also provided an elaborate process by which eligible voters or the Secretary of State may challenge a candidate's qualifications. *Id.* §§ 21-2-5(b)-(e). The public has an interest in having

24

that process work and work smoothly. And an injunction here would undermine that public interest.

## Conclusion

The Court should either abstain, under *Younger*, from exercising jurisdiction over this case because of the ongoing state challenge to Greene's qualifications or deny Greene's motions for injunctive relief on their merits.

Respectfully submitted this 7th day of April, 2022.

*/s/ **Bryan L. Sells**

Georgia Bar No. 635562
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

Ronald Fein*
John C. Bonifaz*
Ben Clements*
Courtney Hostetler*
Benjamin Horton*
FREE SPEECH FOR PEOPLE
1320 Centre St. #405
Newton, MA 02459
(617) 244-0234
rfein@freespeechforpeople.org

Jonathan S. Abady*
Andrew G. Celli, Jr.*
Sam Shapiro*
Andrew K. Jondahl*
EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
jabady@ecbawm.com
acelli@ecbawm.com

*Attorneys for the Rowan Intervenors*

* Motions for admission pro hac vice pending

## Certificate of Compliance

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan L. Sells*
Bryan L. Sells