IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARJORIE TAYLOR GREENE,  :
           :
  Plaintiff,     :
           :
  v.       :
           :  CIVIL ACTION NO.
BRAD RAFFENSPERGER, in his :  22-cv-1294-AT
official capacity as Georgia Secretary :
of State, *et al.*,     :
           :
  Defendants.    :

## OPINION AND ORDER

## Table of Contents

I. INTRODUCTION ................................................................ 3

II. BACKGROUND ................................................................ 4

 A. The Challenge Statute and Related Procedures ........................................... 6

 B. Intervenors' Challenge and the OSAH Proceedings Thus Far .................. 9

 C. The Instant Lawsuit .................................................................. 12

III. PRELIMINARY INJUNCTION LEGAL STANDARD .................................... 15

IV. THRESHOLD PROCEDURAL AND JURISDICTIONAL ISSUES .............. 17

 A. Standing and Ripeness .................................................................. 17

 B. Does Plaintiff Have a Cause of Action to Bring a Claim Under the 1872
Amnesty Act and Does the Court Have Jurisdiction to Address this Claim
Under Count IV? .................................................................. 20

 C. Federal Court Abstention under the *Younger* Doctrine ........................... 24

  1. Sprint Category Two: Civil Proceedings Akin to Criminal Prosecutions
.................................................................................28

2. Sprint Category Three: Civil Proceedings Implicating a State's Interest in Enforcing Orders and Judgments of its Courts ................................... 32

V. PLAINTIFF'S SUBSTANTIVE CLAIMS AND MOTION FOR PRELIMINARY INJUNCTION ................................................................ 38

A. Plaintiff's First and Fourteenth Amendment Claims [Counts I and II].. 38

1. Anderson/Burdick Step 1 ...................................................... 41

2. Anderson/Burdick Step 2 .................................................... 53

3. The Disqualification Provision of Section 3 of the Fourteenth Amendment and the 1872 Amnesty Act.................................... 55

B. Plaintiff's Claims Under Article I, Section 5 [Count III] ........................ 64

VI. CONCLUSION............................................................................... 71

## I.    INTRODUCTION

Before the Court are Plaintiff Marjorie Taylor Greene's Motions for Temporary Restraining Order and Preliminary Injunction. [Docs. 4, 5.] Plaintiff's Complaint and Motions contest the constitutionality of Georgia's "Challenge Statute" as applied to Plaintiff as well as facially. The Challenge Statute allows voters to challenge whether individual candidates in their districts meet the requisite legal qualifications to run for their prospective positions via an administrative proceeding before Georgia's Office of State Administrative Hearings ("OSAH"). Under the Challenge Statute, an OSAH administrative law judge ("ALJ") recommends factual and legal findings, which are then submitted to the Georgia Secretary of State for review and final ruling. That decision in turn may be appealed to the Superior Court of Fulton County, Georgia as well as to the Georgia Court of Appeals or Supreme Court. O.C.G.A. § 21-2-5(e).

This controversy began when five voters in Plaintiff's district filed a challenge to Plaintiff's candidacy on March 24, 2022, triggering the OSAH process. On April 1, Plaintiff filed this action seeking to (1) halt ongoing OSAH proceedings initiated by the voters' challenge and (2) enjoin the assigned ALJ and the Secretary of State from enforcing the Challenge Statute against her. The Court quickly scheduled an expedited briefing schedule and oral argument of several hours' duration that was held on April 8, 2022.

"In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of

persuasion' as to each of the four prerequisites" for an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up). In assessing the question of whether a party is entitled to injunctive relief, the Court is required to apply rigorous standards. This case raises novel and complex constitutional issues of public interest and import. "After a thorough analysis of the evidentiary and legal issues presented in this complex matter involving unsettled questions of law, the Court finds Plaintiff has not carried her heavy burden to establish a strong likelihood of success on the legal merits in this case. Accordingly, the Court denies the Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunction. [Docs. 4, 5.] The state proceedings under the Challenge Statute may therefore proceed.

## II. BACKGROUND

Plaintiff Marjorie Taylor Greene currently serves as a member of the United States House of Representatives for Georgia's 14th Congressional District. (Stipulated Facts, Doc. 38 ¶ 1.) Plaintiff is running for reelection in the 2022 midterms and filed her candidacy for that election on March 7, 2022. (*Id.* ¶ 2.) She then filed an amended notice of candidacy on March 10, 2022. (*Id.*) Two weeks later, on March 24, five registered voters in Georgia's 14th Congressional District ("Intervenors" in this action) challenged Plaintiff's qualifications to serve as a member of Congress by filing an official challenge with the Georgia Secretary of State's office under O.C.G.A. § 21-2-5 ("the Challenge Statute"). The Challenge Statute is described below.

In their challenge, Intervenors allege that Plaintiff "does not meet the federal constitutional requirements for a Member of the U.S. House of Representatives and is therefore ineligible to be a candidate for such office." (*See* Doc. 3-1, Notice of Challenge ¶ 1.) Specifically, Intervenors assert that Plaintiff "voluntarily aided and engaged in an insurrection to obstruct the peaceful transfer of presidential power, disqualifying her from serving as a Member of Congress under Section 3 of the 14th Amendment . . . ." (*Id.*; Stipulated Facts ¶ 5.) Section 3 of the Fourteenth Amendment prohibits certain individuals and office holders, who had previously taken an oath of office to support the Constitution of the United States, from holding federal or state office if they "engaged in insurrection or rebellion" against the United States as follows:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3.

Plaintiff took her oath of congressional office on January 3, 2021, when members of the 117th Congress were sworn in.[1] Intervenors' challenge sets forth, in a 42-page complaint, a broad range of contextual information as to the alleged

---

[1] *See Members of the 117th Congress Sworn In,* U.S. House of Representatives, https://www.house.gov/feature-stories/2021-1-5-members-of-the-117th-congress-sworn-in (last visited Apr. 17, 2021).

insurrection, Plaintiff Greene's alleged activities, and relevant legal background and argument. (*See, e.g.*, Notice of Challenge ¶¶ 43–45.)

### A.   The Challenge Statute and Related Procedures

The Challenge Statute provides that "any elector" who is eligible to vote for a candidate may "challenge the qualifications of the candidate by filing a written complaint with the Secretary of State giving the reasons why the elector believes the candidate is not qualified to seek and hold the public office for which he or she is offering." O.C.G.A. § 21-2-5(b). This challenge must be initiated within two weeks after the deadline for candidate qualifying. *Id.* Upon receiving the challenge, "the Secretary of State shall notify the candidate in writing that his or her qualifications are being challenged and the reasons therefor." *Id.* Additionally, the Secretary of State "shall advise the candidate that he or she is requesting a hearing on the matter before an administrative law judge of the Office of State Administrative Hearings" and shall inform the candidate of the date, time, and place of the hearing. *Id.* Although not in the statute itself, the Georgia Supreme Court has instructed that, in the context of a challenge under the Challenge Statute, the burden is on the candidate to affirmatively establish her eligibility for office. *Haynes v. Wells*, 538 S.E.2d 430, 433 (Ga. 2000). That said, under Georgia Regulations, an ALJ acting pursuant to O.C.G.A. §§ 50-13-13, 50-13-40(c), and 50-13-41 may determine, prior to the commencement of the hearing, "that law or justice requires a different placement of the burden of

proof." *See* Ga. Comp. R. & Regs. R. 616-1-2-.07.[2] As discussed later, the ALJ issued a decision on April 13, 2022, shifting the burden of proof to Intervenors. (Doc. 48-1.) The statute provides for the ALJ to report his written findings to the Secretary of State after completion of the administrative hearing process. O.C.G.A. § 21-2-5(b).

At that point, the Secretary of State "shall determine if the candidate is qualified to seek and hold the public office for which such candidate is offering." *Id.* § 21-2-5(c). If the Secretary of State determines that the candidate is not qualified, the statute directs that he shall withhold the candidate's name from the ballot or strike such candidate's name from the ballots, if the ballots have already been printed. *Id.* However, as discussed further below, counsel for Defendants represented at the Court's April 8 oral argument that the ballots for the May primary at issue here are already printed, that Plaintiff's name is on the ballot, and that it will remain on the ballot, "no ifs, ands, or buts about that." (TRO Hr'g Tr. ("Tr."), Doc. 39 at 29.) The statute further provides that, if there is insufficient time for withholding or striking a candidate's name, "a prominent notice shall be placed at each affected polling place advising voters of the disqualification" and "all votes cast for such candidate shall be void and shall not be counted." O.C.G.A. § 21-2-5(c).

---

[2] Counsel for Defendants represented that ALJs have invoked this provision in the past in the context of state candidate disqualifications related to tax delinquencies or past convictions. (TRO Hr'g Tr. ("Tr.") at 36.)

In the event the Secretary of State rules against the candidate, the candidate "shall have the right to appeal the decision . . . by filing a petition in the Superior Court of Fulton County *within ten days* after the entry of the final decision by the Secretary of State." *Id.* § 21-2-5(e) (emphasis added). The reviewing Fulton County Superior Court may order an immediate stay of the Secretary of State's decision "upon appropriate terms for good cause shown." *Id.* The Fulton County Superior Court review shall be conducted without a jury and shall be confined to the record. *Id.* The Challenge Statute specifically provides that the Fulton County Superior Court may reverse or modify the Secretary of State's decision for various reasons including, *inter alia*, if the decision is in violation of the Constitution or Georgia laws; in excess of the statutory authority of the Secretary of State; clearly erroneous; or affected by other error of law. *Id.* Finally, an aggrieved candidate may obtain review of the final judgment of the superior court by the Court of Appeals or the Georgia Supreme Court as provided by law. *Id.*; *see also Cox v. Barber*, 568 S.E.2d 478, 480 (Ga. 2002) (conducting "expedited review" of candidate eligibility challenge after Secretary of State adopted ALJ's decision to disqualify Barber as candidate for Public Service Commission seat based on residency requirements, and issuing opinion six days before August 20 primary and two days after the record was transmitted to the Georgia Supreme Court).[3]

---

[3] In *Barber*, the challenge was filed on May 11, 2002. The ALJ held a hearing on July 19, 2002, and issued a final decision on July 30, 2002. The Secretary of State adopted that decision, to disqualify Barber, on July 31, 2002. Barber appealed to the Fulton County Superior Court on

In conducting the OSAH review, the ALJ has authority to manage the hearing, rule on motions and issues of proof, and provide for the taking of testimony by deposition or interrogatory, as well as to impose civil penalties for a party's submission of pleadings or papers for an improper purpose or containing frivolous arguments. O.C.G.A. § 50-13-41(b), § 50-13-13. The ALJ is also authorized to dispose of motions to dismiss for lack of agency jurisdiction over the subject matter or parties, or "for any other ground." O.C.G.A. § 50-13-13. In line with ordinary OSAH procedures, the ALJ must issue a decision — including findings of fact and conclusions of law — to all parties within 30 days after the close of the record. *Id.* § 50-13-41(c). Upon review of the ALJ's decision, the Secretary of State has 30 days to reject or modify such decision. *Id.* § 50-13-41(d)(3). However, as evident in the *Barber* case, as well as the events that have transpired in this case so far, these proceedings frequently move far more rapidly than provided for by the OSAH statutory provisions.

## B.    Intervenors' Challenge and the OSAH Proceedings Thus Far

Here, Intervenors filed their challenge of Plaintiff's candidacy on March 24, 2022. That same day, the Secretary of State's office referred the challenge to OSAH and sent notice of the challenge to Plaintiff. (Stipulated Facts ¶¶ 4, 6.) Notice was sent to the email address that Plaintiff provided in her corrected

---

August 6, 2002, and the Fulton County Superior Court reversed the Secretary of State's decision the next day in an order issued on August 7, 2002. The Secretary of State appealed to the Georgia Supreme Court on August 9, 2002, and the record in the case was submitted to that Court on August 12. The Georgia Supreme Court decided the case on August 14, six days before the primary. *See McDonald v. Barber*, OSAH-ELE-CE-0300328-78-WJB (Ga. Office of State Admin. Hearings July 30, 2002); *Barber*, 568 S.E.2d at 478.

candidate qualifying forms, which she submitted on March 10. (*Id.*) However, the email address that Plaintiff used on her candidacy filing forms was one that Plaintiff claims was not regularly checked. (Compl., Doc. 3 ¶ 30 n.1; *see also* Declaration of Steven Ellis, Doc. 36-1 ¶ 3, Ex. A.) As a result, Plaintiff alleges that she did not receive actual notice of the challenge to her candidacy until March 31, 2022. (Compl. ¶ 30 n.1.)

