**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MARJORIE TAYLOR GREENE,

*Plaintiff*,

v.

BRAD RAFFENSPERGER, in his
official capacity as Georgia Secretary,
*et al.*,

*Defendants*.

CIVIL ACTION

No. 1:22-cv-01294-AT

**STATE DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO
DISMISS PLAINTIFF'S COMPLAINT**

# INTRODUCTION

Plaintiff Marjorie Taylor Greene ("Greene") filed this action seeking to bar a state proceeding challenging her qualification as a candidate for U.S. Representative under O.C.G.A. § 21-2-5 (the "Challenge Statute"). The challenge proceeding, initiated by a group of eligible voters, is now nearing a final resolution in the state courts. Since the Court denied Greene's motion for preliminary injunction, the parties have had an opportunity to present their evidence and legal arguments in that case at an administrative hearing. Following the administrative hearing, ALJ Beaudrot issued an initial decision concluding that Greene should not be disqualified under Section 3 of the Fourteenth Amendment because the evidence was insufficient to show that she engaged in insurrection after taking the oath of office. The Secretary issued a final decision adopting the ALJ's findings of fact and conclusions of law and ruling that Greene is a qualified candidate. The Fulton County Superior Court has now affirmed that decision on judicial review, and no appeal of that final order is currently pending.[1]

_____

[1] The Challengers sought direct review by the Supreme Court of the superior court's final order, but that was dismissed by the Georgia Supreme Court because the Challengers needed to seek review through an application for discretionary review. (Exhibit B).

The resolution of the parallel state proceeding will ultimately moot this action, if it is not moot already because of the Superior Court's final order in her favor. Thus, this Court should abstain from exercising its jurisdiction either under the *Younger* or *Colorado River* abstention doctrines and allow the state proceeding to reach a final resolution.

But even if the Court were to consider the merits of Greene's claims, her complaint should be dismissed because, as this Court has already found, there is no legal merit to her attacks on the constitutionality of the Challenge Statute. Georgia's well-established interest in regulating ballot access is served by ensuring that candidates for federal or state office are qualified to hold the office they seek before voters cast ballots in an election. And it is not unduly burdensome to require candidates to demonstrate that they meet the legal qualifications for office if challenged, which is the only available process under state or federal law for screening candidates prior to an election. The state's authority under Article I, Section 4 to regulate ballot access for congressional *candidates* also does not conflict with Congress's authority under Article I, Section 5 to regulate its *members* after election. Finally, the Amnesty Act of 1872 did not grant prospective amnesty to all future members of Congress such that it would shield Greene from disqualification.

2

Accordingly, the Court should either abstain from exercising its jurisdiction and dismiss Greene's complaint, or dismiss the complaint for failure to state a claim on the merits.

## BACKGROUND

### A.    Candidate Qualifying under Georgia Law

Georgia law requires that "every candidate for federal and state office…shall meet the constitutional and statutory requirements for holding the office being sought." O.C.G.A. § 21-2-5(a). The Challenge Statute permits an eligible voter to file a pre-election challenge to the qualifications of a candidate who has filed to run in an upcoming election for a state or federal office by filing a complaint with the Secretary. O.C.G.A. § 21-2-5(b). The Secretary is required to refer the challenge for a hearing by an administrative law judge ("ALJ") of the Office of State Administrative Hearings ("OSAH"). *Id.* The ALJ reports his or her findings to the Secretary, who then determines if the candidate is qualified to hold the relevant office. O.C.G.A. § 21-2-5(b), (c).

The Secretary's determination is subject to judicial review, and either the voter filing the challenge or the candidate has the right to appeal by filing a petition in the Superior Court of Fulton County. O.C.G.A. § 21-2-5(e). Review of the superior court's final judgment in a candidacy challenge then lies with

3

the Supreme Court of Georgia. *See Burgess v. Liberty Cnt'y Bd. of Elections*, 291 Ga. 802, 803 (2012); O.C.G.A. § 5-6-35(a)(1) (review is discretionary).