Upon referral by the Secretary of State, OSAH assigned Administrative Law Judge Charles R. Beaudrot to hear the challenge. (Stipulated Facts ¶ 6.) In the OSAH proceeding, Intervenors filed a notice to produce documents and a motion to take Plaintiff's deposition on March 28, 2022. (Docs. 3-2, 3-3.) Two days later, on March 30, ALJ Beaudrot ordered Plaintiff to respond to Intervenors' notice and motion by April 4 at 12:01 p.m. (OSAH Order Shortening Time Period, Doc. 9; Stipulated Facts ¶ 8.) Plaintiff alleges that she did not receive these filings until March 31 because the candidacy forms that she had executed and signed included the incorrect email address. (Compl. ¶¶ 35–36.)

On April 3, Plaintiff filed in the OSAH proceeding a motion to dismiss the challenge, a motion to stay Plaintiff's deposition, and objections to Intervenors' notice to produce documents. (Stipulated Facts ¶ 9.) The next day, April 4, ALJ Beaudrot denied Intervenors' motion to take Plaintiff's deposition. (*Id.* ¶ 10.) On April 5, ALJ Beaudrot held a prehearing conference call during which he (1) ordered Intervenors to respond to Plaintiff's objections to the notice to produce documents by 5:00 p.m. on April 7; (2) ordered Intervenors to respond to

Plaintiff's motion to dismiss by 11:00 a.m. on Monday, April 11; and (3) indicated that he had not yet ruled on Plaintiff's objections to the notice to produce documents. (*Id.* ¶ 11.) ALJ Beaudrot then scheduled a hearing for April 13, 2022. (*Id.* ¶ 12.) On Monday, April 11, 2022, ALJ Beaudrot held a conference with Plaintiff and Intervenors and continued the hearing from April 13 to either April 19 or April 22, 2022, to accommodate Plaintiff's schedule. (Intervenors' Notice, Doc. 41.) On Tuesday, April 12, the parties confirmed with this Court that the OSAH hearing had been re-set for Friday, April 22 at 9:30 a.m. (Intervenors' Second Notice, Doc. 46.)

Subsequently, on April 13, 2022, ALJ Beaudrot issued a substantive Prehearing Order. (Prehearing Order, Doc. 48-1.) In the Prehearing Order, ALJ Beaudrot first confirmed that the OSAH hearing had been rescheduled for April 22, 2022, to accommodate Plaintiff's schedule. (*Id.* at 1.) He then overruled Plaintiff's objection to the April 22 hearing being live streamed[4] and denied Plaintiff's motion to quash, instead ordering that Plaintiff remain subject to subpoena for the April 22 hearing. (*Id.* ¶¶ 1–2.) Next, in response to a motion *in limine* filed by Plaintiff, ALJ Beaudrot ordered that the burden of proof in the OSAH proceeding would be on Intervenors, not on Plaintiff. (*Id.* ¶ 3) (citing OSAH Rule 616-1-2.07, which allows an ALJ to shift the burden of proof when justice so requires). He added: "Justice does not require [Plaintiff] to 'prove a

---

[4] As the ALJ noted, conducting live streamed public hearings is consistent with the State's administrative rules. (Prehearing Order at 3.) ("These policies are embodied in OSAH Rule 616-1-2-.43, and the Uniform Rules for the Superior Courts to which OSAH Rule 616-1-2-.43 refers.").

negative.' Justice in this setting requires that the burden of proof is on [Intervenors] to establish that [Plaintiff] is disqualified . . . ." (*Id.*)

In addition, ALJ Beaudrot reserved ruling on Plaintiff's motion *in limine* as to evidentiary objections, pending receipt of a more detailed list of Plaintiff's particular objections. (*Id.* ¶ 4.) ALJ Beaudrot also reserved ruling on Plaintiff's motion to dismiss until after the hearing and clarified that, like any other court, OSAH judges "are required to follow and apply the Constitution." (*Id.* ¶¶ 5–6.) He further noted that, in this respect, OSAH judges may make findings that a Georgia statute or regulation is inconsistent with the Constitution by employing accepted canons and methods of statutory interpretation. (*Id.* ¶ 6) Additionally, ALJ Beaudrot indicated that an OSAH judge may not declare a statute unconstitutional, though he may develop the record on issues of constitutional validity in presenting the record to the Secretary of State. (*Id.*) Finally, the Prehearing Order emphasizes the important interest at stake in this proceeding, both to the public at large and to the particular litigants. (*Id.* ¶ 5.) The Order also acknowledges the necessity of swift action and expeditious, but thorough, review of Intervenors' challenge in light of the election context and impending primary deadline. (*Id.*)

### C.   The Instant Lawsuit

After receiving actual notice of Intervenors' challenge on March 31, Plaintiff filed the instant Complaint, emergency motion for temporary restraining order ("TRO"), and motion for preliminary injunction in this Court on Friday,

April 1, 2022. (Docs. 3, 4, 5.) In her Complaint, Plaintiff asserts claims under the First and Fourteenth Amendments (Counts I and II), Article I, Section 5 of the U.S. Constitution (Count III), and the 1872 Amnesty Act (Count IV).

In Count I, Plaintiff alleges that the provision of the Challenge Statute "triggering a government investigation based only upon a Challenger's belief" — here, that Plaintiff engaged in an insurrection — violates Plaintiff's First Amendment right to run for political office. (Compl. ¶ 59.) Count II alleges that the Challenge Statute as applied here violates the Fourteenth Amendment's Due Process Clause because it places the burden on the candidate to prove that she did not engage in an insurrection in response only to a challenger's belief. (*Id.* ¶ 65.) In Count III, Plaintiff alleges that the Challenge Statute violates Article I, Section 5 of the U.S. Constitution because it permits the State of Georgia to make its own independent evaluation of whether a candidate is qualified to serve in the U.S. House of Representatives, thereby usurping Congress's constitutional responsibilities under Article I, Section 5, which instructs that each House "shall be the Judges of the Elections, Returns and Qualifications of its own Members." (*Id.* ¶¶ 68, 71.) Finally, in Count IV, Plaintiff alleges a violation of the 1872 Amnesty Act. (*Id.* ¶¶ 72–77.) The 1872 Amnesty Act removed the "political disability" imposed by Section 3 of the Fourteenth Amendment, as follows:

> [A]ll political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever, except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the

United States, heads of departments, and foreign ministers of the
United States.

*See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).[5] Accordingly, in Count IV,

Plaintiff alleges that application of Section 3 of the Fourteenth Amendment[6] to

bar her from candidacy violates the 1872 Amnesty Act. (Compl. ¶¶ 72–77.) Counts

I, II, and III are brought under 42 U.S.C. § 1983. As pled, Count IV is brought

directly under the 1872 Amnesty Act.

The same day Plaintiff filed her lawsuit, on April 1, counsel for Intervenors

notified the Court's deputy by telephone that they intended to file a motion to

intervene. The motion to intervene was filed the next business day on Monday,

April 4, 2022. (Doc. 13.) The Court ordered an expedited briefing schedule as to

Plaintiff's motions for a TRO and preliminary injunction and scheduled oral

argument for Friday, April 8. (*See* First April 4 Docket Entry; *see also* Order

Directing Proposed Intervenors to Respond to TRO, Doc. 15.) The Court also

ordered expedited briefing on the motion to intervene. (*See* Second April 4

Docket Entry.)

Upon review of the motion to intervene and Plaintiff's response in

opposition to that motion, the Court granted the motion on April 7. (Doc. 33.)

The Court then heard arguments from all parties as to Plaintiff's emergency

---

[5] Congress passed a second Amnesty Act in 1898. *See* Act of June 6, 1898, ch. 389, 30 Stat. 432
("[T]he disability imposed by section three of the Fourteenth Amendment to the Constitution of
the United States heretofore incurred is hereby removed.").
[6] As noted above, Section 3 of the Fourteenth Amendment prohibits an individual from serving
as a representative in Congress if, after having previously taken an oath to support the
Constitution, he or she engages in insurrection or rebellion against the United States.

motion for a TRO and motion for preliminary injunction in open court on Friday, April 8, 2022.

As to the expected timeline, counsel for Defendants represented at oral argument that the "ballot build deadline" for the May 24, 2022 primary has already passed, that absentee ballots for the primary have already been printed, and that Plaintiff's name is on the ballots. (Tr. at 29.) According to Defendants, Plaintiff could "renounce her U.S. citizenship and she is still going to appear on the printed absentee ballots" and "is still going to appear on the ballot marking devices." (*Id.*) Plaintiff did not dispute this assertion or provide any evidence to the contrary.

As noted, after oral argument on April 8, the Court received notice on the docket that the OSAH hearing, previously set for April 13, had been continued to April 22. (Intervenors' Notices, Docs. 41, 46.) Given the additional time available for the Court to rule prior to the commencement of the OSAH hearing, the Court requested limited supplemental briefing from the parties pertaining to the issues of *Younger* abstention and the ALJ's authority to shift the burden of proof in a challenge proceeding. (Doc. 47.) The parties submitted the requested briefs on April 14, 2022, and also attached the April 13 OSAH Prehearing Order discussed thoroughly above. Accordingly, Plaintiff's motions are now ripe for resolution.

## III. PRELIMINARY INJUNCTION LEGAL STANDARD

Before a court will grant a motion for emergency injunctive relief, such as a TRO or a preliminary injunction, the moving party must establish that: (1) she

has a substantial likelihood of success on the merits; (2) she will suffer irreparable injury if the relief is not granted; (3) the threatened injury outweighs the harm the relief may inflict on the non-moving party; and (4) entry of relief would not be adverse to the public interest. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

A TRO or preliminary injunction is "an extraordinary and drastic remedy." *Siegel*, 234 F.3d at 1176; *see also Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) (explaining that "granting a preliminary injunction is the exception rather than the rule" and that a preliminary injunction is "an extraordinary and drastic remedy").[7] A court is authorized to grant such extraordinary injunctive relief only when the moving party "clearly establishe[s] the burden of persuasion as to each of the four prerequisites." *Siegel*, 234 F.3d at 1176 (internal quotation marks omitted). A showing of irreparable injury is "'the sine qua non of injunctive relief.'" *Id.* (citing *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Therefore, even if the moving party establishes a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would make any preliminary injunctive relief improper. *Id.* The irreparable injury asserted by

---

[7] The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), adopted decisions of the Fifth Circuit rendered prior to October 1, 1981, as precedent in the Eleventh Circuit.

the moving party "must be neither remote nor speculative, but actual and imminent." *Id.*

## IV.   THRESHOLD PROCEDURAL AND JURISDICTIONAL ISSUES

Before turning to the merits, the Court must first address three important threshold issues: (1) whether Plaintiff has standing to pursue her claims and whether her claims are ripe; (2) whether Plaintiff has a cause of action to bring her claim under the 1872 Amnesty Act; and (3) whether the Court should decline to exercise jurisdiction in this case under the *Younger* abstention doctrine.

### A.   Standing and Ripeness

In response to Plaintiff's motions, Defendants argue that Plaintiff lacks Article III standing and that her claims are not yet ripe. (Defs.' Opp'n, Doc. 22 at 14–16.) Specifically, Defendants contend that Plaintiff "has not shown that the factual predicate for her alleged injury — namely, her potential disqualification — has sufficiently materialized," and thus her injury is "entirely conjectural and hypothetical" at this point, as neither the ALJ nor the Secretary of State has ruled to disqualify her. (*Id.*) At the April 8 oral argument, Intervenors stated that they do not contest Plaintiff's ability to demonstrate standing with respect to Counts I, II, or III.[8] In reply, Plaintiff contends that she has suffered concrete, particularized injury in being subject to the Challenge Statute via an allegedly unconstitutional process. (Reply, Doc. 32 at 2–3.)