## B.   Background and Procedural History

Greene submitted her filings to run in the primary election for Georgia's 14th Congressional District. (Doc. 3, Compl., ¶ 10.) Eligible voters challenged Greene's qualifications pursuant to Section 3 of the Fourteenth Amendment. (Doc. 3-1, Ex. A to Compl.) The Secretary then forwarded the challenge to OSAH in compliance with the Challenge Statute, which was heard by Judge Beaudrot on April 13, 2022. (Doc. 22-1.)

Before any ruling could be made by OSAH or the Secretary regarding the challenge to her qualifications, Greene initiated this lawsuit on April 1, 2022, alleging that the Challenge Statute violates her First Amendment rights (Count I) and deprives her of due process in violation of the Fourteenth Amendment (Count II).  (Doc. 3, Compl., ¶¶ 54-65.)  She also contends that the Challenge Statute violates Article I, Section 5 of the U.S. Constitution because it "usurps" Congress's power to make a determination regarding the qualification of its members (Count III). (*Id.*, ¶¶ 66-71.) Finally, Greene contends that the Challengers' attempt to disqualify her under Section 3 of the Fourteenth Amendment violates the Amnesty Act of 1872 (Count IV).  (*Id.*, ¶¶ 72-77.)

4

Greene also moved this Court for a temporary restraining order and preliminary injunction seeking to prevent the state challenge proceeding from moving forward, which the Court denied. (Docs. 4, 5., and 52). As a result, the OSAH hearing on the challenge moved forward, and ALJ Beaudrot issued an initial decision concluding that Greene is qualified. (Doc. 68-1 at 2). Specifically, ALJ Beaudrot determined that the evidence was insufficient to show that Greene engaged in insurrection after having taken the oath of office, and therefore she should not be disqualified under Section 3 of the Fourteenth Amendment. (*Id*. at 12-18). ALJ Beaudrot declined to determine whether the Challenge Statute was unconstitutional or whether the Amnesty Act of 1872 prospectively removed any disability, but acknowledged that Greene had preserved her arguments in that regard for judicial review. (*Id*. at 18-19). The Secretary adopted ALJ Beaudrot's decision in full, and issued a final decision declaring Greene qualified. (*See generally* Doc. 68-2.)

The Challengers sought judicial review of the Secretary's decision in the Superior Court of Fulton County. (Doc. 68-3). Greene moved to intervene so she could raise the same constitutional arguments that she raises in her complaint, and the Superior Court granted her motion. (Doc. 68-4 at 9-10). Following a hearing, the Superior Court affirmed the Secretary's decision as supported by the record evidence. (Exhibit A). The Challengers filed a notice of

5

appeal to the Georgia Supreme Court, which was dismissed because they did not file the required application for discretionary review.[2]

## ARGUMENT

I. **The Court Should Refrain from Exercising Jurisdiction Under the *Younger* Abstention Doctrine and Instead Should Dismiss Greene's complaint.**

Although this Court has previously rejected the State Defendants' arguments to abstain under the *Younger* abstention doctrine, circumstances have changed with regards to the state challenge proceeding since this Court's prior decision. Specifically, the Secretary has now issued a final decision determining that Greene is qualified and the Fulton County Superior Court has affirmed that decision. Further action by this Court impacting on the parallel state litigation can render those orders nugatory, which this Court has recognized is a factor favoring abstention under *Younger*. (Doc. 52 at 37.)

The Supreme Court has explained that, under the *Younger* doctrine, "a federal court should not enjoin a pending state criminal proceeding except in the very unusual situation that an injunction is necessary to prevent great and immediate irreparable injury." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627 (1986) (citing *Younger v. Harris*, 401 U.S. 37, 43

---

[2] At the time of filing this motion to dismiss and brief in support, the Challengers have yet to file an application for discretionary review.

(1971)). The Supreme Court has expanded *Younger* abstention to three "exceptional circumstances", which are (1) criminal proceedings; (2) civil proceedings akin to a criminal proceeding; and (3) civil proceedings involving certain orders "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Communs. Inc. v. Jacobs*, 571 U.S. 69, 69-70, 73 (2013). Accordingly, in determining whether to abstain from enjoining a state proceeding under *Younger*, a court should determine if the state proceeding meets one of the three "exceptional circumstances," and, if so, whether: (1) the state proceedings constitute an ongoing state judicial proceeding, (2) the proceedings implicate important state interests, and (3) there is an adequate opportunity in the state proceeding to raise constitutional challenges. *Tokyo Gwinnett, LLC v. Gwinnett Cty.*, 940 F.3d 1254, 1268 (11th Cir. 2019) (citing *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