---

[8] However, Intervenors argue that the Court does not have jurisdiction to address Count IV, as discussed further in Section IV.B. (Tr. at 48.)

Under Article III of the Constitution, a federal court's jurisdiction is limited to "Cases" and "Controversies." U.S. Const., art. III, § 2. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

At issue here is the first requirement: injury in fact. This requirement ensures that a plaintiff has a "personal stake in the outcome of the controversy." *Id.* at 158 (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To meet this first requirement, an injury must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "[A]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony*, 573 U.S. at 158 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). When an individual is subject to threatened enforcement of a law, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.* ("[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent."). A threatened administrative proceeding, for example, may give rise to harm sufficient to justify pre-enforcement review. *Id.* at 165; *see also Steffel v. Thompson*, 415 U.S. 452, 458–60 (1974) (holding that reasonable threat of

prosecution for conduct allegedly protected by Constitution gives rise to sufficiently ripe controversy).

Under this logic, the Supreme Court explained in *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.* that "[i]f a reasonable threat of prosecution creates a ripe controversy," it necessarily follows that the "actual filing of [an] administrative action threatening sanctions" does as well. 477 U.S. 619, 625–26 n.1 (1986) ("It is true that the administrative body may rule completely or partially in appellees' favor; but it was equally true that the plaintiffs in *Steffel* and *Doran* may have prevailed had they in fact been prosecuted."); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 n.13 (1979) ("[T]he prospect of issuance of an administrative cease-and-desist order . . . or a court-ordered injunction . . . against such prohibited conduct provides substantial additional support for the conclusion that appellees' challenge . . . is justiciable.").

The same is true here. Like in *Ohio Civil Rights Commission*, "an administrative action threatening sanctions" has already commenced. 477 U.S. at 625–26 n.1. Indeed, Plaintiff has responded to motions and discovery requests in the OSAH proceeding concerning the challenge to her candidacy and has even filed a motion to dismiss of her own. Further, the potential consequences of an adverse ruling in the administrative proceeding here are serious. Plaintiff is at risk of losing her ability to run for a congressional position. Citizens have a constitutionally protected right, though limited, to run for public office. *Cook v.*

*Randolph Cnty.*, 573 F.3d 1143, 1152 (11th Cir. 2009). Plaintiff has therefore alleged a "concrete, particularized, and actual or imminent" injury sufficient to demonstrate standing to pursue her claims related to Georgia's Challenge Statute and the OSAH process generally.

### B. Does Plaintiff Have a Cause of Action to Bring a Claim Under the 1872 Amnesty Act and Does the Court Have Jurisdiction to Address this Claim Under Count IV?

At oral argument, Intervenors argued that the Court does not have jurisdiction to address Count IV as pled because the 1872 Amnesty Act does not create a private right of action. (Tr. at 48, 76.) Plaintiff responded that Count IV is brought via 42 U.S.C. § 1983, which allows a plaintiff to bring a claim under the federal Constitution or laws. (*Id.* at 77.)

Federal courts are courts of limited jurisdiction. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (noting that federal courts are "empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution and which have been entrusted to them by a jurisdictional grant authorized by Congress") (internal quotation marks omitted). For this reason, "a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." *Id.* at 410 ("Indeed, it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking."). "The burden for establishing federal subject matter jurisdiction rests with the party bringing

the claim." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc*., 411 F.3d 1242, 1247 (11th Cir. 2005).

Here, the Complaint asserts federal jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). (Compl. ¶ 5.) Section 1331 provides district courts with original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States. 28 U.S.C. § 1331. Section 1343(a)(3) provides district courts with jurisdiction over a civil action to redress the deprivation, under color of any state law or statute, of any right, privilege, or immunity secured by the Constitution or by any act of Congress. 28 U.S.C. § 1343(a)(3).

However, these jurisdictional statutes do not create a private right of action for the violation of any federal law. *See Jairath v. Dyer*, 154 F.3d 1280, 1282 (11th Cir. 1998) ("Such federal-question jurisdiction [under § 1331] may be based on a civil action alleging a violation of the Constitution, or asserting a federal cause of action *established by a congressionally created expressed or implied private remedy for violations of a federal statute*.") (emphasis added); *Storey v. Rubin*, 976 F. Supp. 1478, 1483 (N.D. Ga. 1997) ("Federal courts have federal question subject matter jurisdiction under [Section 1331] only when Congress explicitly or implicitly has created a private right of action independent of [Section 1331] supporting a given plaintiff's claim."). The Court must therefore ask whether Congress intended to create a private remedy for violations of the 1872 Amnesty Act. *Loc. Div. 732, Amalgamated Transit Union v. MARTA*, 667 F.2d 1327,

1333–34 (11th Cir. 1982) (explaining that the concepts of federal subject matter jurisdiction and implied rights of action are "inextricably intertwined").

In circumstances where a plaintiff asserts a claim directly under a federal statute and that statute does not afford a private right of action, federal courts have explained that they lack jurisdiction. *See, e.g.*, *Acara v. Banks*, 470 F.3d 569, 572 (5th Cir. 2006) ("We hold there is no private cause of action under HIPAA and therefore no federal subject matter jurisdiction over Acara's asserted claims"); *Abner v. Mobile Infirmary Hosp.*, 149 F. App'x 857, 858–59 (11th Cir. 2005) (finding that "[t]he Medicare Act does not create a private right of action for negligence," and thus "the district court properly found that jurisdiction did not exist in this case").

At the April 8 oral argument, Plaintiff argued that Count IV was brought via Section 1983. But first, Count IV, as alleged, is brought directly under the 1872 Amnesty Act, not Section 1983. Second, Section 1983 does not itself create a private right of action. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.,* 477 F.3d 1282, 1299 (11th Cir. 2007) (explaining that "Section 1983 is merely a vehicle by which to bring" suits against those acting under color of state law for deprivation of any rights, privileges, or immunities secured by the Constitution and laws). As the Supreme Court has instructed, "[a] court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (citing *Golden State*

*Transit Corp. v. Los Angeles*, 493 U.S. 103, 107–08 (1989) (explaining that "[a] claim based on a statutory violation is enforceable under § 1983 only when the statute creates 'rights, privileges, or immunities' in the particular plaintiff")). "Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id.* at 285–86(citing *California v. Sierra Club*, 451 U.S. 287, 294 (1981) ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries")). Ultimately, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

Therefore, a cause of action would only lie under the 1872 Amnesty Act itself. However, Plaintiff has made no argument that the 1872 Amnesty Act itself confers an explicit or implied private right of action. Whether a federal statute creates an implied private right of action and a private remedy involves a complex assessment of the statutory text and structure to determine whether Congress intended to create a private right. *See Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001).

Here, the parties have not briefed the novel issue as to whether the 1872 Amnesty Act creates a private right that may serve as the basis for a private suit and whether the Court has jurisdiction to entertain a claim brought under this Act. The Court finds it unwise to wade into these uncharted waters without

briefing or a concrete understanding of what, if any, legal moorings exist for Plaintiff's position. This is especially so as the Court sees no basis at this preliminary juncture to find that the 1872 Amnesty Act was intended to create enforceable individual legal rights of action that could be asserted in the federal courts, as opposed to merely authorizing the removal of the "disability" incurred by a subset of the identifiable former office holders who, by the terms of Section 3 of the Fourteenth Amendment, were disqualified from serving in Congress as of 1872. Plaintiff has therefore not carried her burden to establish that the Court has jurisdiction over her 1872 Act claim. *Sweet Pea Marine*, 411 F.3d at 1247. Nevertheless, the Court may still consider certain arguments Plaintiff has made regarding the 1872 Act in the context of Plaintiff's remaining constitutional claims.

### C.    Federal Court Abstention under the *Younger* Doctrine

Having determined that Plaintiff has standing to maintain her claims alleged in Counts I through III and that those claims are ripe for adjudication, the Court next considers whether it should, as Defendants and Intervenors argue, decline to exercise its jurisdiction to hear this case under the *Younger* abstention doctrine.

This abstention doctrine originates from the Supreme Court's holding in *Younger v. Harris*, 401 U.S. 37 (1971). In *Younger*, the Supreme Court held that, under "the basic doctrine of equity jurisprudence," federal courts should not act to restrain ongoing criminal prosecutions in state courts, provided that "the

moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."[9] *Id.* at 43–44. This principle of equitable restraint serves the interest of "avoid[ing] a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted." *Id.* at 44. As the Supreme Court explained in *Younger*, the rationale for restraining courts of equity from interfering with ongoing criminal prosecutions is also reinforced by a consideration of comity, that is:

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Id.* This concept, which "is referred to by many as 'Our Federalism,' . . . does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts." *Id.*

Because the same concern for "comity and federalism" is "equally applicable to certain other pending state proceedings," the Supreme Court extended the *Younger* abstention doctrine to other types of state civil proceedings "in which important state interests are involved." *Ohio Civil Rights Comm'n*, 477 U.S. at 627. Despite this prior extension, the Supreme Court has more recently narrowed *Younger*'s domain, cautioning that "[a]bstention is not

---

[9] Unlike standing and ripeness, the *Younger* abstention doctrine "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction where particular kinds of state proceedings have already been commenced." *Ohio Civil Rights Comm'n*, 477 U.S. at 626.

in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).[10] Rather, circumstances fitting within the *Younger* doctrine are "exceptional" and only apply to the three specific categories of state proceedings identified in *Sprint*: (1) "state criminal prosecutions," (2) "civil enforcement proceedings" akin to criminal prosecutions, and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state court's ability to perform their judicial functions." *Id.* at 73 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350, 367–68 (1989)). In *Sprint*, the Supreme Court emphasized that, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging,'" and "[p]arallel state-court proceedings do not detract from that obligation." *Id.* at 77.

After a federal court finds that state-court proceedings fall into one of these three exceptional categories, and only after that determination, "additional factors" must be considered by the federal court to determine whether abstention is appropriate. *Barone v. Wells Fargo Bank, N.A.*, 709 F. App'x 943, 948 (11th Cir. 2017) (quoting *Sprint*, 571 U.S. at 81). The federal court must apply the "*Middlesex* factors" and consider whether the state proceeding (1) constitutes an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides an adequate opportunity to raise federal challenges. *Id.* (citing

---

[10] *See Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886, 890 (3d Cir. 2022) (explaining that, in the years that followed *Younger*, "federal courts expanded [the doctrine] and abstained too frequently, so the Supreme Court reined in that expansion," and "has since consistently narrowed abstention doctrines, including *Younger*").

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

When all three *Middlesex* factors are satisfied, a federal court should abstain from interfering with ongoing state proceedings absent a showing that (1) the state proceeding was initiated in bad faith or for the purpose of harassment; (2) the challenged statute is "flagrantly and patently unconstitutional;" or (3) other extraordinary circumstances render abstention inappropriate. *Middlesex*, 457 U.S. at 437.[11]

Although the parties in this case focus on whether the three *Middlesex* factors are satisfied, they devote little attention to whether this case falls into any of the three categories in which *Younger* abstention could apply as identified by the Supreme Court in *Sprint*. Plaintiff does not dispute Defendants' and Intervenors' contention that this case falls into *Sprint*'s third category, but that certainly is not dispositive. The Court has an independent obligation to determine whether this case does in fact fall into one of the three categories in which *Younger* abstention could potentially apply. As the Supreme Court observed in *Sprint*, "abstention is not warranted whenever these so-called

---

[11] *See, e.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 489–90 (1965) (finding that abstention was inappropriate where the plaintiffs alleged that the State was abusing its legislative power and criminal processes in order to harass and humiliate plaintiffs, without any hope of ultimate success in the prosecutions but instead to discourage plaintiffs' civil rights activities); *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973) (finding that *Younger* abstention did not apply where district court determined that state tribunal was "incompetent by reason of bias to adjudicate the issues pending before it"); *Younger*, 401 U.S. at 53–54 (acknowledging that it was "of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it") (internal quotation marks omitted).