This action falls into the third "exceptional circumstance" explained in *Sprint*. Greene's complaint seeks to have this Court interfere with Georgia's unique judicial process of ensuring only candidates that meet the statutory and constitutional qualifications for office are placed on the ballot, which is its duty under Article I, Section 4 to regulate "the Times, Places and Manner of holding Elections for Senators and Representatives." There is now a final decision by

7

the Secretary and a final order by the superior court affirming the Secretary's decision that are at risk of being nullified should this Court exercise jurisdiction and entertain the merits of Greene's complaint.

This Court discussed in detail the third exception circumstance for *Younger* abstention in its prior order denying Greene's injunction motions. (*See* Doc. 52 at 32-38).  After analyzing the precedent, this Court explained that the Third Category of cases applies to "suits seeking to enjoin state court contempt orders, final judgments, or other enforcement orders, and suits seeking to force recusal[.]" (*Id*. at 35). This Court concluded that, at the time of its order, its involvement "would not render any judgment or order of a state court 'nugatory[.]" (*Id* at 37). That is no longer the case, however. ALJ Beaudrot has issued an initial decision finding Greene qualified, (Doc. 68-1), the Secretary adopted that decision as his final decision (Doc. 68-2), and the Superior Court affirmed the Secretary's decision. (Exhibit A). Should this Court continue to exercise jurisdiction, those decisions are at risk of being rendered nugatory, which is why abstention is appropriate under *Younger* now, even if it was not earlier in this case. (*See* Doc. 52 at 36-38 (citing *Juidice v. Vail*, 430 U.S. 327, 336 n.12 (1977)).[3]

---

[3] The State Defendants do not repeat their arguments in support of the three factors that counsel in favor of abstention under *Younger* here.  Instead, the

## II.   This Court Should Abstain Under the *Colorado River* Abstention Doctrine.

If the Court concludes that *Younger* abstention is still not appropriate, the *Colorado River* doctrine provides an alternative ground for abstention. This federal lawsuit is parallel to a state proceeding involving the same parties and issues. The state proceeding began before this federal lawsuit, and its continued existence only wastes valuable judicial resources because, ultimately, this case is going to be rendered moot when the competent Georgia state courts decide the same questions and issues that are being brought before this Court.

The Eleventh Circuit recently explained that the *Colorado River* abstention doctrine applies "when concurrent state and federal litigation exists, and the federal litigation does not qualify for abstention under any of the three traditional abstention doctrines." *Gold-Fogel v. Fogel*, 16 F.4th 790, 799 (11th Cir. 2021).[4]  Should other abstention doctrines not apply, then "wise

---

State Defendants incorporate by reference the arguments in support of those three factors that they made in their response in opposition to Greene's motions for a temporary restraining order and preliminary injunction contained in Doc. 22 at pages 10-15, pursuant to Federal Rule of Civil Procedure 10(c).

[4] The Eleventh Circuit has aptly summed up the other abstention doctrines: *Pullman*, *Burford* and *Thibodaux*, and *Younger*. *Id.* at 799 n. 11; *see also Pitman v. Cole*, 267 F.3d 1269, 1285-87 (11th Cir. 2001).

judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, may allow a federal court not to perform its otherwise virtually unflagging obligation to exercise the jurisdiction given it." *Id*. at 799-800 (quotation marks omitted) (alterations accepted). This Court should consider several factors when deciding whether to abstain under *Colorado River*:

> (1) whether one of the courts has assumed jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction, (5) whether state or federal law will be applied, (6) the adequacy of the state court to protect the parties' rights, (7) the vexatious or reactive nature of either the federal or the state litigation, and (8) whether the concurrent cases involve a federal statute that evinces a policy favoring abstention.

*Id*. at 800 (quotation marks omitted) (alterations accepted). These factors are not exhaustive, however. *Id*. Nor are they to be applied "mechanically," but rather, "the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case[,]" and so, the court is to "carefully balance the important factors as they apply in a given case with the balance heavily weighted in favor of the exercise of jurisdiction." *Id*. at 800.