*Middlesex* factors are met." *Barone*, 709 F. App'x at 948. If courts did not limit the application of *Younger* to "the three types of exceptional proceedings which define *Younger*'s scope," it "would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Id.* (quoting *Sprint*, 571 U.S. at 81–82). Such a result is "irreconcilable with the general rule 'that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule.'" *Id.*

Keeping in mind these important directives, the Court turns to the question of whether *Younger* abstention applies to this case. To answer that question, the threshold issue the Court must first address is whether this case falls within one of the three exceptional categories of cases identified by the Supreme Court in *Sprint*. The underlying state proceeding is unquestionably not a criminal prosecution; thus, the first category plainly does not apply. The Court therefore focuses its analysis on whether the state proceeding at issue falls within *Sprint*'s second and third categories.

### 1. *Sprint Category Two: Civil Proceedings Akin to Criminal Prosecutions*

A state civil proceeding is generally akin to a criminal prosecution when it constitutes an "enforcement action" initiated to sanction the federal plaintiff for a "wrongful act." *Sprint*, 571 U.S. at 79; *see also Watson v. Fla. Jud. Qualifications Comm'n*, 618 F. App'x 487, 490 (11th Cir. 2015). The Supreme Court cited several past examples of such state enforcement actions in *Sprint. See Ohio Civil Rights*

*Comm'n,* 477 U.S. 619 (abstaining where case involved state-initiated administrative proceedings to enforce state civil rights laws); *Moore v. Sims,* 442 U.S. 415, 419–20 (1979) (abstaining where case involving state-initiated proceeding to gain custody of children allegedly abused by their parents); *Trainor v. Hernandez,* 431 U.S. 434, 444 (1977) (abstaining where underlying civil proceeding was "brought by the State in its sovereign capacity" to recover welfare payments defendants had allegedly obtained by fraud); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 598 (1975) (abstaining where state proceeding was initiated to enforce civil obscenity laws).

Such "enforcement actions" are typically initiated by the State in its sovereign capacity, and the State acts as a party in the proceeding. *Sprint*, 571 U.S. at 79. These civil enforcement actions also often involve a formal investigation and a complaint filed at the end of the investigation. *Sprint*, 571 U.S. at 79 (citing *Ohio Civil Rights Comm'n,* 477 U.S. at 624, and *Middlesex*, 457 U.S. at 433). In applying *Sprint*, courts of appeals have also considered "whether the State could have alternatively sought to enforce a parallel criminal statute." *ACRA Turf Club, LLC v. Zanzuccki,* 748 F.3d 127, 138 (3d Cir. 2014) (citing *Huffman*, 420 U.S. at 604 (describing the civil proceeding at issue as "closely related to criminal statutes which prohibit the dissemination of obscene materials")); *see also Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886 (3d Cir. 2022); *Minn. Living Assistance, Inc. v. Peterson*, 899 F.3d 548 (8th Cir. 2018).

Recent cases in which appellate courts have abstained under the second *Sprint* category illustrate the category's requirements of (1) a state-initiated proceeding which is (2) brought after a state investigation (3) to sanction or punish misconduct. *See, e.g.*, *Watson*, 618 F. App'x at 490–91 (affirming a district court's determination that a Florida Judicial Qualifications Commission's proceeding was akin to a criminal prosecution because "it sought to punish" a judge for her alleged unethical actions and was "initiated and prosecuted" by a state actor); *Gonzalez v. Waterfront Comm'n of N.Y. Harbor*, 755 F.3d 176, 182 (3d Cir. 2014) (finding that proceeding brought by Waterfront Commission of the New York Harbor was akin to a criminal prosecution where Commission first suspected that the plaintiff engaged in perjury, investigated the falsity of the statements, and then initiated disciplinary hearing to sanction the plaintiff for his "wrongful" conduct); *Herrera v. City of Palmdale*, 918 F.3d 1037 (9th Cir. 2019) (holding that a nuisance action was akin to a criminal prosecution where the City executed an inspection warrant, identified violations of state and local laws on a motel property, and then initiated an action for nuisance abatement); *Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017) (holding that a university's disciplinary proceeding was akin to a criminal prosecution where pubic university initiated proceeding, was a party to the proceeding, and the "case . . . involved a filed complaint, an investigation, notice of the charge, and the opportunity to introduce witnesses and evidence").

The parties here did not address *Younger*'s second category in their initial briefing. However, at the Court's April 8 oral argument, Defendants asserted that the state proceeding at issue may "very well be an arguably quasi criminal proceeding." (Tr. at 35.) Also at oral argument, Plaintiff described the state proceeding as depriving Plaintiff of protections generally afforded in the criminal context, such as the requirement that an individual may not be subject to prosecution absent a showing of probable cause, or the concept that an individual is innocent until proven guilty. (*Id.* at 8–10.) In light of these arguments, the Court requested additional briefing on this issue. In those supplemental briefs, both Plaintiff and Defendants clarified that they do not believe that the state proceeding here falls in the second category.[12] Defendants in particular stated that the state proceeding here is not akin to a criminal prosecution because: (1) the challenge was initiated by Intervenors, not the State; (2) the State is the referring agency, not a party to the proceeding; and (3) there has been no agency investigation. (Defs.' Suppl. Br., Doc. 48 at 4.) The Court also notes that ALJ Beaudrot stated in his Prehearing Order that "the Secretary of the State is the referring agency and is not a party to the hearing in this matter. The Secretary of State is not appearing or participating in this matter." (Prehearing Order ¶ 3.)

In light of this representation from the State itself that it is not pursuing a post-investigation enforcement proceeding against Plaintiff for wrongdoing,

---

[12] Intervenors argued in their supplemental brief that the lower proceeding is akin to a criminal prosecution because it seeks to sanction — *i.e.*, disqualify — a candidate who does not meet the qualifications. (Intervenors' Suppl. Br., Doc. 49 at 2–3.)

combined with the representation from ALJ in the underlying proceeding that the State is not in fact a party to the matter, it is readily apparent that the state proceeding below is not encompassed within the second category of cases to which *Younger* abstention applies.

### 2. Sprint Category Three: Civil Proceedings Implicating a State's Interest in Enforcing Orders and Judgments of its Courts

Under the third category, federal courts may abstain when there is a "civil proceeding[] involving certain orders . . . that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78 (quoting *NOPSI*, 491 U.S. at 368). Put another way, this category covers state proceedings that "implicate a State's interest *in enforcing the orders and judgments of its courts*." *Id.* at 70 (internal citation omitted) (emphasis added). As articulated in *Sprint*, the seminal examples of civil proceedings that fall within this third category are *Juidice v. Vail*, 430 U.S. 327 (1977) and *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987).

In *Juidice*, the primary plaintiff had been held in contempt by a county court justice and sought to enjoin county justices' future use of statutory contempt procedures, arguing that New York's contempt statute was unconstitutional. 430 U.S. at 329–30. A three-judge district court agreed and enjoined enforcement of the contempt procedures on the basis that the statute violated the Fourteenth Amendment. *Id.* at 331. Upon review, the Supreme Court reversed, finding that the district court should have abstained under the *Younger*

doctrine. The *Juidice* Court reasoned that *Younger*'s reach extended to cases "in which the State's contempt process is involved" because "[t]he contempt power lies at the core of the administration of a State's judicial system." *Id.* at 335–36 n.12 (explaining that the contempt process "stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory"). In so holding, the *Juidice* Court articulated a third *Younger* category separate from the first category of criminal proceedings and the second category of civil proceedings akin to criminal prosecutions. *Id.* at 335.

The Supreme Court later reinforced and reaffirmed this third category in *Pennzoil.* There, Pennzoil sued Texaco in Texas state court, and a jury rendered a verdict against Texaco. 481 U.S. at 5–6. Before the trial court entered judgment, Texaco filed suit in federal district court, seeking to enjoin Pennzoil from taking any action to enforce the judgment. *Id.* Texaco specifically argued that Texas's procedures related to the posting of appeals bonds were unconstitutional. *Id.* at 6. The Supreme Court held that the district court should have abstained under the principles articulated in *Juidice* because "[b]oth *Juidice* and this case involve challenges to the processes by which the State compels compliance with the judgments of its courts." *Id.* at 13–14; *see also id.* at 14 ("Not only would federal injunctions in such cases interfere with *the execution of state judgments*, but they would do so on grounds that challenge the very process by which those judgments were obtained.") (emphasis added).

Thus, the holdings in both *Juidice* and *Pennzoil* rest upon the rationale that federal courts should abstain where an injunction would interfere with a state court's ability to perform its judicial functions — specifically, its authority to enforce orders and judgments. Relying on this rationale, courts of appeals have held that *Younger* abstention similarly applies in cases where plaintiffs seek federal injunctions requiring the recusal of state-court judges. *See Aaron v. O'Connor*, 914 F.3d 1010, 1017 (6th Cir. 2019) ("We conclude that the ability of the courts of the State of Ohio to determine when recusal of a judge or justice is appropriate and to administer the recusal decision process in accordance with state law operates uniquely in furtherance of the state courts' ability to perform their judicial functions.") (internal quotation marks omitted) (collecting cases); *see also Shapiro v. Ingram*, 207 F. App'x 938, 940 (11th Cir. 2006) (finding that abstention was appropriate where plaintiff sought to overturn state court judge's failure to recuse herself as well as her contempt finding, noting that injunction would have required district court to direct state court judge "to reverse her prior rulings, effectively telling the state court how to run its contempt proceeding").

The Eleventh Circuit has also invoked this third category where the plaintiffs sought to enjoin a state court from imposing sanctions and costs against them based on the terms of a settlement agreement reached after court-ordered mediation. *See Dandar v. Church of Scientology Flag Serv. Org., Inc.*, 619 F. App'x 945, 948 (11th Cir. 2015) ("For the district court to address claims that question the manner in which a state court handles the enforcement of its orders

would directly cause the federal court to interfere with a state court's administration of its duties.").

Beyond these contexts — suits seeking to enjoin state court contempt orders, final judgments, or other enforcement orders, and suits seeking to force recusal — appellate courts have been hesitant to find *Younger*'s third category applicable. *See, e.g.*, *Smith & Wesson*, 27 F.4th at 895 (holding that *Younger*'s third category did not apply because state court order directing Smith & Wesson to comply with subpoena did not constitute an order "uniquely in furtherance" of the state court's ability to perform its judicial functions given that Smith & Wesson had already complied with subpoena) ("If a *threat* of contempt were all that was required to trigger abstention, we would have to abstain whenever there was a pending civil proceeding since the contempt power is generally available to enforce court orders") (emphasis in original); *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 671–72 (10th Cir. 2020) (finding that category three did not apply where intervenors had filed motion in state court proceeding asking court to issue order requiring that defendant be held in contempt for violating settlement agreement but no contempt order had been issued) ("[B]oth *Juidice* and *Pennzoil* involved requests to directly or indirectly thwart state court compliance processes"); *Cavanaugh v. Geballe*, 28 F.4th 428, 434 (2d Cir. 2022) (finding *Younger*'s third category inapplicable where plaintiff sought to enjoin Connecticut commissioner from asserting lien on estate funds, finding that probate court's order recognizing lien did not "lie[] at the core of the

administration of a State's judicial system," nor did it implicate "a process that aids the state court's core ability to function or force the parties to comply with its order") (internal quotation marks and citation omitted).

In the present case, Defendants argue that this third category — for proceedings that are "uniquely in furtherance of the state courts' ability to perform their judicial functions" — applies here because Plaintiff "seeks to stop and have this Court interfere with Georgia's unique judicial process of ensuring that only candidates that meet the statutory and constitutional qualifications for office are placed on the ballot." (Defs.' Opp'n at 8). Defendants further contend that the State has a "constitutional duty in ensuring that qualified candidates are placed on ballots," and so this case falls within the realm of exceptional cases that fall within *Sprint*'s third category. (*Id*. at 9.) In subsequent briefing, Defendants reiterated these arguments, adding that it is the "exclusive jurisdiction of the state judiciary to resolve election contests." (Defs.' Suppl. Br. at 5.) Plaintiff did not, in briefing or at oral argument, contend that this third category was inapplicable.[13]

Nevertheless, having conducted its own review of the matter, the Court finds that the state proceeding below does not fall into *Sprint*'s third category as it neither "implicate[s] a State's interest in enforcing the orders and judgments of its courts" nor involves orders "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 70. First, in seeking to

---

[13] Intervenors also do not mention the three categories articulated in *Sprint* in their opposition brief.

enjoin the ongoing proceeding below, there has been no state court "order" that has been violated. Plaintiff does not seek to enjoin a contempt order, a sanctions order, or some other court judgment or process "by which the State compels compliance with the judgments of its courts." *Pennzoil*, 481 U.S. at 13–14. And this Court's involvement in the matter would not render any judgment or order of a state court "nugatory." *Juidice*, 430 U.S. at 336 n.12. Second, although Defendants argue that the third category applies because Plaintiff "attempts to enjoin the administration of one aspect of the state judicial system," that is true virtually any time a plaintiff seeks to enjoin a parallel state proceeding in furtherance of an administrative enforcement scheme. Granted, the State has established a unique judicial process for reviewing disqualification decisions under the specific statute at issue, but accepting this as a rationale to abstain would run afoul of *Sprint*'s principle that "even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule." *Sprint*, 571 U.S. at 81–82 (internal quotation marks omitted). Additionally, Defendants have not provided any legal authority in which federal courts have abstained in the face of a state court proceeding comparable to the one at issue in the instant case.