A stay under *Colorado River* is appropriate here. First, this federal action is parallel to one in the competent Georgia state courts—which was initiated before this one—involving the same parties and the same issues.

Specifically, the Intervenors here brought a challenge to Greene's qualifications by asserting that she engaged in insurrection, which disqualifies her under Section 3 of the Fourteenth Amendment. (Doc. 3 ¶¶ 30-32; Doc. 38 at 2). Greene, however, defended herself against this challenge by asserting the same arguments in the challenge proceeding that she raises here, and seeks to further those arguments on judicial review. (*See* Doc. 68-1 at 18-19; Doc. 68-4 at 9-10). The State Defendants determined Greene was qualified, and now the Secretary must defend both his final decision and the constitutionality of the Challenge Statute on judicial review. Thus, this federal action involves the exact same parties and substantially the same issues as the ongoing state proceeding as required by *Colorado River*. *See Ambrosia Coal & Constr. Co. v. Morales*, 368 F.3d 1320, 1330 (11th Cir. 2004).

As for the remaining circumstances of this case, they weigh heavily in favor of staying this action while the state action proceeds. The state court proceeding began *first* and is progressing much faster, having already reached a final decision on judicial review in the Superior Court. Meanwhile, the proceedings in this Court have not even moved past the responsive pleadings phase. The state proceedings, however, generally move quite quickly as this Court has already recognized, (*see* Doc. 52 at 49-51), and the Intervenors may

11

seek discretionary review by the Georgia Supreme Court, which is the last step before one can petition for *certiorari* in the U.S. Supreme Court.

Moreover, state courts are just as competent in answering federal constitutional questions as this Court. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) ("state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.") (citations omitted); *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981). Therefore, staying this action will not preclude Greene from having her constitutional challenges to the Challenge Statute decided by a court of competent jurisdiction which can adequately protect her rights. And should Greene disagree with the state courts' determination of her constitutional questions, then she can petition for review by the U.S. Supreme Court. 28 U.S.C. § 1257(a); *see also Sears v. Upton*, 561 U.S. 945, 946 n.1 (2010) (concluding it had jurisdiction over state court decision because "it resolved a federal issue on exclusively federal-law grounds.").[5]

Because Georgia state courts are on the same footing as this Court to answer constitutional questions, the continued litigation in this court is a

---

[5] Even if the state courts were not competent to consider Greene's constitutional claims, this Court should still stay the action until the Eleventh Circuit has ruled on the appeal.

waste of judicial resources, as the arguments being made here are duplicative of the arguments being made in the Georgia state courts. The Supreme Court has characterized the *Colorado River* abstention doctrine as the federal courts' ability to "refrain from hearing cases . . . which are duplicative of pending state proceedings." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996). A duplicative state proceeding is exactly what we have here, which can effectively resolve the issues before this Court, and the outcome of which will likely moot this action. Accordingly, this Court should either abstain or agree to stay this case to avoid the needless duplication of litigation.

## III.    Greene Fails to State a Claim Upon Which Relief Can Be Granted

Finally, even if the Court were to exercise jurisdiction over Greene's claims, she has otherwise failed to state a claim upon which relief can be granted because her claims are legally meritless. Greene asserts both facial and as-applied constitutional challenges to the Challenge Statute, arguing that it violates her right to be a candidate for federal office under the First and Fourteenth Amendments. She further contends that the Challenge Statute violates Article I, Section 5 of the U.S. Constitution because it "usurps" the U.S. House of Representative's power to make a determination regarding the qualification of its members. Finally, she asserts that the application of the Challenge Statute to her seeking to find her disqualified under Section 3 of the

Fourteenth Amendment violates the Amnesty Act of 1872. As this Court has already concluded—and more recently the Fourth Circuit—these claims are legally without merit, and therefore, fail to state a claim upon which relief can be granted.

### A.    The Challenge Statute does not violate the First and Fourteenth Amendment Under the Anderson-Burdick Framework.