The conclusion that abstention is inappropriate here is inescapable even though Defendants, as representatives of the State of Georgia, undoubtedly have a great interest and a duty to ensure that only qualified candidates are placed on the ballot. If federal courts were required to abstain from resolving federal

questions every time an ongoing state proceeding implicated an important state interest, *Younger*'s scope would extend to "virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest." *Barone*, 709 F. App'x at 948 (quoting *Sprint*, 571 U.S. at 81) (internal quotation marks and citation omitted).

In sum, Plaintiff does not seek to thwart any state court compliance process and thus does not seek to enjoin a proceeding uniquely in furtherance of a state court's ability to perform its *judicial* functions, such that this Court's assessment of Plaintiff's federal claims would render a state court *order or judgment* void. *Juidice*, 430 U.S. at 336 n.12. As a result, this case does not fall into the narrow class to which *Younger* abstention applies. The Court therefore is obligated to "hear and decide [the] case" on the merits. *Sprint*, 571 U.S. at 77. Although the Court has found abstention inappropriate, the State challenge proceedings may continue, given the Court's determination that no injunctive relief is warranted in the instant case at this time.

## V. PLAINTIFF'S SUBSTANTIVE CLAIMS AND MOTION FOR PRELIMINARY INJUNCTION

### A. Plaintiff's First and Fourteenth Amendment Claims [Counts I and II]

In her first two Counts, Plaintiff argues that the Challenge Statute violates the First and Fourteenth Amendments — on its face, in the case of her First Amendment claim, and as applied to her, in the case of her Fourteenth Amendment due process claim. Specifically, Plaintiff contends that running for

office is an activity protected by the First Amendment and that Defendants'
enforcement of the Challenge Statute against her forces her into a burdensome
process without probable cause. Plaintiff argues that the Challenge Statute is
facially unconstitutional because it triggers this process based on the challenger's
mere "belief" that a candidate lacks the requisite qualifications. Plaintiff also
contends that the challenge process violates the Due Process Clause of the
Fourteenth Amendment as applied to her because it places the burden of proof
on her to establish that she possesses the requisite qualifications for Congress. In
this case, Plaintiff contends that this means she must "prove the negative" that
she did not engage in an insurrection in violation of her oath as a member of
Congress for purposes of Section 3 of the Fourteenth Amendment. As explained
below, resolving these claims requires the Court to address not only the
constitutional burdens that Plaintiff alleges are imposed by Defendants'
enforcement of the Challenge Statute and the alleged state interests that could
potentially justify those burdens, but also whether those potential justifications
have been eliminated by the 1872 Amnesty Act.

   As Plaintiff raises her First and Fourteenth Amendment claims in a ballot
access context, the claims must be analyzed under the framework outlined by the
Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) and *Burdick
v. Takushi*, 504 U.S. 428, 433 (1992).[14] The Court will therefore analyze Plaintiff's

---

[14] Although Plaintiff's claims technically pertain to her right to appear on the ballot rather than
the right to vote, the Supreme Court has "minimized the extent to which voting rights cases are

First and Fourteenth Amendment claims together under the *Anderson/Burdick* framework.[15] Under this framework, "the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1292 (N.D. Ga. 2018).

To apply this test, the Court must first "weigh the character and magnitude of the burden the State's rule imposes" to determine the appropriate level of scrutiny. *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1336 (N.D. Ga. 2019) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997), and *Burdick*, 504 U.S. at 434); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019); *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014) ("[T]he level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights — [l]esser burdens trigger less exacting review.") (internal quotation marks omitted). Second, if a law severely burdens the right to vote, the Court must consider whether the law was narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434; *Lee*, 915 F.3d at 1318. But "reasonable,

---

distinguishable from ballot access cases." *Burdick*, 504 U.S. at 438 (citing *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

[15] Unlike Defendants, Intervenors argue that Plaintiff's procedural due process claim should be evaluated under the three-part balancing test articulated by the Supreme Court in *Matthews v. Eldridge*, 424 U.S. 319 (1976) instead of under the *Anderson/Burdick* test. But as Defendants point out, the Eleventh Circuit clarified in *New Georgia Project v. Raffensperger* that the *Anderson/Burdick* framework applies to procedural due process claims in the ballot access context. 976 F.2d 1278, 1282 (11th Cir. 2020).

nondiscriminatory restrictions" that impose a minimal burden may be warranted by "the State's important regulatory interests." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson*, 460 U.S. at 788). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318–19 (citing *Billups*, 554 F.3d at 1352).

In applying this test to the circumstances presented here, the Court will first consider the character and magnitude of the burdens that Defendants' enforcement of the Challenge Statute imposes on Plaintiff's constitutional rights. Then, the Court will balance those burdens against Defendants' interest in enforcing the Challenge Statute to ensure that only qualified candidates appear on the ballot. Finally, the Court will address whether any interest Defendants have in enforcing the Challenge Statute based on the qualification contained in Section 3 of the Fourteenth Amendment has been effectively eliminated by the 1872 Amnesty Act on Plaintiff's theory that the 1872 Act renders Section 3 of the Fourteenth Amendment inapplicable to her.

### 1. Anderson/Burdick Step 1

The Court begins by addressing the significance of the burden on Plaintiff's constitutionally protected rights. As an initial matter, a candidate's right to appear on the ballot does not rise to the level of a fundamental constitutional right, nor does a challenge to a candidate's qualifications necessarily equate to a severe burden on that candidate's First Amendment rights. *See Clements v.*

*Fashing*, 457 U.S. 957, 963 (1982) ("Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)); *see also Timmons*, 520 U.S. at 359 ("That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights."). But in this case, Plaintiff contends that the specific *process* she must go through to establish her qualifications imposes a severe burden on her First and Fourteenth Amendment rights.

As noted, Plaintiff argues that the Challenge Statute's burden of proof requires her to prove a negative and thereby burdens her constitutionally protected rights. In support of this argument, Plaintiff principally relies on *Speiser v. Randall*, 357 U.S. 513 (1958). The plaintiffs in *Speiser* were honorably discharged World War II veterans who sought to claim property tax exemptions under California law. *Id.* at 515–16. Importantly, one of the forms the plaintiffs were required to fill out to claim their exemptions contained an oath stating,

> 'I do not advocate the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means, nor advocate the support of a foreign Government against the United States in event of hostilities.'

*Id.* at 515. Each of the plaintiffs claimed the exemption but refused to sign the oath. *Id.* As a consequence, the plaintiffs' local tax assessors denied the exemptions. *Id.* The assessors' decisions to deny the exemptions were based on a

provision of California law providing that, "[i]f the assessor believes that the claimant is not qualified in any respect, he may deny the exemption and require the claimant, on judicial review, to prove the incorrectness of the determination." *Id.* at 517. Although the Supreme Court took no position on the constitutional validity of the oath itself, it found that the application of the burden of proof on the taxpayer in these proceedings violated the taxpayers' due process rights.

In invalidating this procedure, the Supreme Court observed, "When the State undertakes to restrain unlawful advocacy it must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights." *Id.* at 520–21. The Court determined that the procedures at issue in the tax proceedings were deficient because "[n]ot only does the initial burden of bringing forth proof of nonadvocacy rest on the taxpayer, but throughout the judicial and administrative proceedings the burden lies on the taxpayer of persuading the assessor, or the court, that he falls outside the class denied the tax exemption." *Id.* at 522. The Court emphasized that even though it is "familiar practice in the administration of a tax program for the taxpayer to carry the burden of introducing evidence to rebut the determination of the collector," this same procedure violates due process "when the purported tax was shown to be in reality a penalty for a crime." *Id.* at 524–25. The Court explained that the "underlying rationale" for removing the burden from the taxpayer who seeks the exemption in this circumstance is that "where a person is to suffer a penalty for a

crime he is entitled to greater procedural safeguards than when only the amount of his tax liability is in issue." *Id.* at 525. The Court emphasized,

> Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt.

*Id.* at 525–26. In other words,"[w]here the transcendent value of speech is involved, due process certainly requires in the circumstances of this case that the State bear the burden of persuasion to show that the appellants engaged in criminal speech." *Id.* at 526. Therefore, in the context of *Speiser*, the Court found that it was a violation of due process to require the taxpayer to "sustain the burden of proving the negative." *Id.*

Plaintiff argues that here, just like in *Speiser*, it is unconstitutional to require her to "prov[e] the negative" that she did not engage in insurrection and that she is therefore qualified to run for Congress. In spite of these apparent similarities, the Court finds *Speiser* distinguishable based both on its facts and the current posture of this case.

For one thing, although Plaintiff has at least a limited interest in being able to run for office, as previously noted, Plaintiff's interest in appearing on the ballot does not rise to the level of a fundamental right. *Clements*, 457 U.S. at 963; *Timmons*, 520 U.S. at 359. And it certainly does not rise to the level of a citizen's interest in avoiding potential criminal jeopardy — *i.e.*, a criminal defendant's

interest in his liberty — based on unrelated possible political activity or beliefs in the course of applying for a tax credit. Further, as Intervenors' counsel pointed out at oral argument, it is not clear why Plaintiff cannot meet the initial burden to prove the negative by simply submitting an affidavit stating under oath that she did not engage in an insurrection or addressing the allegations in the challenge that are focused on her own activities. At that point, the burden would shift to the challengers to rebut that evidence, unlike in *Speiser*, where "throughout the judicial and administrative proceedings the burden lie[d] [with] the taxpayer of persuading the assessor, or the court, that he falls outside the class denied the tax exemption." 357 U.S. at 522.

But even if the burden of proof were to be deemed constitutionally problematic in this context, as Defendants' counsel noted, Georgia Regulations authorize the ALJ to shift the burden away from Plaintiff if it is necessary to do so in the interest of justice. *See* Ga. Comp. R. & Regs. § 616-1-2-.07(2) ("Prior to the commencement of the hearing, the Court may determine that law or justice requires a different placement of the burden of proof."). In fact, the ALJ overseeing Plaintiff's proceeding *has already done this* in his Prehearing Order, issued on April 13, 2022, by granting Plaintiff's motion *in limine* to shift the burden of proof to the challengers. (*See* Prehearing Order at 4–5.) Therefore, at least insofar as Plaintiff raises an as-applied challenge to her specific proceeding, any concerns about the constitutionality of the burden of proof are at this point a nullity. And if the Challenge Statute does not impose a severe burden as applied

to Plaintiff, logically, it also would not impose a severe burden on all candidates on its face, as the State regulations authorize shifting of the burden of proof as appropriate. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))).

At this point, the only potential burden on Plaintiff's First Amendment rights is the burden of simply having to go through the challenge process itself. Plaintiff argues that the Challenge Statute is unconstitutional because it triggers a proceeding in which she must respond to a citizen's challenge that can be based solely on "a written statement why he or she believes the Candidate is disqualified from running for office." (Compl. ¶ 57.) In turn, she complains that the citizen's expression of "mere 'belief' is not enough to infringe on the fundamental right concerned."[16] (*Id.* ¶ 58.)  However, Plaintiff's claim here wholly ignores citizens' own First Amendment rights to file complaints regarding the operation of the electoral process that the Challenge Act recognizes. Further, as discussed earlier, the ALJ is authorized under governing Georgia law to dismiss a complaint on any ground. O.C.G.A. § 50-13-13(a)(6). Indeed, a hearing officer clearly would not only be authorized to dismiss a frivolous challenge but also to impose civil penalties for a party's submission of pleadings or papers for an improper purpose

---

[16] This argument is raised is tandem with the burden of proof claim, which the Court has already addressed above as it applies to this case.

or containing frivolous arguments.  O.C.G.A. § 50-13-41(b).  In short, Plaintiff's argument on this ground holds no water.