It is well established that states have an important interest in regulating candidate access to the ballot, including candidates for Congress. *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Storer v. Brown*, 415 U.S. 724, 732 (1974); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *Cowen v. Sec'y of Ga.*, 22 F.4th 1227, 1233-34 (11th Cir. 2022). As this Court concluded, candidacy is not a fundamental right under the First or Fourteenth Amendment, and there is certainly no constitutionally-protected right to run for office if the candidate does not meet the constitutional requirements for federal office. (*See* Doc. 52 at 41-42 (citing *Clements v. Fashing*, 457 U.S. 957, 963 (1982)). Courts have recognized that restrictions affecting candidates can have a derivative effect on the fundamental right to vote. *See Bullock v. Carter*, 405 U.S. 134, 143 (1972). But still, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460

U.S. at 788. Thus, "the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" *Clements*, 457 U.S. at 963 (quoting *Bullock*, 405 U.S. at 143); *see also Grizzle v. Kemp*, 634 F.3d 1314, 1321 (11th Cir. 2011).

In reviewing challenges to restrictions on candidacy or ballot access under the First and Fourteenth Amendments, courts are to apply the more flexible *Anderson-Burdick* framework, which weighs the "character and magnitude of the asserted injury" against the state's asserted interests. *Anderson v. Celebreeze*, 460 U.S. 780, 789 (1982). The rigorousness of the Court's inquiry "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). When "those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (citations omitted). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).[6]

---

[6] It is not clear whether Greene is asserting a procedural due process claim or a substantive due process claim under the Fourteenth Amendment. But the

Here, this Court has already determined that, at best, Greene can show "that it would be inconvenient for her to have to go through the challenge process established by Georgia law." (Doc. 52 at 53.). In reaching this conclusion, this Court concluded that the burden of proof being placed on Greene in the challenge proceeding was not constitutionally suspect, and nevertheless ALJ Beaudrot had already shifted the burden of proof to the Intervenors. (*Id*. at 42-46). Furthermore, this Court dispatched Greene's argument that the initiation of the challenge proceeding occurred as a result of mere belief and complaint by a private party, and thus in violation of the Due Process Clause of the Fourteenth Amendment, by concluding that Greene's arguments (1) ignored citizens' First Amendment rights to file a complaint, (2) the ALJ's ability to dismiss a frivolous challenge and impose sanctions, and (3) Greene's purported Fourth Amendment standard did not apply because she was not being subjected to arrest or prosecution. (*Id*. at 46-48).

For these reasons, the Court already correctly concluded that the burden imposed by the state challenge process is merely inconvenient. Indeed, at this

---

distinction is not important, as the Eleventh Circuit has held that due process challenges to laws affecting elections should be analyzed under the *Anderson-Burdick* framework. *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).

point, Greene has now gone through the challenge process and has prevailed in defending her qualification. (*See* Docs. 68-1 and 68-2; Exhibit A). To the extent the Challenge Statute imposes any sort of restriction on ballot access, it is a reasonable, nondiscriminatory restriction that imposes a minimal burden on candidates and is more than outweighed by the compelling interest of the state and the voters. "[A] State has an interest, if not a duty to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock*, 405 U.S. at 145; *see also Anderson*, 460 U.S. at 788. The Challenge Statute plainly advances this important state interest, as this Court has already concluded. (*See* Doc. 52 at 55 (stating "Generally speaking, advancing these important State regulatory interests would easily justify any minimal burden on Plaintiff's First and Fourteenth Amendment Rights.")).

## B.    The Challenge Statute does not violate Article I, Section 5.

The Secretary's authority to determine the qualifications of candidates under the Challenge Statute is a legitimate exercise of the state's authority under the Elections Clause of Article I, Section 4. It does not usurp Congress's power to be "Judge of the Elections, Returns and Qualifications of its own Members" under Article I, Section 5. (Doc. 3 ¶¶ 66-71.) Rather, the state and congressional authorities delegated under Sections 4 and 5 of Article I were

intended to work in tandem, as federal courts have long recognized. *See Roudebush v. Hartke*, 405 U.S. 15, 24-26 (1972) (holding that Article 1, Section 4 gives the states the ability to conduct a recount for a U.S. Senate election without usurping the Senates authority to judge the election results under its Article I, Section 5 powers); *see also Cawthorn v. Amalfi et al.*, 35 F.4th 245, 265 (4th Cir. 2022) (Wynn, J., concurring) ("to the extent Congress possesses the power to judge the qualifications of candidates, that power is not exclusive.").