Relying on *Alexis, Inc. v. Pinellas County, Florida*, 194 F. Supp. 2d 1336 (M.D. Fla. 2002), Plaintiff further argues that subjecting her to the proceeding without a threshold showing of probable cause violates her First Amendment rights in the same way that "a peaceful protestor's rights would be violated if arrested based upon a reasonable suspicion." (Doc. 4 at 4.) However, the Court finds both *Alexis* and Plaintiff's attempted analogy inapposite given that Plaintiff has not been subject to arrest or criminal prosecution. *Cf.* 194 F. Supp. 2d at 1347–48 (holding that "the Sheriff's deputies were constrained by the Fourth Amendment standard of probable cause to arrest only those persons violating the ordinances in their presence" and "the actions of the Sheriff's Department in arresting dancers for whom there was probable cause for arrest did not present an impermissible prior restraint in violation of the First Amendment").[17]

Moreover, as Intervenors note, the challenge process at issue here does not appear particularly burdensome given that it "consists of a streamlined administrative hearing under Georgia's ordinary rules of administrative procedure." (Intervenors' Opp'n, Doc. 30 at 10–11.) And Plaintiff cites no case law in support of the proposition that a challenge process such as this one is overly

---

[17] The Supreme Court has also explained that certain procedural protections — protection from self-incrimination, double jeopardy protection, and the standard of proof beyond a reasonable doubt — are limited to criminal defendants and criminal cases. *United States v. Ward*, 448 U.S. 242, 248 (1980). *See also Foucha v. Louisiana*, 504 U.S. 71, 93 (1992) (Kennedy, J., dissenting) (noting that criminal cases are afforded "heightened due process scrutiny").

burdensome. Instead, Plaintiff merely speculates that there could potentially be delays in resolving the challenge. At oral argument, Plaintiff's counsel suggested that it could take many weeks or months to complete the challenge process, and by that point, ballots would already be printed, the primary election would already be over, and Plaintiff's chances to become the Republican nominee for Georgia's 14th Congressional District would be all but eliminated. Counsel also contended that regardless of how short (or long) the review process actually took, it would be almost impossible to complete the appellate review process before the May 24 primary. But all evidence points to the contrary.

First, as a practical matter, Defendants represented at oral argument that the ballots for the May 24 primary have already been printed and that Plaintiff's name is listed on the ballots. (Tr. at 29) ("She is [] going to appear on the printed absentee ballots. She is [] going to appear on the ballot-marking devices."). In light of this reality, Plaintiff's hypothetical argument that adjudication in the state proceeding might prevent Plaintiff from being included on the absentee ballot is not a viable contention. Rather, as Defendants explained at oral argument, the only question about the status of Plaintiff's candidacy moving forward is whether the votes cast for her on those ballots will ultimately be counted.[18]

---

[18] Plaintiff's counsel also suggested at oral argument that the challenge proceeding could infringe upon the rights of Plaintiff's supporters to cast their votes for Plaintiff as the candidate of their choice. Admittedly, "the rights of candidates do not lend themselves to neat separation" and "laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock*, 405 U.S. at 142–43. Nevertheless, assuming arguendo that Plaintiff would have standing to bring such a claim, Plaintiff's voters still would not have a First Amendment right to vote for a disqualified candidate. *See Rhoden v. Athens-Clarke Cnty. Bd. of Elections*, 850 S.E.2d 141, 149 (Ga. 2020) (holding that "the application of a policy voiding votes cast for a dead

Also of practical import, all evidence before the Court indicates that Defendants are making significant efforts to resolve this matter expeditiously in the state proceeding. The Secretary of State referred the case to OSAH the same day that Intervenors filed their challenge. The assigned ALJ has acted with speed — ruling on motions quickly and ordering an expedited briefing and hearing schedule. Indeed, ALJ Beaudrot ruled on Intervenors' motion to depose Plaintiff *one day* after receiving Plaintiff's response to said motion. And in his recently issued prehearing order, he stated, "As an election case, this proceeding must be expedited so that this litigation does not interfere with an orderly and properly conducted election." (Prehearing Order at 6.) Importantly, Defendants' counsel also emphasized at oral argument that resolving this matter quickly is in the State's interest.

The procedure outlined in the Challenge Statute provides further support for Defendants' representation — and the evidence to date suggesting — that the review process in this matter will be seriously expedited. The text of the statute

---

candidate does not violate the right to vote under the First Amendment and the Fourteenth Amendment any more than it would violate the rights of an individual who wanted to vote for someone otherwise disqualified from appearing on the ballot or assuming office"). "The right to vote does not include the right to vote in any manner, or the right to vote for a specific individual, and it may be subject to qualification since states have an interest in protecting the integrity of the election process[.]" 25 Am. Jur. 2d Elections § 98 (footnote omitted); *see Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (finding that "[a] voter has no right to vote for a specific candidate"). That said, in recognition of the fact that "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters," *Bullock*, 405 U.S. at 143, the Court acknowledges that some voters may fear that their votes will be wasted if they vote for a candidate whom they believe — rightly or not — may be disqualified, and that this could potentially dissuade these voters from casting their ballots for the candidate of their choice. But Plaintiff has presented no evidence to that effect at this preliminary stage, and it is unclear whether these claims would fall within the scope of Plaintiff's Complaint as currently pled.

itself states that an appeal of the Secretary of State's determination must be made to the Superior Court of Fulton County within just 10 days. O.C.G.A. § 21-2-5(e). And as Defendants' counsel stated at oral argument, "There is a concerted effort on the part of all of the State judiciary to remove any uncertainty prior to the certification period to ensure a smooth application of the election process." (Tr. at 42–43.)

The case *Cox v. Barber*, 568 S.E.2d 478 (Ga. 2002), is illustrative. *See also McDonald v. Barber*, OSAH-ELE-CE-0300328-78-WJB (Ga. Office of State Admin. Hearings July 30, 2002). In that case*,* a candidate for a Public Service Commission seat, J. Mac Barber, faced a residency challenge to his qualifications. In response to this challenge, Barber raised a constitutional defense that the residency requirement violated the Equal Protection Clause of the Constitution. The ALJ held a hearing on July 19, 2002 and issued a decision eleven days later, on July 30, 2002.[19] The Secretary of State adopted the ALJ's decision to disqualify Barber the next day, July 31, 2002. Barber then filed a complaint in the Superior Court of Fulton County on August 6, and the Fulton County Court issued its decision reversing the Secretary of State on August 7, 2002. The Secretary of State then appealed the decision on August 9, 2002, and the record was transmitted to the Georgia Supreme Court on August 12, 2002. The Georgia Supreme Court issued its opinion a mere two days later on August 14, 2002. The

---

[19] A review of the timeline in *Barber* indicates that the challenge was filed on May 11, 2002, but the hearing did not occur until July 19, 2002. There is no concern of a similar delay in the present case, as ALJ Beaudrot has scheduled the OSAH hearing for Friday, April 22, 2022.

entire review process in *Barber* – from the hearing before the ALJ to the issuance of the decision by the Georgia Supreme Court — was expeditious.

In short, all evidence points to the conclusion that swift resolution is likely in this case. Plaintiff has presented no evidence — and provided this Court with no reason to believe — that the challenge to her candidacy will be treated with any delay.[20] What is more, as long as the resolution is quick, and the challenge to the candidate's qualifications are nonfrivolous, there is nothing constitutionally impermissible about requiring a candidate to respond to a notice of challenge, especially now that the ALJ has shifted the burden of proof to the challengers.

Under the circumstances, the Court fails to see how the challenge process qualifies as a severe burden on Plaintiff's First and Fourteenth Amendment rights. This is especially so considering that, in recent years, the U.S. Supreme Court and courts in this Circuit have repeatedly rejected claims by other candidates and voters who have similarly asserted that a state's various procedural hurdles to accessing the ballot placed a severe burden on their constitutional rights.

For example, in *Crawford v. Marion County Election Board*, the Supreme Court held that Indiana's requirement for voters to obtain a photo ID as a prerequisite for voting imposed "only a limited burden" on voters' access to the ballot. 553 U.S. 181, 202–03 (2008). The Eleventh Circuit followed suit the

---

[20] The Court also notes that on April 11, 2022, Plaintiff requested a two-week extension in the administrative hearing proceedings based on her own scheduling needs. The hearing officer granted this request. The request is reasonable but does not reflect the concerns about urgency in resolution of this matter that are raised in Plaintiff's briefs and her counsel's oral argument.

following year in *Common Cause/Georgia. v. Billups*, when it found Georgia's requirement that "every voter who casts a ballot in person [] produce an identification card with a photograph of the voter" did not pose a significant burden on voters who lack photo identification. 554 F.3d 1340, 1345, 1354 (11th Cir. 2009). More recently, in *Cowen v. Secretary of State of Georgia*, the Eleventh Circuit found Georgia's requirement that third party and independent candidates obtain petition signatures from "a number of voters equal to 5% of the total number of registered voters eligible to vote in the last election for the office" did not impose a severe burden for purposes of the *Anderson/Burdick* analysis. 22 F.4th 1227, 1230 (11th Cir. 2022). The court reached that conclusion even though the candidates at issue only had a 180-day period in which to collect signatures — which had to be supported by a notarized affidavit from the petition circulator — and the candidates were also required to submit either a filing fee or a pauper's affidavit. *Id.* Similarly, in *New Georgia Project v. Raffensperger*, 976 F.2d 1278 (11th Cir. 2020), the Eleventh Circuit found that the Georgia Secretary of State's refusal to extend the deadline for accepting absentee ballots during the 2020 general election did not impose a severe burden on voters' access to the ballot — in spite of the inherent risks of voting in person in the midst of the COVID-19 pandemic and the well-documented delays in processing mail through the postal service — because voters could still "take reasonable steps and exert some effort to ensure that their ballots are submitted on time." *Id.* at 1282. And another judge in this district held last year that the Georgia's "use it or lose it"

voter-list-maintenance process did not impose a severe burden on the right to vote because the steps voters had to take to avoid being removed from the voter rolls imposed "no more than ordinary burdens" on voters' access to the ballot. *Fair Fight Action, Inc. v. Raffensperger*, No. 18-cv-5391, slip op. at 54 (N.D. Ga. Mar. 31, 2021).

The common theme from these cases is that "[b]urdens are severe if they go beyond the merely inconvenient."[21] *Crawford*, 553 U.S. at 205 (Scalia, J., concurring). And at this stage, all Plaintiff has shown is that it would be "inconvenient" for her to have to go through the challenge process established by Georgia law. That is not enough to establish a severe burden at *Anderson/Burdick*'s first step. As such, the Court finds that Plaintiff has not established a severe burden on her First and Fourteenth Amendment rights for purposes of *Anderson/Burdick*'s first step.

### 2. *Anderson/Burdick Step 2*

Absent Plaintiff's showing of a severe burden, to survive a constitutional challenge on *Anderson/Burdick* grounds, Defendants would have to show that enforcing the qualifications of Section 3 of the Fourteenth Amendment through the process laid out in the Challenge Statute is justified by the State's important regulatory interests in restricting ballot access to qualified candidates.

---

[21] The Court does not intend any specific commentary on any of the aforementioned cases other than the obvious — they all reach the same conclusion that the existence of procedural hurdles to accessing that ballot does not by itself establish a severe burden for purposes of *Anderson/Burdick*'s first step absent other evidence reflecting additional substantive burdens. In accordance with that precedent, the Court must reach that same conclusion here.