The U.S. Constitution "anticipates that the electoral process is to be largely controlled by the states and reviewed by the legislature." *Hutchinson v. Miller*, 797 F.2d 1279, 1283 (4th Cir. 1986). States have the authority to regulate *candidates* and *elections* for federal office, while Congress retains the authority to regulate its *members* after they are elected. *See id.*; *see also Cawthorn*, 35 F.4th at 262 (Wynn, J., concurring) ("States have typically enjoyed broad powers to regulate candidates pursuant to the Elections Clause[,]" and "[n]othing in the text of [Article I, Section 5, Cl. 1] says anything about 'candidates,' 'prospective Members,' 'would be members,' and the like."); *Roudebush*, 405 U.S. at 24-26; *McIntyre v. Fallahay*, 766 F.2d 1078, 1083 (7th Cir. 1985). Thus, while Congress can decline to seat a candidate who has won election as a U.S. Representative, the states have the constitutional authority

18

to regulate which candidates for U.S. Representative are placed on the ballot and the manner of their election. *Cawthorn*, 35 F.4th at 263 (Wynn, J., concurring) (stating "the framers decision to refer to '*Members'* alone must mean that Congress, by negative implication, lacks exclusive control to judge the qualifications of *non*members, including candidates.") (emphasis in original).

Thus, there is no legal support for Greene's argument that states are prohibited under Article I, Section 5 from requiring candidates for federal office to demonstrate their qualifications for office if a pre-election challenge is raised. State ballot regulations are the only mechanism for determining candidate qualifications before voters cast their ballots. If states were enjoined from disqualifying candidates for federal office prior to an election, then there would be no legal process by which the state could prevent candidates who fail to meet the constitutional requirements for Congress from accessing the ballot. The Qualifications Clause provides that no person may serve as a U.S. Representative unless that person is at least twenty-five years old, has been a citizen of the United States for at least seven years, and be an inhabitant of the state when elected. U.S. CONST. art. I, § 2, cl. 2. The unregulated process urged by Greene would invite the possibility that fraudulent or unqualified candidates such as minors, out-of-state residents, or non-citizens could be

19

elected to Congress—and the state would be powerless to prevent it from happening. "It is hard to believe the State legislatures that ratified the Constitution signed up for such a charade." *Cawthorn*, 35 F.4th at 265 (Wynn, J., concurring).

**C.    The Amnesty Act of 1872 does not create a private cause of action for Greene, and even if it did, it did not make Section 3 of the Fourteenth Amendment a nullity.**

When denying Greene's motions for a preliminary injunction, this Court rightly questioned whether the Amnesty Act of 1872 even created a private right of action, because it does not.  And even if it did, it does not remove all prospective disability from Greene even if she were found to have engaged in insurrection in violation of Section 3 of the Fourteenth Amendment.

> 1.    *The Amnesty Act of 1872 does not create a private right of action for Greene to assert in federal courts*

In determining whether a private right of action exists, the Courts "must first determine whether Congress *intended to create a federal right*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original). And "[f]or a statute to create such private rights, its text must be phrased in terms of the persons benefited." *Id*. at 284; *see also California v. Sierra Club*, 451 U.S. 287, 294 (1981) ("[t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries").

Quite simply, here, even assuming arguendo that the Amnesty Act created a federal right—which it arguably did not since it merely removed a disability to hold public office imposed by Section 3 of the Fourteenth Amendment—it must first be determined whether Greene is in the class of persons being conferred a right by it.  As explained further below, the Amnesty Act of 1872 did not prospectively remove disabilities imposed by Section 3 of the Fourteenth Amendment, and therefore, Greene has no rights conferred to *her* by the Act that she can enforce in federal court. Thus, she does not have the ability to bring a claim under the Amnesty Act of 1872, or one under Section 1983 seeking to enforce that act, because she is not in the class of persons contemplated by it. Therefore, the Amnesty Act of 1872 does not provide Greene a private right of action she can raises in federal court in the first instance.