Consistent with the State's obligations under Article I, Section 4, which charges it with regulating the time, place, and manner of elections, as Defendants note, the State has an "important and well-established interest in regulating ballot access and preventing fraudulent or ineligible candidates from being placed on the ballot." (Defs.' Opp'n at 25); *see Bullock*, 405 U.S. at 145 (noting that "a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies"); *Hassan v. Colorado*, 495 F. App'x 947, 948 (10th Cir. 2012) (Gorsuch, J.) (noting that "a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office"); *Rhoden v. Athens-Clarke Cnty. Bd. of Elections,* 310 Ga. 266, 274–76 (2020) (finding that the State's legitimate interest in administering a fair and efficient election justifies discarding of votes for a deceased or disqualified candidate and does not violate the right to vote under the First and Fourteenth Amendments). And as the Supreme Court noted in *Anderson*, "[I]t is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." 460 U.S. at 788 n.9; *see also Burdick*, 504 U.S. at 440 n.10 ("It seems to us that limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable.").

In order to advance these important state interests, the State also has a legitimate interest in proceeding with the specific statutory process it has

established to ensure that only qualified candidates appear on the ballot. (*See* Defs.' Opp'n at 2) ("As part of the orderly administration of elections, Georgia law requires that candidates be qualified in advance of an election and provides a process by which eligible voters or the Secretary of State may challenge the legal qualifications of any candidate before any voter casts a ballot."); (*see also* Tr. at 42) ("The State has a legitimate interest in proceeding with the State process through its culmination to determine and ensure that only qualified candidates . . . occupy the ballot in Georgia."). Generally speaking, advancing these important State regulatory interests would easily justify any minimal burden on Plaintiff's First and Fourteenth Amendment rights.

On the other hand, the State would not have a legitimate regulatory interest in imposing nonexistent qualifications on candidates for federal office. And Plaintiff contends that this is exactly what Defendants are attempting to do here by putting her through a proceeding involving Section 3 of the Fourteenth Amendment — a provision that Plaintiff claims no longer is extant or applies. The Court considers this argument below.

### 3. The Disqualification Provision of Section 3 of the Fourteenth Amendment and the 1872 Amnesty Act

As previously noted, Section 3 of the Fourteenth Amendment prohibits certain individuals and office holders, who have previously taken an oath of office to support the Constitution of the United States, from holding federal or state office if they "engaged in insurrection or rebellion" against the United States. This provision specifically states:

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3. Plaintiff argues that this provision was rendered inoperative by the passage of the 1872 Amnesty Act, which, according to Plaintiff, removed the "political disabilities" imposed by Section 3 of the Fourteenth Amendment for anyone who engaged in insurrection or rebellion thereafter. This Act provides:

[A]ll political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever, except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States.

See Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).

Importantly, the Fourteenth Amendment was passed and ratified in the years following the Civil War, and when the 39th Congress convened in December of 1865, "Senators and elected Representatives from the ex-Confederate States showed up ready to take their seats," thereby "infuriat[ing] most Republicans in Congress." See Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87, 91 (2021). This

inspired the inclusion of Section 3 of the Fourteenth Amendment. *Id.* In the years after the passage of the Fourteenth Amendment, Section 3 was relied on to exclude both state and federal officials from office. *Id.* at 88 (explaining that federal prosecutors brought action to oust half of the Tennessee Supreme Court); *id.* at 110–11 (noting that the Senate refused to seat a member-elect, Zebulon Vance, the wartime governor of North Carolina, on the grounds that he was ineligible under Section 3). However, calls for amnesty quickly grew. *Id.* at 111–12. "Until 1872, Congress relied on private bills to remove Section Three disabilities from thousands of individuals." *Id.* at 112. But the "sheer number of personal amnesty requests soon overwhelmed Congress and led to calls for general Section Three amnesty legislation." *Id.* at 112–13 (noting that the "momentum for amnesty was also in reaction to a white terror campaign in the South"). After President Ulysses Grant endorsed amnesty legislation, *id.* at 116, Congress began efforts to pass a bill, culminating in the 1872 Amnesty Act at issue here. *See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).

As is clear from the text, the 1872 Amnesty Act removed "[a]ll political disabilities imposed" by Section 3 of the Fourteenth Amendment, subject to a number of exceptions. *See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).

Here, Plaintiff and Intervenors vigorously dispute whether the 1872 Act was intended to provide amnesty (1) prospectively, that is, to all future office holders who, having taken an oath to support the Constitution, engage in insurrection or rebellion; or (2) retrospectively, that is, only to those who were

disqualified under this provision at the time of the passage of the 1872 Act. Put another way, Plaintiff contends that the language in the 1872 Amnesty Act removing "all political disabilities" necessarily means "all past and all future disabilities." (Tr. at 60.) The Court is not persuaded.

Plaintiff's position is not supported by the text of the 1872 Act or subsequent history. For one thing, the text of the statute contains no language suggesting that it applies prospectively. For instance, it does not say that it removes all future disabilities, disabilities that may be incurred, disabilities that shall be incurred, or the like. Although Section 3 itself utilizes the future perfect tense by applying its restriction to any individual who "*shall have engaged* in insurrection or rebellion," the 1872 Amnesty Act utilizes only the past tense phrase that "all political disabilities *imposed* by the third section of the fourteenth article . . . are hereby *removed* from all persons whomsoever . . . ." Moreover, as Intervenors argue, it strains credulity for Plaintiff to argue that Congress can "remove" something that does not yet exist.

Notwithstanding these textual barriers, in an effort to support her reading, Plaintiff points to a separate Amnesty Act that Congress passed in 1898, which removed the political disabilities of individuals who were excluded from the 1872 Act, such as Senators and Representatives of the 36th and 37th Congresses. The 1898 Act simply stated, "the disability imposed by section three of the Fourteenth Amendment to the Constitution of the United States *heretofore incurred* is hereby removed." S*ee* Act of June 6, 1898, ch. 389, 30 Stat. 432 (emphasis

added). Based on that language contained in this separate statute that was passed by a different Congress, Plaintiff's counsel argued that one could infer that, in 1872, Congress must have intended for the 1872 Act to apply prospectively, solely by virtue of the fact that Congress did not include the "heretofore incurred" language that was later included in the 1898 Act.

One federal district court, in *Cawthorn v. Circosta*, has accepted the argument Plaintiff's counsel is making here. No. 5:22-cv-00050, 2022 WL 738073 (E.D.N.C. Mar. 10, 2022) As the court noted in *Cawthorn*, the congressional committee responsible for investigating then-Congressman Victor Berger in 1919 analyzed Section 3 of the Fourteenth Amendment "in light of the Amnesty Act of 1898" when it was determining whether to expel Berger from Congress.[22] *Id.* at *12. In Berger's defense, he argued — just as Plaintiff argues here — that he could not be disqualified by Section 3 because Section 3 had been "entirely repealed" by the 1898 Act. *Id.* But as the congressional committee responsible for investigating Berger observed, "Congress has no power whatever to repeal a provision of the Constitution by a mere statute." *See* 6 Clarence Cannon, Cannon's Precedents of the House of Representatives 55 (1935), *available at* https://www.govinfo.gov/content/pkg/GPO-HPREC-CANNONS-V6/pdf/GPO-HPREC-CANNONS-V6.pdf#page=75. And the

---

[22] Berger was a Socialist member of Congress accused of providing aid to Germany during World War I. *See* Jennifer K. Elsea, Cong. Rsch. Serv., LSB10569, The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment 2 (2021).

committee further noted that Congress certainly did not have the power to remove future disabilities:

> While under the provisions of section 3 of the fourteenth amendment Congress was given the power, by a two-thirds vote of each House, to remove disabilities incurred under this section, manifestly it could only remove disabilities incurred previously to the passage of the act, and Congress in the very nature of things would not have the power to remove any future disabilities.

*Id.* The Committee added that Congress "plainly recognized" it could not remove disabilities prospectively by including the words "heretofore incurred" in the text of the 1898 Act. *Id.*

Though the court in *Cawthorn* apparently took the view that the inclusion of the "heretofore incurred" language was the sole reason why the 1898 Act did not apply prospectively, *see* 2022 WL 738073, at *12 (stating that "the court agrees with the Berger committee that the 1898 Act, due to its 'heretofore incurred' language, removed disabilities only as to those persons excepted previously under the 1872 Act"), as the Berger Committee stated, the inclusion of that language was merely a "recogni[tion]" of the fact that Congress "manifestly" lacked the power to remove the disabilities imposed by Section 3 prospectively. And if Congress lacked the power to remove disabilities prospectively in 1898, it is equally true that it lacked the power to remove disabilities prospectively in 1872. To summarize, if the reading suggested by Plaintiff and the court in *Cawthorn* were correct, the 1872 Amnesty Act would have both applied prospectively to remove disabilities that did not yet exist and, together with the

1898 Act, effectively repealed a constitutional provision by statute — both of which, as the Berger Committee recognized, Congress cannot do.

Plaintiff's counsel claimed that his position was not that Section 3 of the Fourteenth Amendment had been repealed but merely that Congress had implemented the last clause of that provision by exercising its authority to remove the disabilities imposed by that same provision into the future. This is at best a semantic distinction. While Congress could certainly remove those disabilities on an individualized basis — or even the disabilities of all individuals who had already incurred disabilities, as it did through the 1898 Act — a blanket exercise of that authority for all individuals past and future would effectively erase Section 3's requirements altogether, including the requirement that Congress vote to remove those disabilities once they are actually incurred. By the same token, accepting *Cawthorn*'s conclusion that "Section 3 can apply to no current member of Congress" after the passage of the 1872 and 1898 Amnesty Acts, would necessarily require one to accept the conclusion that Congress had entirely repealed Section 3 of the Fourteenth Amendment through the mere passage of two statutes. 2022 WL 738073, at *11. Suffice it to say, the Court is skeptical. It seems much more likely that Congress intended for the 1872 Amnesty Act to apply only to individuals whose disabilities under Section 3 had already been incurred, rather than to all insurrectionists who may incur disabilities under that provision in the future.

This reading is supported not only by the text of the statute and the practical limitations on Congress's authority, but also by pure common sense. As Intervenors' counsel pointed out, it would make little sense for Congress to have prohibited Jefferson Davis and other leaders of the Confederacy from serving in Congress in 1872 while simultaneously granting blanket amnesty to all future insurrectionists regardless of their rank or the severity of their misconduct. But that is precisely the reading that Plaintiff asks this Court to adopt. The far more plausible reading is that Congress's grant of amnesty only applied to *past* conduct. *See* Jennifer K. Elsea, Cong. Rsch. Serv., LSB10569, The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment 2 (2021) ("The Amnesty Act appears to be retrospective and apparently would not apply to later insurrections or treasonous acts.").

If there were any doubt, a close reading of past Supreme Court authority demands the conclusion that Section 3 remains operative. In *U.S. Term Limits, Inc. v. Thornton* — decided in 1995, long after the passage of the 1872 Act — the Supreme Court referenced Section 3 of the Fourteenth Amendment as a basis for disqualification that exists in the Constitution, along with other provisions, stating that "[b]ecause those additional provisions are part of the text of the Constitution, they have little bearing on whether Congress and the States may add qualifications to those that appear in the Constitution." 514 U.S. 779, 787 n.2 (1995). The Court declined to address whether this disqualification provision could be read as a qualification, but in doing so plainly stated that Section 3

remains an existing "part of the Constitution." *See also Powell v. McCormack*, 395 U.S. 486, 520 n.41 (1969) (declining to reach the issue of whether Section 3 is an additional qualification but acknowledging that "s 3 of the 14th Amendment disqualifies 'any person who having previously taken an oath . . . to support the Constitution of the United States, shall have engaged in an insurrection or rebellion against the same, or given aid or comfort to the enemies thereof'"). Plaintiff's interpretation that the 1872 Act removed Section 3's disability forevermore is at odds with the acknowledgments in *U.S. Term Limits* and *Powell*. In other words, it is unlikely — even inconceivable — that the *U.S. Term Limits* and *Powell* Courts would have referred to Section 3 as a disqualification if it had been effectively repealed by the 1872 Amnesty Act.

For all of these reasons — the plain text of the 1872 Act, the nature of Congressional power vis-à-vis the Constitution, common sense, and the Supreme Court's recognition of Section 3 in cases after the passage of the 1872 Act — it is apparent that the 1872 Act does not provide amnesty prospectively. Therefore, if Defendants were to enforce the Challenge Statute against Plaintiff based on this disability, Defendants would merely be enforcing an existing disqualification within the text of the Constitution. The Court has no basis for concluding, as the court did in *Cawthorn*, that the challenge proceeding violated federal law on the ground that the State's power to enforce Section 3 had been "rendered ineffective" by the passage of the 1872 Amnesty Act. 2022 WL 738073, at *12.