> 2.    *The Amnesty Act of 1872 did not provide prospective amnesty to future insurrectionists.*

Even assuming Greene could bring an action based on the Amnesty Act of 1872, it did not prospectively remove any disability incurred under Section 3 to all future members of Congress, which this Court has already concluded. (Doc. 52 at 57-64). After the passage of the Fourteenth Amendment, Congress relied on private bills to remove the disabilities imposed by Section 3 on certain

individuals, but Congress soon became overwhelmed by requests for amnesty,

which "led to calls for general section three amnesty legislation." *See* Gerard

N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36

Const. Comment. 87, 131–35 (2021). Accordingly, Congress passed a broad

amnesty act in 1872, *id.*, which provided specifically:

> That all political disabilities imposed by the third section of the
> fourteenth article of amendments of the Constitution of the United
> States are hereby removed from all persons whomever, except
> Senators and Representatives of the thirty-sixth and thirty-
> seventh Congresses, offices in the judicial, military, and naval
> service of the United States, heads of departments, and foreign
> ministers of the United States.

Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).

The plain language of the Amnesty Act of 1872 simply does not support

Greene's contentions that it removed any disability imposed by Section 3 both

retrospectively and prospectively such that it would shield any future member

of Congress who engages in insurrection. The Fourth Circuit recently rejected

the same argument in a nearly identical case brought by Madison Cawthorn,

who was facing the same challenge to his candidacy as Greene. *Cawthorn*, 35

F. 4th at 258-61. Specifically, the Fourth Circuit rejected Cawthorn's argument

that the Amnesty Act of 1872 removed any possible disability imposed by

Section 3 on future insurrectionists by concluding "[t]he most fundamental

problem with Representative Cawthorn's proposed interpretation is that the

Act's operative clause refers to those 'political disabilities *imposed'* in the past tense rather than new disabilities that might arise in the future. The past tense is 'backward-looking'; it refers to things that have already happened, not those yet to come." *Id*. at 258 (emphasis in original). Thus, the Amnesty Act of 1872 "did not prospectively immunize Representative Cawthorn—or anyone else—from Section 3's reach." *Id*. at 261.[7]

There is no reason for this Court to depart from its own and the Fourth Circuit's prior analysis concluding that the Amnesty Act of 1872 does not provide prospective amnesty. The plain language of the 1872 Amnesty Act is quite clear in that it was not removing any disability under Section 3 of the Fourteenth Amendment that was incurred in the future, but rather, only disabilities that had already been incurred previously by Congress's use of past tense participles and verbs. *See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872) ("That all political disabilities *imposed* . . . are hereby *removed*.") (emphasis added); *see also Cawthorn*, 35 F. 4th at 258. And although Congress

---

[7] The Fourth Circuit bolstered its interpretation of the text of the Amnesty Act of 1872 by confirming that the history and context of the Act also confirmed its interpretation that the Amnesty Act of 1872 did not remove disabilities incurred in the future. *Id*. at 259-60. The Fourth Circuit also rejected the argument that Congress's 1898 Amnesty Act supported Cawthorn's reading of the 1872 Amnesty Act, because "Congress's choice of phrasing in 1898 sheds little light on what a different Congress meant in 1872." *Id*. at 260.

has the authority to "remove such disability" imposed by Section 3 of the Fourteenth Amendment, it cannot effectively repeal Section 3 and render it forever inoperative. Thus, the Amnesty Act of 1872 did not grant Greene blanket amnesty for any violation of Section 3 of the Fourteenth Amendment.

## CONCLUSION

For the reasons discussed above, this Court should dismiss Greene's complaint.

Respectfully submitted this 17th day of August, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505

Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580

*/s/ Russell D. Willard*
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, Georgia, 30334
rwillard@law.ga.gov
Telephone: 404-458-3316
Fax: 404-657-9932

*/s/ Charlene McGowan*
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316

24

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
Telephone: 404-458-3658
Fax: 404-651-9325

*/s/ Lee M. Stoy, Jr.*
Lee M. Stoy, Jr.
Assistant Attorney General
Georgia Bar No. 884654
Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, Georgia, 30334
lstoy@law.ga.gov
Telephone: 404-458-3661
Fax: 404-657-9932

*/s/ Elizabeth Vaughan*
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334
evaughan@law.ga.gov
Telephone: 404-458-3549
Fax: 404-657-9932

*Counsel for Defendants Raffensperger and Beaudrot*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Lee M. Stoy, Jr.*