In short, Section 3 of the Fourteenth Amendment is an existing constitutional disqualification adopted in 1868 — similar to but distinct from the Article I, Section 2 requirements that congressional candidates be at least 25 years of age, have been citizens of the United States for 7 years, and reside in the states in which they seek to be elected. On the current record, it appears that the Challenge Statute imposes minimal burdens through its process of ensuring that only candidates who meet the Constitution's minimum threshold requirements appear on the ballot — including candidates who are not disqualified by Section 3 of the Fourteenth Amendment. And those minimal burdens are easily justified by the important state regulatory interest in the orderly administration of elections. The only burden on Plaintiff at this stage is her participation in an expedited, streamlined administrative review process, in which the burden of proof has now been placed on Intervenors, and an expedited appeals process, if sought. The State's interest in ensuring the integrity and efficiency of its election process is sufficiently weighty to justify that relatively minimal burden. The Court therefore finds that Plaintiff has not established a likelihood of success on the merits of Counts I and II.

### B.    Plaintiff's Claims Under Article I, Section 5 [Count III]

The Court next considers whether Plaintiff is likely to succeed on the merits of her separate contention that Georgia's Challenge Statute violates Article I, Section 5 of the U.S. Constitution. Plaintiff contends in Count III of her Complaint that the Challenge Statute is unconstitutional because it usurps

Congress's constitutional powers under Article I, Section 5. (Compl. ¶¶ 68–71.) Specifically, Plaintiff alleges that the Challenge Statute permits the State to make a determination as to whether a candidate is constitutionally qualified to be elected to the House of Representatives, and that this determination extends beyond the bounds of the authority of the State to regulate its elections. (*Id.* ¶¶ 68–69.) In response, Defendants rely on the constitutional authority granted to the states under Article I, Section 4 to argue that the State has the authority to regulate elections and determine whether a congressional *candidate* is qualified and can therefore be placed on the ballot. (Defs.' Opp'n at 22.) ("If states were enjoined from disqualifying candidates for federal office prior to an election, then there would be no legal process by which the state could prevent candidates who fail to meet the constitutional requirements for Congress from accessing the ballot.")  Intervenors make a similar argument but add that the State is well within its authority to enforce *existing* constitutional requirements to "disqualify constitutionally ineligible candidates." (Intervenors' Opp'n at 18.)

The U.S. Constitution assigns responsibilities to both Congress and the states with respect to the election of congressional candidates. *Hutchinson v. Miller*, 797 F.2d 1279, 1284 (4th Cir. 1986) (acknowledging that the Constitution "express[ly] delegat[es] to Congress and the states [] shared responsibility for the legitimation of electoral outcomes").  Article I, Section 4 of the Constitution affords states the power to regulate the "Times, Places, and Manner" of electing United States Senators and Representatives, but adds that "Congress may at any

time by Law make or alter such Regulations, except as to the Places of chusing

Senators." *See* U.S. Const. Art. I § 4, cl.1. At the same time, Article I, Section 5

empowers each house of Congress to act as "the Judge of the Elections, Returns

and Qualifications of its own Members." *See* U.S. Const. Art. I § 5, cl. 1.

Historically, the states' authority to regulate the "Times, Places, and Manner" of

elections under their Article I, Section 4 authority has been interpreted broadly.

In *Roudebush v. Hartke*, the Supreme Court reasserted the "bredth" of the states'

powers under Article I, Section 4, explaining that the "comprehensive words"

embraced in that Section provide a "complete code for congressional elections."

405 U.S. 15, 24 (1972). The *Roudebush* Court further explained that this authority

extends:

> not only as to times and places, but in relation to notices,
> registration, supervision of voting, protection of voters, prevention of
> fraud and corrupt practices, counting of votes, duties of inspectors
> and canvassers, and making and publication of election returns; in
> short, to enact the numerous requirements as to procedure and
> safeguards which experience shows are necessary in order to enforce
> the fundamental right involved.

*Id.* at 24–25 (finding that Indiana's recount procedures did not usurp power that

only the Senate could exercise, where recount did not prevent Senate from

independently evaluating the election, and also noting that the Senate was free to

accept or reject the apparent winner or conduct its own recount) (citing *Smiley v.*

*Holm*, 285 U.S. 355, 366 (1932)).

Consistent with this broad power, federal appellate courts have held that

states have the power to exclude from the ballot constitutionally unqualified or

ineligible candidates. In *Hassan v. Colorado*, then-judge Gorsuch wrote for the Tenth Circuit, holding that Colorado had a legitimate interest in excluding the plaintiff from the ballot because he was constitutionally prohibited from assuming the office of President of the United States under Article II because he was a naturalized citizen rather than a "natural born Citizen." 495 F. App'x at 948. In so finding, the *Hassan* Court rejected the plaintiff's argument that, "[e]ven if Article II properly holds him ineligible to *assume the office of president*," it was still unlawful "for the state to deny him *a place on the ballot*." *Id.* (emphasis in original) The Court determined that "a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office." *Id.* Similarly, in *Lindsay v. Bowen*, the Ninth Circuit held that California was authorized to exclude from the ballot a twenty-seven-year-old who was constitutionally ineligible to become president because of her age. 750 F.3d 1061, 1064 (9th Cir. 2014) ("[A] state has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.") (quoting *Bullock*, 405 U.S. at 145).

However, the Supreme Court has conclusively ruled that neither the states nor Congress have the power to impose *additional* qualifications for congressional membership that are not recognized in the Constitution's text. *See U.S. Term Limits,* 514 U.S. at 837–838 ("In the absence of a properly passed constitutional amendment, allowing individual States to craft their own

qualifications for Congress would thus erode the structure envisioned by the Framers[.]"); *Powell*, 395 U.S. at 522, 540 (holding that Congress cannot alter or add to the qualifications outlined in the Constitution and that qualifications "could be altered only by a constitutional amendment"); *see also Public Citizen, Inc. v. Miller*, 992 F.2d 1548 (11th Cir. 1993) (similar). That said, in *U.S. Term Limits,* the Supreme Court held that the requirement imposed by Section 3 of the Fourteenth Amendment became "part of the text of the Constitution" as a result of a constitutional amendment and therefore does not constitute an additional or unauthorized congressional membership qualification. 514 U.S. at 787, n.2. Furthermore, the Supreme Court in *U.S. Term Limits* acknowledged that the term "qualifications" may include more than what is outlined specifically in Article I, Section 2, which establishes age, citizenship, and residency requirements for members of the House of Representatives. *See id*. The Supreme Court noted that Section 3 of the Fourteenth Amendment disqualifies any person who, having previously taken an oath to support the Constitution, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. *Id*. The Court then explained that it need not determine whether this provision constituted a "qualification" for purposes of that specific case before it. *Id*.

Here, this Court concluded above in Section V.A.3. that the 1872 Amnesty Act did not grant amnesty prospectively to all conceivable future insurrectionists. Therefore, the 1872 Act did not invalidate Section 3 of the Fourteenth

Amendment. The disability outlined in that provision of the Constitution remains exactly that — a disability that disqualifies an individual who has engaged in acts of insurrection in violation of their prior oath of office from running for or holding office. In light of this finding, it is clear that, in complying with the procedures set out in the Challenge Statute, the State of Georgia is not imposing any *additional* qualifications on Plaintiff.[23] Rather, it is enforcing an *existing* provision enshrined in the Fourteenth Amendment, just as Colorado and California did in *Hassan* and *Lindsay* when they enforced other constitutional provisions.

The Court recognizes that the circumstances here are not completely analogous to those in *Hassan* and *Lindsay*. In each of those cases, the question of whether the plaintiff met the requisite age and citizenship qualifications was arguably more easily assessed and not in dispute. Nevertheless, both the *Hassan* and *Lindsay* courts emphasized that, under Article 1, Section 4, states have a significant interest in protecting the legitimacy and functioning of the political process of elections. As demonstrated by those cases, this legitimate interest includes enforcing existing constitutional requirements to ensure that candidates

---

[23] During oral argument Intervenors' counsel argued that Plaintiff had waived the argument that Defendants were adding additional qualifications for purposes of Count III by failing to include that argument until her reply brief. The Court need not reach the issue of waiver given its conclusion that Section 3 of the Fourteenth Amendment is an existing constitutional qualification rather than an additional one.

meet the threshold requirements for office and will therefore not be subsequently disqualified, thereby causing the need for new elections.[24]

In this case, Plaintiff has pointed to no authority holding that a state is barred from evaluating whether a candidate meets the constitutional requirements for office or enforcing such requirements. Indeed, as each house of Congress may only act to judge the "Elections, Returns and Qualifications *of its own Members*," U.S. Const. Art. I § 5, cl. 1 (emphasis added), it is also not clear that the current 117th Congress would be permitted to assess the qualifications of a candidate, like Plaintiff, for the 118th Congress. If this is so, under Plaintiff's theory, neither the State nor Congress would be permitted to exclude a constitutionally unqualified candidate from the ballot before the election. As noted, such a result is at odds with the decisions in *Hassan* and *Lindsay*, which recognized states' interests in protecting the legitimacy of the political and election process.  In addition, as Defendants argue, such an "unregulated process" could "invite the possibility that fraudulent or unqualified candidates such as minors, out-of-state residents, or foreign nationals could be elected to Congress—and the state would be powerless to prevent it from happening." (Defs.' Opp'n at 23.)

---

[24] *Cf. Anderson*, 460 U.S. at 788, n.9 ("We have upheld generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.  The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates.").

The parties devoted little time and few pages to the complicated questions inspired by this novel situation. Given the preliminary stage of the proceedings, the difficulty of the legal questions posed, and Plaintiff's failure to cite persuasive legal authority or even include a developed legal argument that the State of Georgia lacks the authority to enforce an existing constitutional provision, Plaintiff has not established a likelihood of success on the merits on Count III. *See Sampson v. All Am. Home Assistance Servs., Inc.*, No. 1:13-cv-495, 2013 WL 12322089, at *10 (N.D. Ga. Mar. 7, 2013) ("[C]ircumstances involving resolution of relatively undeveloped body of law or novel factual settings make a determination of success on the merits difficult to forecast[.]") (quoting *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 569–70 (5th Cir. 1981))); *Cincinnati Bengals, Inc. v. Bergey*, 453 F. Supp. 129, 145 (S.D. Ohio 1974) ("[W]here there are novel or complex issues of law or fact that have not been resolved a preliminary injunction should be denied."); *Miller v. Am. Tel. & Tel. Corp.*, 344 F. Supp. 344, 349 (E.D. Pa. 1972) ("There can be no substantial likelihood of success, if there are complex issues of law and fact, resolution of which is not free from doubt.").

## VI. CONCLUSION

This case involves a whirlpool of colliding constitutional interests of public import. The novelty of the factual and historical posture of this case – especially when assessed in the context of a preliminary injunction motion reviewed on a fast track – has made resolution of the complex legal issues at stake here

particularly demanding. The Court has thus carefully evaluated governing legal precedent, the relevant historical record, the briefs and evidence submitted by the parties, and the adequacy and efficient speed of the State of Georgia's statutory and administrative procedures for addressing election qualification challenges.

As noted at the outset of this Order, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to *each of the four prerequisites*" for an injunction. *Siegel*, 234 F.3d at 1176 (emphasis added). The Court has particularly focused on whether Plaintiff has carried her burden of persuasion to establish a strong likelihood of prevailing on the merits of her legal claims. Upon a thorough analysis of each of the claims asserted in this case, the Court concludes that Plaintiff has not carried her burden of persuasion with respect to this important and essential prerequisite to Plaintiff's demonstration of an entitlement to injunctive relief. As the Court has found that Plaintiff fails to establish a substantial likelihood of success on the merits, the Court need not further address the three other prerequisites for injunctive relief. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994). Accordingly, the Court **DENIES** Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunctive Relief. [Docs. 4, 5.]

**IT IS SO ORDERED** this 18th day of April, 2022.

_____
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**